UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, AND ALLSTATE NORTH AMERICAN INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> ROGERS PARK ONE DAY SURGERY CENTER, INC., MOHAMED SIRAJUDEEN A/K/A MOHAMED SIRAJ, NARJISHA THOWFEEK, PETERSON SURGERY CENTER LLC D/B/A ROGERS PARK SURGERY CENTER, MANISH D. PANDYA, D.C., 87TH STREET REHAB CLINIC PLLC, DEEN HEALTH SYSTEM LLC, M & R RUDRA INCORPORATED D/B/A NEW LIFE MEDICAL CENTER, ARMV SHIVA MEDICAL CORPORATION D/B/A ADVANCED MEDICAL CENTER, PAULINA ANESTHESIA, INC., RPAV MANAGEMENT DME INC., AND AMS MEDICAL BILLING CONSULTANTS INC., <br><br> Defendants. | C.A. No.: <br><br><br><br><br><br><br><br> **Demand for Jury Trial** |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate North American Insurance Company (hereinafter collectively referred to as "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink P.C., hereby allege as follows:

-1-

## I. **INTRODUCTION**

1. Mohamed Sirajudeen a/k/a Mohamed Siraj ("Sirajudeen"), and his co-conspirators, Narjisha Thowfeek ("Thowfeek"), Rogers Park One Day Surgery Center, Inc. ("Rogers Park"), Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center ("Peterson Surgery"), Manish D. Pandya D.C. ("Pandya"), 87th Street Rehab Clinic, PLLC, ("87th St. Rehab"), Deen Health System LLC ("Deen Health"), M & R Rudra Incorporated d/b/a New Life Medical Center ("New Life"), ARMV Shiva Medical Corporation d/b/a Advanced Medical Center ("ARMV"), Paulina Anesthesia, Inc. ("Paulina Anesthesia"), AMS Medical Billing Consultants Inc. ("AMS"), and RPAV Management DME Inc. ("RPAV") (hereinafter referred to collectively as the "Defendants"), with the help of others, engaged in a scheme to defraud Allstate by submitting[1] fraudulent records and bills ("False Medical Documentation"), for the rendering of medically unnecessary healthcare services, surgical procedures, anesthesia services, and prescription medication, through the U.S. Mail and/or interstate wires seeking ultimately to collect payment from Allstate.

2. The scheme, illustrated below, was intentionally initiated, promoted, financed, operated and/or maintained by the Defendants.

3. The Defendants are aware that their scheme is unfair and deceptive to payors of healthcare services, such as Allstate.

4. The Defendants' scheme involved intentional fraudulent conduct, including:

  a. Participation in an improper fee-splitting and unlawful patient referral agreement.

---

[1] The Defendants submitted or caused to be submitted to Allstate false medical documentation through the U.S. Mail and/or interstate wires. The phrase "submitted or caused to be submitted" will be shortened to "submitted" throughout.

b. Billing for fraudulent, unlawful, and grossly excessive surgical facility fees for procedures that were purportedly performed at Rogers Park.

c. Billing for fraudulent, unlawful, and grossly excessive anesthesia services purportedly performed at Rogers Park.

d. Billing for fraudulent, unlawful, and medically unnecessary chiropractic/physical therapy services purportedly performed at New Life, 87th St. Rehab, Deen Health, and Rogers Park.

e. Billing for fraudulent, and unlawful COVID personal protective equipment and services fees; and

f. Billing for fraudulent, and unnecessary transportation services fees.

g. Billing for fraudulent, unlawful, medically unnecessary durable medical equipment ("DME") which were distributed without the requisite license.

5. The Defendants targeted the insurance benefits available to motor vehicle accident victims (also referred to herein as "Allstate claimants") to ensure a steady stream of revenue to support their fraudulent scheme.

6. The Defendants abused the insurance coverage available to Allstate claimants by billing for healthcare services that the Defendants had no legal right to collect.[2]

7. The Defendants intentionally siphoned payments from the proceeds of the insurance monies paid by Allstate to resolve the claimants' medical expenses and bodily-injury claims.

8. The insurance fraud scheme perpetrated by the Defendants was designed to, and did in fact, result in payments from Allstate to and for the benefit of the Defendants.

---

[2] The term "healthcare services" shall mean medical, chiropractic, surgical procedures, anesthesia services, and the sale of DME, and related services.

9.     The Defendants' conduct constitutes an intentional violation of Illinois laws, regulations, and the doctrines regarding clinic/surgery center ownership, patient referrals and medical decision-making, and DME distribution.

10.     The Defendants caused False Medical Documentation to be created.

11.     The Defendants caused False Medical Documentation to be mailed to Allstate claimants and/or their personal injury attorneys who, in turn, mailed the documents to Allstate in support of the Allstate claimants' medical expense and bodily-injury claims.

12.     For the reasons set out below, every record, bill and lien submitted through the U.S. Mail and/or interstate wires by Rogers Park, Paulina Anesthesia, and Deen Health (hereinafter referred to collectively as the "Sirajudeen healthcare businesses") contained omissions and material misrepresentations concerning the nature of the medical services purportedly performed and/or administered therein.

13.     For the reasons set out below, every record, bill and lien submitted through the U.S. Mail and/or interstate wires by 87th St. Rehab, New Life, and RPAV (hereinafter referred to collectively as the "Pandya healthcare businesses") contained omissions and material misrepresentations concerning the nature of the medical services purportedly performed/administered therein.

14.     Every fraudulent medical record and billing statement in dispute—as set forth in the affixed exhibits—was systematically created, generated, and finalized by AMS. Acting as the administrative engine for the entire scheme, AMS designed and produced these deceptive documents specifically for and on behalf of the Sirajudeen healthcare businesses and the Pandya healthcare businesses.

15.     The Defendants knew that Allstate would rely on the representations made in the Defendants' records and bills when determining whether to pay medical expenses and bodily-injury claims.

16.     Allstate justifiably and detrimentally relied upon the Defendants' False Medical Documentation in evaluating insurance claims.

17.     In all cases, Allstate reasonably relied upon the Defendants' misrepresentations and omissions of material fact concerning (1) illegal ownership of the Sirajudeen healthcare businesses; (2) unlawful referrals by all Defendants; (3) fraudulent ambulatory surgery center fees; (4) fraudulent anesthesia fees; (5) billing for medically unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; (6) the fraudulent practice of unbundling medical services to inflate reimbursement; and (7) billing for services that were not performed as represented.

18.     The Defendants secured payment for their services by asserting healthcare liens under the Illinois Health Care Services Lien Act, 770 ILCS 23/10, which purportedly gave the Defendants the right to be paid from settlements, judgments, or awards obtained by the Allstate claimants.

19.     Allstate made payments to the Defendants, and Allstate was also caused to make payments in connection with bodily-injury claims presented by the Allstate claimants, which collectively total more than $1,687,372.71.

20.     Allstate made payments on these claims in direct reliance on the False Medical Documentation created by the Defendants.

21. Had Allstate known about the Defendants' fraudulent scheme, Allstate would not have issued payments for the services purportedly rendered or medications purportedly dispensed.

22. By its pleading, Allstate brings this action against the Defendants seeking damages for violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962, and under Illinois state laws, including (a) common law fraud and (b) unjust enrichment.

23. Allstate also seeks an order declaring that Allstate has no obligation to pay the Defendant Medical Companies[3] for any of the fees and/or costs at issue in this Complaint, including fees and/or costs submitted by the Defendant Medical Companies.

24. Allstate also seeks an award of (a) treble damages as authorized by law, (b) statutory interest, (c) costs, and (d) attorneys' fees.

## II. THE PARTIES

### A. PLAINTIFFS

25. Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate North American Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

26. Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate North American Insurance Company have their respective principal places of business in Northbrook, Illinois.

---

[3] The term "Defendant Medical Companies" shall refer to 87th St. Rehab, Deen Health, New Life, Paulina Anesthesia, RPAV and Rogers Park.

27. At all times relevant to the allegations contained in this Complaint, the Plaintiffs were authorized to conduct business in the State of Illinois.

**B.     DEFENDANTS**

**1.     Mohamed Sirajudeen a/k/a Mohamed Siraj**

28. Sirajudeen is a resident and citizen of the State of Illinois.

29. Sirajudeen has used the alias "Mohamed Siraj."

30. Sirajudeen has been the chief architect of the widespread fraudulent scheme described herein. He created and managed this scheme, along with Thowfeek and Pandya (collectively, these three Defendants are herein referred to as the "Individual Defendants"), through an expansive network of affiliated entities. This network included the Sirajudeen healthcare businesses and the Pandya healthcare businesses.

31. On or about June 12, 2025, a federal grand jury indicted Sirajudeen (and others) in *United States v. Anosh Ahmed*, No. 1:25-CR-00321 (N.D. Ill.), for his role in a wide-ranging, sophisticated fraudulent scheme targeting the United States government.

32. The scheme against the government involved the systematic submission of false claims for COVID-19 testing that was never performed, the use of stolen personal information, and the preparation of fabricated documentation, resulting in over $293,000,000.00 in payments from federal funds.

33. The government has alleged that Sirajudeen was central to the government scheme by facilitating the financial transactions to proceed and remain concealed, including:

- Allowing the use of his company, Chicago Polyclinic, to open bank accounts structured to appear as legitimate internal accounts;

- Directing and agreeing to direct fraud proceeds through these accounts to create the false impression of ordinary business operations;

- Actively participating in creating fake and backdated invoices, specifically by having his controlled companies (O'Hare Clinical Lab Services and Chicago Polyclinic) pay co-conspirators for services never provided; and

- Engaging in active efforts to obstruct a government audit by fabricating supporting documentation (false bills).

34.     Sirajudeen has engaged in the same or similar pattern of fraudulent conduct against Allstate by submitting false or fabricated claims and/or documentation to obtain payments to which he (and his healthcare businesses) were not entitled.

35.     The actions taken by Sirajudeen in the government scheme—which involved sophisticated money movement, the creation of fake documents, and obstruction of justice—demonstrate a clear and established intent to deceive and defraud when conducting financial and business transactions, which intent was carried forward in his scheme to defraud Allstate.

36.     Just as Sirajudeen used the legitimate appearance of Chicago Polyclinic to conceal fraudulent proceeds from the government, Sirajudeen utilized his medical companies, Deen Health, Rogers Park, and Paulina Anesthesia to submit claims to Allstate, falsely representing them as legitimate and compensable healthcare services. The foregoing demonstrates Sirajudeen's motive, intent, and common plan/scheme to falsely bill Allstate for bogus healthcare services.

37.     The submission of claims to Allstate involved the creation of false documentation, including invoices, medical records, or claims forms, to justify payments for services that were either medically unnecessary, not rendered as represented, or otherwise non-compensable, directly mirroring his creation of "false bills" in the government scheme.

38. On information and belief, Sirajudeen provided the necessary business and financial infrastructure, as he did for the government fraud, to ensure the proceeds from the Allstate fraud could be laundered and concealed, specifically through the use of corporate bank accounts and inter-company transfers to give the false impression of legitimate transactions.

39. Sirajudeen's repeated acts of submitting false claims, and using the mails for fraudulent schemes constitute a pattern of racketeering activity.

40. Defendant Sirajudeen's indictment includes a specific charge for money laundering (Count 23), demonstrating his ability, willingness, and intent to move and conceal illegal proceeds.

41. Sirajudeen's transfers of the luxury condominium units (401 North Wabash Ave., Units 43A and 43B) to a special trust for Thowfeek in late 2024, followed by the securing of substantial mortgages in May 2025, were done in contemplation of indictment (June 2025), this lawsuit, and potential forfeiture, and served as a vehicle to defraud creditors, including Plaintiff Allstate, by placing the assets beyond the reach of potential judgments.

42. The timing and execution of these transfers and subsequent mortgages, allegedly used to fund Sirajudeen's $5,000,000.00 bond and the construction of the Peterson Surgery center, evidence a continued effort by Sirajudeen and his associates to utilize and protect the proceeds of their ongoing fraudulent schemes and hinder recovery by those they defrauded.

### 2. **Narjisha Thowfeek**

43. Thowfeek is a resident and citizen of the State of Illinois.

44. Thowfeek is the wife of Sirajudeen.

45. Thowfeek is a licensed practical nurse (LPN) in Illinois, holding license number 43121995.

46. A licensed practical nurse does not possess the qualifications under Illinois law to own or control a medical practice, including a chiropractic clinic. 225 ILCS 60/2, 60/3.

47. Thowfeek has worked as an LPN at Rogers Park, as recently as 2023.

48. Since 2024, Thowfeek has owned Rogers Park through the corporation, Peterson Surgery.

### 3. Rogers Park One Day Surgery Center, Inc.

49. Rogers Park is a corporation organized under the laws of the State of Illinois in 1997.

50. Rogers Park is an ambulatory surgical center ("ASC").

51. Rogers Park's principal place of business is currently at 7616 N. Paulina St., Chicago, IL 60626.

52. At all times relevant, Rogers Park has been controlled and illegally operated by laypersons who lack medical licenses, in direct violation of the Illinois Corporate Practice of Medicine Doctrine ("CPOM").

53. Rogers Park fraudulently billed Allstate and Allstate claimants for improper and medically unnecessary surgery center fees.

54. Rogers Park fraudulently billed Allstate and Allstate claimants for anesthesia services purportedly administered to Allstate claimants while undergoing injection procedures performed at Rogers Park.

55. Rogers Park fraudulently billed Allstate and Allstate claimants for chiropractic services and physical therapy services purportedly administered to Allstate claimants at Rogers Park.

56. Rogers Park was previously owned by Raghuveer Nayak ("Nayak").

57. As evidence of the historical pattern of racketeering at Rogers Park, a federal fraud case was brought against Nayak in 2012 (*United States v. Raghuveer Nayak*, No. 12-CR-00447, N.D. Ill. 2012). Nayak pleaded guilty to one count of mail fraud, and admitted to a scheme spanning nearly a decade where he paid bribes and kickbacks (often in cash) to physicians in exchange for patient referrals to Rogers Park, and other surgery centers. He also admitted to concealing these payments by falsely claiming them as advertising expenses on his tax returns, impeding the IRS.

58. In February 2014, Nayak was sentenced to two years in federal prison, was required to pay a $500,000 fine, and an additional $23,000 in punitive damages to the IRS.

59. In 2017, Sirajudeen purportedly purchased Rogers Park for approximately $4,200,000.00.

60. In 2017, Sirajudeen submitted an application to the Illinois Health Facilities and Services Review Board ("HFSRB") to transfer the operational permit for Rogers Park to himself. The HFSRB subsequently approved the transfer.

61. Based on Allstate's investigation, Sirajudeen and Thowfeek continued to operate a scheme to pay illegal kickbacks (either in cash or in kind) to medical providers for patient referrals to Rogers Park.

62. On October 3, 2022, the Nayak Family, LLC sold 7616 N. Paulina Street, Chicago, IL 60626 (Rogers Park's current location) to Thowfeek for $1,500,000.00.

63. On or around March 15, 2024, Sirajudeen and his wife, Thowfeek, submitted three applications concurrently to the Illinois HFSRB regarding Rogers Park, including:

a. Application No. E-011-24, which sought to transfer ownership of Rogers Park from Sirajudeen to Peterson Surgery, thereby making Thowfeek, as the sole owner of Peterson Surgery, the new proprietor.

b. Application No. 24-009 requested permission to establish a new ASC, Peterson Surgery, at a different location, with plans to transfer Rogers Park's personnel and equipment to the new site.

c. Application No. 24-010 requested that the HFSRB discontinue Rogers Park One Day Surgery Center once the new Peterson Surgery facility is operational.

64. In Application E-011-24, Sirajudeen represented that the ownership transfer to Thowfeek was for estate planning. This transfer was intended to make Peterson Surgery the new owner and operator through the transfer of Rogers Park's assets.

65. The ownership change sought in Application E-011-24 was necessary to align the ownership of Rogers Park prior to its planned relocation. Sirajudeen represented that no monetary exchange occurred between the parties, as the transfer was between spouses.

66. The HFSRB approved Application E-011-24 in or around August 2024. Following this approval, the ownership of Rogers Park was officially transferred to Peterson Surgery (and thus, to Thowfeek as the sole owner).

67. Although Applications 24-009 and 24-010 were submitted separately due to the complexity of relocating Rogers Park, they collectively formed a single, unified plan to transfer and rename Rogers Park to Peterson Surgery.

68. Application 24-009 was submitted by Thowfeek, as owner of Peterson Surgery, to secure approval for the new location at 2300 W Peterson Avenue, Chicago, IL 60659.

69. Application 24-010 sought to discontinue Rogers Park, citing, among other reasons, that it was unable to obtain proper credentials for Medicaid/Medicare participation.

70.     On or around October 31, 2024, the HFSRB approved the discontinuation of Rogers Park, under application 24-010.

71.     On or around October 31, 2024, the HFSRB Application 24-009 was, however, conditionally approved contingent upon the new ASC location on W Peterson Avenue being completed and conforming to all HFSRB requirements.

72.     The discontinuation of Rogers Park is pending the completion of the new facility, which has not yet occurred.

73.     The new ASC, which will be operating under the name Peterson Surgery, is expected to begin operations in 2026.

74.     However, the opening of this new facility does not negate the concerning past operational and billing practices of the predecessor entity, Rogers Park Surgery Center. Prior to the August 2024 sale and subsequent establishment of Peterson Surgery, Rogers Park operated in a manner that allegedly resulted in numerous unlawful and excessive billings to Allstate claimants, as detailed herein.

75.     Since August of 2024, Thowfeek, through Peterson Surgery, has acted as the primary officer, assuming control of the assets and accounts formerly associated with the Rogers Park entity.

76.     As set out below, Rogers Park (a) billed for services that were provided in violation of Illinois law, (b) billed pursuant to an unlawful referral agreements, and (c) billed for surgical facility, anesthesia, and chiropractic/physical therapy services that were unlawful, medically unnecessary, and grossly excessive.

77. Due to his exclusive ownership and control over Rogers Park until August 2024, Sirajudeen is responsible for the unlawful, medically unnecessary, and unreasonably charged fees billed for by Rogers Park in connection with Allstate claimants.

78. Since August 2024, after the change in ownership, Rogers Park has been exclusively controlled by Thowfeek through her entity, Peterson Surgery. In this capacity, Thowfeek is responsible for the ongoing unlawful practices of Rogers Park, including the creation and maintenance of false and fabricated medical records used to support the continued billing of the medically unnecessary and grossly excessive services detailed herein.

### 4. Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center

79. Peterson Surgery was formed on January 26, 2024.

80. Thowfeek is the sole owner of Peterson Surgery.

81. Since August of 2024, Peterson Surgery has had ownership and control over Rogers Park.

82. The current listed address for Peterson Surgery is 7616 N. Paulina Street, Chicago, IL 60626, the same location as Rogers Park.

83. Peterson Surgery became the legal owner of Rogers Park in or around August 2024, following the approval of HFSRB application E-011-24.

84. On November 18, 2024, Peterson Surgery assumed the name of Rogers Park Surgery Center.

85. HFSRB Application 24-009, which seeks approval to relocate the Rogers Park to 2300 W. Peterson Ave., Chicago, IL 60659, is still pending, as the new location is currently under construction.

86.     Once construction is completed, all equipment and personnel from the current location (Rogers Park) will be transferred to the new site.

### 5.     Paulina Anesthesia, Inc.

87.     Paulina Anesthesia was established in 2000.

88.     Sirajudeen purchased Paulina Anesthesia from Nayak when he purchased Rogers Park.

89.     Paulina Anesthesia's principal place of business, like Rogers Park, is at 7616 N. Paulina Street, Chicago, IL 60626.

90.     Paulina Anesthesia does business under the name Paulina Anesthesia Association.

91.     Paulina Anesthesia is an entity exclusively owned and controlled by Sirajudeen that provides and bills for all anesthesia services rendered to Allstate claimants and other patients undergoing surgical and injection procedures at Rogers Park.

92.     Due to his exclusive ownership and absolute control over Paulina Anesthesia, Sirajudeen is directly responsible for all actions and billings associated with the company, including the provision of unlawful, medically unnecessary, fraudulent, and grossly excessive anesthesia services billed to Allstate Claimants for procedures purportedly rendered at Rogers Park.

### 6.     Deen Health System LLC

93.     Deen Health was a chiropractic services provider founded in 2018, with its principal place of business located at 4909 W Division Street, 101, Chicago Illinois, 60605.

94.     Sirajudeen was the sole owner and controller of Deen Health from its formation until its involuntary dissolution on July 14, 2023.

95. Deen Health provided chiropractic services to Allstate claimants.

96. At all times relevant, Deen Health has been controlled and illegally operated by laypersons who lack medical licenses, in direct violation of the Illinois Corporate Practice of Medicine Doctrine ("CPOM").

97. Due to his exclusive ownership and control of the entity, Sirajudeen is directly responsible for the unlawful, medically unnecessary, fraudulent, and excessively charged chiropractic services billed by Deen Health in connection with Allstate Claimants.

### 7.     **Manish D. Pandya, D.C.**

98. Pandya is a resident and citizen of the State of Illinois.

99. Pandya is a licensed Illinois chiropractor, possessing license number 038009513.

100. Pandya controls and partly owns 87th St. Rehab and controls and solely owns New Life. He serves as the clinic director for both entities.

101. Pandya also controls and owns RPAV.

102. Due to his ownership, control, and role as clinic director of both 87th St. Rehab and New Life, Dr. Pandya is responsible for all actions, practices, and billings of these entities, including the unlawful, medically unnecessary, or fraudulent services provided to Allstate Claimants.

### 8.     **M & R Rudra Incorporated d/b/a New Life Medical Center**

103. New Life is a chiropractic clinic, incorporated in Illinois in 2007. New Life has a principal address of 4735 Lilac Avenue Glenview, Illinois 60025.

104. New Life operates multiple locations throughout the Greater Chicagoland area.

105. New Life is owned, operated, and controlled by Dr. Pandya.

106. Pandya is the President, Director, and Secretary of New Life.

107. Pandya seldomly treats patients at New Life. Instead he hires various chiropractors to render medically unnecessary services at New Life locations.

108. Pandya is the clinical director of New Life and is responsible for all billing submitted to Allstate on behalf of Allstate claimants.

109. Providers at New Life have treated and continue to treat Allstate claimants.

110. As set out below, New Life chiropractors (a) billed pursuant to an unlawful referral agreement wherein they referred Allstate claimants to other medical businesses that would in turn refer patients directly to New Life; (b) billed for services that were not provided as represented; and (c) billed for services that were not provided at all.

111. Due to his ownership and/or control of New Life, Pandya is responsible for the unlawful, medically unnecessary, and unreasonably charged fees billed to Allstate by New Life in connection with Allstate claimants.

### 9. ARMV Shiva Medical Corporation d/b/a Advanced Medical Center

112. On or about January 24, 2025, Defendant Pandya, incorporated ARMV, identifying himself as the sole President, Secretary, and Director.

113. On or about November 25, 2025, Pandya submitted paperwork to the Illinois Secretary of State for ARMV to assume the name "Advanced Medical Center."

114. In or around May 2025, New Life publicly signaled the transition by announcing a "rebranding" on its Facebook page, which featured the logo for Advanced Medical Center.

115. Advanced Medical Center serves as a mere continuation of New Life, providing the same chiropractic services and submitting bills to Allstate in the same fashion as New Life, utilizing the same providers and the same chiropractic modalities.

116. The only material change in the claims submitted to Allstate is the name of the billing entity; the underlying clinical and administrative operations remain identical to the practices previously employed by New Life.

117. As with New Life, Pandya is carbon-copied on all initial chiropractic reports as the "Clinical Director." Upon information and belief, Pandya exercises total dominion and control over every aspect of a patient's treatment plan, including all referrals and clinical paperwork drafted by staff chiropractors.

118. Although staff chiropractors draft referrals for pain management and/or durable medical equipment, Pandya directs where these referrals are sent and determines which entities provide the services.

119. This pattern of control extends to 87th St. Rehab, which continues to bill under its own name but operates under Pandya's direction. Pandya is copied on all evaluation reports for 87th St. Rehab and, upon information and belief, controls all aspects of its treatment and referral protocols (e.g., Allstate Claim No. 0804321289).

120. Separately, Pandya uses ARMV as a purported independent medical entity to bill for pain management encounters at 312 N. May St., Ste 110, Chicago, IL—the business location of Metropolitan Institute of Pain ("MPI").

121.    The pain management services for ARMV are provided by Dr. Akash Jindal, who is simultaneously a medical provider for MPI; notably, clinical paperwork for ARMV often retains the MPI header, further evidencing the lack of corporate separation.

122.    ARMV, Advanced Medical Center, and 87th St. Rehab operate a closed-loop referral scheme wherein claimants are referred to ARMV for pain management and are eventually, and inevitably, referred for invasive injection procedures.

123.    These injection procedures are systematically performed at Rogers Park / Peterson Surgery, with anesthesia services provided by Paulina Anesthesia, regardless of individual medical necessity or the specific clinical requirements of the claimant.

### 10.    87th Street Rehab Clinic PLLC

124.    87th Street Rehab is a chiropractic clinic that was incorporated in Illinois in 2019.

125.    87th Street Rehab has a principal address of 4735 Lilac Avenue Glenview, Illinois, 60025.

126.    87th St. Rehab conducts services at 1701 E. 87th Street, Chicago, Illinois, 60017.

127.    87th St. Rehab is owned, operated, and controlled by Pandya and Reema Pandya.

128.    Pandya does not directly treat patients at 87th St. Rehab, instead he uses various chiropractors to render medical services at the 87th St. Rehab location, mainly Aldrin Carrion, D.C.

129.    Pandya is the clinical director of 87th St. Rehab and is responsible for all billing submitted to Allstate on behalf of Allstate claimants.

130.    As set out below, 87th St. Rehab chiropractors (a) billed pursuant to an unlawful referral agreement wherein they referred Allstate claimants to other medical businesses that would

in turn refer patients directly to 87th St. Rehab; (b) billed for services that were not provided as represented; and (c) billed for services that were not provided at all.

131. Due to his ownership and/or control of 87th St. Rehab, Pandya is responsible for the unlawful, medically unnecessary, and unreasonably charged fees billed to Allstate by 87th St. Rehab in connection with Allstate claimants.

### 11. RPAV Management DME Inc.

132. RPAV Management DME Inc. ("RPAV") is an Illinois corporation organized and existing under the laws of the State of Illinois.

133. RPAV was formed in November 2024 by Pandya.

134. At all times relevant hereto, Pandya has served as the President, Secretary, and Director of RPAV.

135. RPAV's principal place of business is located at 4735 Lilac Avenue, Glenview, IL 60025, which, upon information and belief, is a residential location.

136. RPAV is a DME distribution business that lacks a bona fide physical storefront or warehouse where equipment is dispensed or stored.

137. Instead, RPAV functions as a captive billing conduit for New Life, utilizing New Life's clinical locations to distribute DME.

138. Upon information and belief, Pandya and/or RPAV entered into an unlawful referral arrangement with New Life providers to ensure a guaranteed stream of DME prescriptions regardless of medical necessity.

139. The DME supplies at issue were allegedly provided to Allstate claimants at New Life locations only when those claimants had a concurrent encounter with a New Life provider.

140. These referrals were not based on individualized clinical assessments; rather, they were part of a predetermined referral scheme designed to self-generate profit for Pandya and his affiliated entities.

141. RPAV is not licensed in the State of Illinois to conduct business as a Durable Medical Equipment or Home Medical Equipment provider, rendering any charges resulting from these referrals unlawful.

142. Pandya owns, operates, and controls RPAV; as such, Pandya is responsible for the systematic solicitation and processing of these improper referrals. Moreover, Pandya is directly responsible for fraudulent bills submitted to Allstate claimants.

143. As set forth below, RPAV billed for DME that was: (a) the product of an unlawful self-referral or kickback scheme; (b) medically unnecessary and provided automatically pursuant to a pre-arranged agreement; (c) dispensed by an unlicensed entity; and (d) billed at grossly excessive rates.

### 12. AMS Medical Billing Consultants Inc.

144. AMS is an Illinois corporation formed in 1994, with its principal place of business located at 120 Parkview Drive, Wauconda, IL 60084.

145. At all times relevant, Mary Soto ("Soto") served as the sole owner, officer, and primary managing agent of AMS. All actions taken by AMS as described herein were performed by, or at the direction of, Soto in the course and scope of her role at AMS.

146. AMS did not merely provide administrative services; instead, it worked in concert and entered into a conspiratorial agreement with the Defendant Medical Companies and the

Individual Defendants to knowingly design, generate, and submit false medical records and fraudulent billing statements to Allstate.

147. Based on information provided by Allstate claimants and documentation submitted by the Defendants, AMS actively directed the fabrication of clinical data. AMS provided the fraudulent "templates" and standardized coding protocols that ensured Defendant Medical Companies' records were "upcoded," "unbundled," or manipulated to reflect products and services that were not medically unnecessary, rendered as represented, or rendered at all.

148. AMS was responsible for:

- Dictating the specific fraudulent charges to be applied to Allstate claimants;

- Synthesizing billing entries for services that lacked medical necessity or were not provided as represented or provided at all.

- Directing the collection and distribution of these illicit proceeds.

149. Because AMS provided the essential infrastructure and deceptive coding required to execute the scheme across multiple locations, AMS is jointly and severally liable for the damages resulting from the unlawful and unreasonably charged distribution of medications and services billed to Allstate.

150. AMS is therefore responsible for the unlawful, medically unnecessary, and fraudulent billing practices performed on behalf of the other Defendants in this matter.

## III. **JURISDICTION AND VENUE**

151. Jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

152. Supplemental jurisdiction over the Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1967.

153. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the majority of the acts at issue in this Complaint were carried out within the Northern District of Illinois.

154. The claims asserted against RPAV arise from the same common nucleus of operative facts as the federal claims asserted against the other Defendants herein. Specifically, RPAV participated in the same overarching scheme to submit fraudulent billing for medically unnecessary services and supplies, utilized the same New Life Medical clinical locations, and was orchestrated by the same central figure, Dr. Pandya, such that the claims are inextricably intertwined.

155. Consequently, this Court has supplemental jurisdiction over the claims against RPAV pursuant to 28 U.S.C. § 1367(a). Even in the absence of a federal RICO count specifically naming RPAV, the factual nexus regarding the unlawful referral arrangement, the lack of medical necessity, and the fraudulent billing practices at the shared New Life Medical facilities renders the adjudication of all claims in a single proceeding both efficient and necessary for the administration of justice.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL ALLEGATIONS

### A. IMPACT OF THE DEFENDANTS' SCHEME TO DEFRAUD ON ALLSTATE

156. Allstate insures motor vehicles in the State of Illinois.

157. Providers of healthcare services can bill Allstate directly under applicable policies of insurance.

158. Providers of healthcare services routinely submit bills and in some cases liens to Allstate in connection with bodily-injury claims made by Allstate claimants.

159. The Defendants sought to bolster the appearance of injury to Allstate claimants by routinely prescribing clinically unwarranted (a) courses of physical therapy and chiropractic treatment, (b) pain management consultations, (c) surgical injections and other pain management procedures, and (d) anesthesia services as part of surgical injection procedures, regardless of their ages, injury histories, and comorbidities.

160. The Defendants fraudulently billed Allstate claimants for treatment and services pursuant to a predetermined treatment protocol regardless of their individual medical needs.

161. The Defendants fraudulently billed Allstate claimants for healthcare services when the Defendants falsely represented to Allstate that the healthcare services were medically necessary and prescribed by independent healthcare professionals hired and retained directly by the Allstate claimants.

162. The Defendants fraudulently billed Allstate claimants for the healthcare products and services when the Defendants falsely represented to Allstate that the healthcare products and services were rendered, administered, and/or distributed to Allstate claimants pursuant to Illinois law.

163. The Defendants fraudulently billed Allstate claimants for healthcare services, which were not rendered as represented in the records and bills.

164. In reasonable reliance on the Defendants' omissions and material representations, Allstate issued payments to or for the benefit of the Defendants.

B.    STRUCTURE OF THE DEFENDANTS' SCHEME TO DEFRAUD

165.    The scheme described in this Complaint was driven by the provision of unauthorized, unnecessary, and fraudulent medical services purportedly rendered, administered, and/or distributed to Allstate claimants in the State of Illinois.

166.    The Individual Defendants perpetrated their scheme by giving the appearance that their healthcare businesses were legitimate companies in the business of facilitating and/or providing healthcare services.

167.    With the intent to conceal their illicit activities, the Defendants falsely portrayed the Sirajudeen healthcare businesses, and the Pandya healthcare businesses as legitimate, and operated an illegal self-referral scheme resulting in kickbacks and overutilization of medical services.

168.    The Defendants' conduct, as described herein, constitutes an intentional violation of Illinois law regarding qualifications for the administration of services, kickback payments, unlawful medical referrals, and the submitting of false medical documentation.

169.    To achieve their goal, the Defendants regularly submitted bills to Allstate seeking payment for treatments and services that were: (1) medically unnecessary; (2) unreasonable; and (3) not rendered as represented to the patients, including Allstate claimants. As a direct and proximate result of the conduct described herein, the Defendants rendered and/or facilitated the rendering of services, and procedures to patients that were medically unnecessary. These services were not based on legitimate medical need or sound clinical judgment but were a function of improper and unlawful referrals.

170. Unless otherwise pled to the contrary, all documents, notes, reports, health invoices, medical diagnoses, Current Procedural Terminology ("CPT"), code tally sheets, referrals, liens, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail and/or interstate wires

171. The Sirajudeen healthcare businesses and others participated in a scheme that was devised to exploit the medical expense and bodily-injury coverages available to their customers by billing for (1) unlawful referrals; (2) healthcare services performed in violation of the prohibition of the corporate practice of medicine; (3) treatment not rendered; (4) unnecessary healthcare services and DME provided pursuant to a predetermined treatment protocol; and (5) at duplicative and grossly excessive rates.

172. As set out below, the Defendants unlawfully billed for healthcare services in connection with Allstate claimants.

### 1. Defendants' Unlawful Ownership and/or Control of Sirajudeen Healthcare Businesses

173. Under Illinois law, lay ownership and control is prohibited, as codified in the Illinois Medical Practice Act, 225 ILCS 60 et seq.

174. The prohibition stems from public policy concerns with "the dangers of lay control over professional judgment, the division of the physician's loyalty between his patient and his profitmaking employer, and the commercialization of the profession." *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 227 Ill. Dec. 769, 688 N.E.2d I 06 (Ill. 1997).

175. The practice of medicine is reserved exclusively for licensed individuals under the Medical Practice Act. 225 ILCS 60/3.

176. Additionally, the Illinois Limited Liability Company Act provides that any limited liability company organized to engage in the practice of medicine must be organized by a licensed physician. 805 ILCS 180/5-1.

177. The Illinois Medical Corporation Act also mandates that all officers, directors, and shareholders of a medical corporation be individuals licensed to practice medicine in Illinois. 805 ILCS 15/13.

178. In addition, the Medical Practice Act prohibits physicians and chiropractors from dividing, sharing, or splitting any professional fee or other form of compensation for professional services with anyone in exchange for a referral or otherwise, other than as provided in Section 22.2 of the Practice Act. 225 ILCS 60/22.2.

179. The Defendants—Sirajudeen, Thowfeek, Rogers Park, Peterson Surgery, Paulina Anesthesia, and Deen Health—have violated the Corporate Practice of Medicine (CPOM) doctrine by allowing non-licensed individuals (Sirajudeen and Thowfeek), and a corporation (Peterson Surgery) to own, operate, and control business entities that employ or contract with licensed healthcare providers to deliver medical services in Illinois.

180. Sirajudeen and Thowfeek (through Peterson Surgery), owned and operated a network of healthcare facilities in Illinois, including a chiropractic clinic (Deen Health), an ASC (Rogers Park), and an anesthesia business (Paulina Anesthesia) in violation of Illinois law, with their involvement extending beyond mere administration.

181. Neither Sirajudeen nor Thowfeek are licensed chiropractors or physicians. Nonetheless, they have consistently maintained key leadership positions across the Sirajudeen healthcare businesses.

182. By engaging in the unlawful conduct described herein, the proposed Defendants have violated the Medical Practice Act of 1987, 225 ILCS 60/22, by practicing medicine without a valid license and/or aiding and abetting the unlawful practice of medicine.

183. Sirajudeen and Thowfeek are prohibited from owning and operating these healthcare businesses under the Corporate Practice of Medicine (CPOM) Doctrine. The CPOM Doctrine bars business entities from practicing medicine or hiring licensed professionals, such as chiropractors or physicians, to provide services to patients (including Allstate claimants), as it exists to protect the doctor-patient relationship and prevent laypersons from controlling medical decisions.

184. The Defendants' operation of these healthcare businesses in violation of the CPOM doctrine is not a mere technical violation; it has direct and tangible financial consequences. Because Sirajudeen and Thowfeek are prohibited from controlling or operating medical facilities, their involvement renders the facilities' claimed services and subsequent billings inherently unlawful and fraudulent.

185. Sirajudeen, Thowfeek, and Peterson Surgery committed fraud by submitting medical records and bills for payment through Deen Health, Rogers Park, and Paulina Anesthesia, falsely certifying that the services were rendered in full compliance with all applicable Illinois laws, including the Corporate Practice of Medicine Doctrine and the Medical Practice Act.

186. The purpose of submitting the documents identified in the preceding paragraph was to obtain payment for treatment that was otherwise not compensable due to the underlying violations of Illinois law.

187. Had Allstate known that the services purportedly rendered at Deen Health, Rogers Park, and by Paulina Anesthesia were performed in violation of CPOM and other Illinois statutes, Allstate would not have issued payment for those services, resulting in damages to Allstate.

a.     <u>Layperson Ownership and/or Control of Deen Health</u>

188. Deen Health operated in a manner that violated Illinois's prohibition against CPOM.

189. Deen Health, a corporation owned and directed by Sirajudeen (who is implicitly a layperson, lacking a medical or chiropractic license), engaged in the illegal practice of chiropractic.

190. Since a corporation cannot hold a medical or chiropractic license, Deen Health's corporate structure and provision of regulated services (including chiropractic diagnosis, treatment, and referrals) constitutes a direct violation of the relevant CPOM doctrine and the Medical Practice Act.

191. Sirajudeen had authority and responsibility for hiring and terminating employees and/or independent contractors of Deen Health.

192. Moreover, Sirajudeen and Deen Health exerted unlawful control and direction over the professional medical practice of licensed chiropractors, such as Dr. Leon Wleklinski ("Dr. Wleklinski"). This control extended beyond permissible administrative, logistical, or billing assistance.

193. Dr. Wleklinski diagnosed and treated Allstate claimants for Deen Health.

194. Dr. Wleklinski provided physical therapy services to Allstate claimants at Deen Health.

195.   On behalf of Deen Health, Dr. Wleklinski issued referrals for additional medical services, to include referrals for medical imaging and referrals for pain management.

196.   In connection with the services provided at Deen Health, Deen Health submitted Health Insurance Claim Forms (HICFs) to Allstate, listing Dr. Wleklinski, among others, as the rendering provider.

197.   On July 21, 2021, Dr. Wleklinski testified as the chiropractic provider at Deen Health, for Allstate claimant, O.A. (Claim No. 521475830).

198.   In that deposition, Dr. Wleklinski confirmed that Sirajudeen was the owner of Deen Health.

199.   A true and accurate excerpt from that deposition is depicted below:

> Q.  Who owns Deen Health Systems?
> A.  Who owns it?
> Q.  Yes.
> A.  It's a gentleman by the name of -- oh, my gosh. He's Eastern European. I can't remember his last name. It begins with an S. Sorry, I don't know his last name. I just call him Mohammad.
> Q.  Is he a doctor?
> A.  No.
> Q.  Does he have any sort of medical specialty?
> A.  No, not that I know of.

200.   Dr. Wleklinski also confirmed that Deen Health, under Sirajudeen's direction, participated in a predetermined treatment protocol that involved, among other things, the ordering

of diagnostic testing for patients (Allstate claimants), which employed chiropractors were expected to follow without independent medical consideration.

201. The unlawful control exerted by Deen Health and Sirajudeen over Dr. Wleklinski's practice is demonstrated by the September 4, 2019, referral for a cervical MRI for claimant O.A. This control is conclusively evidenced by Dr. Wleklinski's sworn testimony on July 21, 2021, in O.A.'s bodily injury case. When confronted regarding this specific referral, Dr. Wleklinski testified under oath that he subordinated his independent professional judgment by following the protocols and directives set forth by the unlicensed corporation, Deen Health, and its owner, Sirajudeen, in ordering services.

202. A true and accurate excerpt of this testimony is depicted below:

> Q. On September 4, your soap notes indicate his neck was a three. His left knee was a three. And his low back was a three to four. Correct?
> A. Yes.
> Q. He's having the same complaints that you noted from the very beginning about the intermittent numbness and tingling in both his upper extremities and lower extremities, correct?

\*     \*     \*

-31-

> A. Correct.
>
> Q. There is no notation on your soap note of September 4 that you felt it was necessary to have an MRI ordered, correct?
>
> A. Correct.
>
> Q. As we sit here today, do you know why you ordered it?
>
> A. Not really. I think I was given a sheet to order it by my front desk.
>
> Q. By Deen Medical?
>
> A. Yes.
>
> Q. Who at Deen Medical would have requested that you, the treating chiropractor, order an MRI?
>
> A. I don't know.
>
> Q. You didn't order one for the low back?
>
> A. No.
>
> Q. And you didn't order one for the left knee?
>
> A. No.

203.   Sirajudeen, who, through Deen Health, was directly involved in ordering further services without independent consideration from the chiropractor demonstrates that services, such as the referenced MRI referral, were ordered based on corporate profit or direction rather than medical necessity.

204.   The practice of Deen Health and Sirajudeen dictating or controlling patient care decisions constitutes a direct violation of the CPOM doctrine and the Medical Practice Act. Furthermore, any bills or medical records submitted by Deen Health to Allstate for services administered under this non-licensed corporate protocol are fraudulent.

205. By submitting these documents, Deen Health is falsely representing that the licensed provider (e.g., Dr. Wleklinski) exercised independent medical judgment and decision-making concerning the patient—a representation that is contradicted by the evidence of corporate control over the medical protocol.

206. Allstate would not have authorized any payment had it known that Deen Health was illegally owned and operated.

207. All of the fraudulent bills submitted by Deen Health traveled through the U.S. Mail and/or interstate wires.

208. Allstate is entitled to recover payments in connection with the fraudulent billing by Deen Health.

b. <u>Layperson Ownership and/or Control of Rogers Park - ASC</u>

209. Rogers Park operated in a manner that violated Illinois' prohibition against the CPOM.

210. Rogers Park, a corporation owned and directed by Sirajudeen, Thowfeek, and Peterson Surgery (who are laypersons billing a medical practice) engaged in the illegal practice of medicine.

211. The Illinois Ambulatory Surgical Treatment Center Act, 210 ILCS 5/6 ("ASTC Act") mandates that the facility, like Rogers Park be "under the medical supervision of one or more physicians." This mandatory requirement—coupled with Rogers Park's lay ownership—compelled the facility to structure a supervisory arrangement where lay leadership retained control over the physicians and the practice of medicine, thereby establishing an ongoing violation of CPOM.

212. Sirajudeen had authority and responsibility for hiring and terminating employees and/or independent contractors of Rogers Park, until ownership was transferred in August of 2024.

213. Based on information and belief, since at least August of 2024, Thowfeek has had authority and responsibility for hiring and terminating employees and/or independent contractors of Rogers Park, as the sole owner of Peterson Surgery Center, LLC, the new legal owner of Rogers Park.

214. Sirajudeen, Thowfeek, and Peterson Surgery, as lay owners of Rogers Park, an ASC, further violated the CPOM doctrine by establishing a Medical Director position and illegally employing a physician for that role. This employment gave the lay owners unlawful control over the medical practice at Rogers Park, which constitutes the unauthorized practice of medicine by a corporate entity.

215. The Medical Director, who was Dr. Robert Fink until 2018 and Dr. Vicko Gluncic from 2019 thereafter, was professionally responsible for the medical supervision, clinical policy, and quality of patient care.

216. Throughout their respective tenures, the Medical Directors at Rogers Park unlawfully subordinated professional authority to the unlicensed lay-owned entity, Rogers Park, allowing non-physician corporate personnel, including Sirajudeen and Thowfeek, to establish or dictate the scope, protocols, and necessity of medical services.

217. By operating Rogers Park with an illegally employed Medical Director, Sirajudeen, Thowfeek and Peterson Surgery concealed a material fact (the illegal employment structure) from payors like Allstate.

218. A core duty of the Medical Director is to apply independent professional judgment in setting and approving clinical standards. Based on Allstate's investigation, Dr. Fink, and subsequently Dr. Gluncic, failed to exercise this independent judgment throughout their combined tenure. Instead, each acted merely as a figurehead or rubber stamp, thereby permitting the unlicensed corporation and its owners, Sirajudeen, Thowfeek and Peterson Surgery to illegally practice medicine by making clinical and financial decisions disguised as administrative policy.

219. Had Allstate known of this illegal employment, it would not have issued payment for services rendered at Rogers Park. All payments were issued in reliance upon the misrepresentation of the facility's legal operating status.

220. Allstate would not have authorized any payment had it known that Rogers Park was illegally owned and operated.

221. All of the fraudulent bills submitted by Rogers Park traveled through the U.S. Mail and/or interstate wires.

222. Allstate is entitled to recover payments in connection with the fraudulent billing by Rogers Park.

c. Layperson Ownership and/or Control of Rogers Park's Chiropractic

223. Rogers Park is a lay-owned ASC. Despite this status, Sirajudeen, Thowfeek, and Peterson Surgery created and executed a scheme designed to fraudulently maximize profit from Allstate claimants. This scheme involved the immediate establishment of a new venture—which included chiropractic and physical therapy services—following the closure of Deen Health.

224. This new venture was intentionally placed and operated out of a back-office space within Rogers Park, enabling Sirajudeen, Thowfeek, and Peterson Surgery to exploit the ASC facility's setting and billing capabilities to illegally enrich themselves from claims, in direct violation of the Medical Practice Act.

225. Rogers Park has billed for chiropractic services to Allstate claimants, as early as mid-2023.

226. Based on information and belief, Rogers Park's chiropractic practice is a successor entity of Deen Health, which closed around July 2023.

227. Chiropractic services rendered at Rogers Park have been by various medical providers, including Dr. Daphnee Roscoe, D.C. ("Dr. Roscoe") and Dr. Wleklinski, both previous medical providers at Deen Health.

228. A true and accurate excerpt of a HICF submitted by Rogers Park when rendering chiropractic services is depicted below:



229.     A true and accurate excerpt of a ledger recently submitted to Allstate by Rogers Park for an Allstate claimant is depicted below:



-37-

230. The encounter notes submitted by Rogers Park, as a chiropractic provider, are identical in form and content to those previously used by Deen Health.

231. Rogers Park is using the same standardized paperwork previously used by Deen Health, including predetermined treatment protocols and encounter notes.

232. Rogers Park has also used at least two of the same chiropractors previously associated with Deen Health - Dr. Wleklinski and Dr. Roscoe.

233. Rogers Park is an Illinois corporation owned by Sirajudeen, a layperson.

234. Ownership of Rogers Park was subsequently transferred to Peterson Surgery Center, which is solely owned by Sirajudeen's wife, Thowfeek.

235. Thowfeek is a licensed practical nurse.

236. Rogers Park operates as an ambulatory surgical center, and as an ambulatory surgical center may legally operate under certain conditions, including requiring a medical director to oversee the medical facility.

237. However, Rogers Park is also illegally functioning as a chiropractic clinic.

238. As an entity wholly owned by laypersons, Rogers Park cannot function as a chiropractic clinic under the Illinois Medical Practice Act.

239. While certain business functions—such as human resources, staffing, or billing—may be outsourced or managed by non-licensed persons/entities, those persons/entities may not participate in clinical decision-making, the hiring and firing of medical personnel, and in the compensation of medical professionals.

240. Dr. Wleklinski previously testified that he was compensated on a daily basis and had no involvement in billing decisions or setting prices for the services he rendered at Deen Health.

241. Based on information and belief, the compensation structure between Rogers Park and Dr. Wleklinski, for chiropractic services, is similar to the one Dr. Wleklinski had with Deen Health.

242. Based on information and belief, Rogers Park, as a chiropractic services provider, determines pricing structures and pays chiropractors for their services directly, without the licensed providers maintaining control over billing or fee collection, which is consistent with how operations were at Deen Health.

243. Rogers Park's structure and operations—whereby medical professionals are paid fixed fees by a lay-controlled corporation that handles billing and fee collection—violate the Illinois Medical Practice Act's prohibition on fee-splitting. *See* 225 ILCS 60/22.2.

244. These violations materially affect the validity of the charges submitted to Allstate for chiropractic services and support Allstate's claims for restitution and declaratory relief.

245. Through the ownership and operation of the Rogers Park, Sirajudeen, Thowfeek, and Peterson Surgery continued the same illegal pattern of conduct that they did at Deen Health. This conduct involved hiring or contracting with licensed professionals, including Dr. Wleklinski, to provide chiropractic care and physical therapy services to Allstate claimants under the control and direction of the unlicensed lay owners.

246. A true and accurate representative invoice from Rogers Park seeking to be compensated for these services is depicted below:

**ROGERS PARK SURGERY CENTER**

PATIENT ACCOUNT LEDGER
As Of JUNE 2, 2025

PATIENT NAME: ███████████
#:000000000

AMS ACCT # RPDH0304 CLAIM
D.O.I. 11/27/2024

| D.O.S. | PROCEDURE | CHARGE AMT | PAYMENT | BALANCE |
|---|---|---|---|---|
| 1/14/2025 | INITIAL CONSULT | $ 230.00 | $ - | $230.00 |
| 1/16/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 1/23/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 1/28/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 1/30/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 2/4/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 2/6/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 2/11/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 2/13/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 2/18/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 2/20/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 2/25/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 2/27/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 3/4/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 3/11/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 3/13/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 3/18/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 3/20/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 3/25/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 4/1/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 4/3/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 4/8/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 4/15/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 4/17/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 4/24/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| 5/1/2025 | FOLLOW UP PT | $ 400.00 | $ - | $400.00 |
| | LEDGER TOTAL | | | $ 10,230.00 |
| | PAYMENT RECEIVED | | | $ - |
| | ACCOUNT BALANCE | | | $ 10,230.00 |

247.     This arrangement undermines the professional autonomy and ethical duty of the licensed chiropractor, converting the chiropractor's medical judgment into a mere mechanism for billing, which is the very reason the CPOM doctrine exists to protect patients from such commercially motivated medical interference.

248.     Allstate claimant, E.R. (Claim No. 0776956914), who was involved in a motor vehicle accident on November 27, 2024, is a representative example of undue influence by laypersons. Although initial X-rays showed no injury and conservative treatment led to diminishing pain, Dr. Wleklinski dramatically escalated the treatment protocol at the alleged behest of Sirajudeen and/or Thowfeek.

249. Despite licensed providers' clinical findings of diminishing pain with conservative care, E.R.'s treatment was escalated—from effective physical therapy to ordering medically unnecessary advanced diagnostics (MRIs), which ultimately led to an invasive, high-cost procedure (bilateral facet joint injection on March 31, 2025) performed by pain specialist, Shoeb Mohiudden, M.D. This escalation was directed or unduly influenced by the layperson ownership and control, seeking to maximize billing.

250. The ordering of MRIs for the cervical and lumbar spine on February 11, 2025, lacked sufficient clinical justification. Dr. Wleklinski's own notes indicated that E.R.'s pain was diminishing with physical therapy. The standard of care dictates that advanced imaging for soft-tissue injuries responding to conservative treatment should be delayed or avoided.

251. Recommending and proceeding with a bilateral facet joint injection on March 31, 2025, constitutes a premature and potentially unnecessary escalation of care. The documented success of the physical therapy, which was actively diminishing the patient's pain, indicates that a maximum benefit from non-invasive, conservative management had not been reached or sufficiently proven to have failed prior to the invasive procedure.

252. All chiropractic services billed to Allstate, were procured, provided, and billed as part of a scheme to maximize revenue, as directed or unduly influenced by layperson ownership and control.

253. Because the escalation of care—culminating in medically unnecessary advanced diagnostics and a high-cost invasive procedure—was undertaken despite the licensed providers' clinical findings of diminished pain with conservative treatment, these services lacked medical necessity and were not reasonable or medically necessary.

254. As a result, the submission of these bills to Allstate constitutes a material misrepresentation of the services' compensability and is fraudulent. Had Allstate known that these services were driven by improper financial motives rather than clinical need, Allstate would not have rendered payment.

255. Allstate would not have authorized any payment had it known that Rogers Park was illegally owned and operated.

256. All of the fraudulent bills submitted by Rogers Park traveled through the U.S. Mail and/or interstate wires.

257. Allstate is entitled to recover payments in connection with the fraudulent billing by Rogers Park.

d.     <u>Layperson Ownership and/or Control of Paulina Anesthesia</u>

258. Sirajudeen employed staff, nurses, chiropractors, and physicians to work at the Sirajudeen healthcare businesses.

259. Defendant Sirajudeen, a non-licensed medical professional (layperson), is the President, Secretary, and Director of Paulina Anesthesia, an entity that provides professional anesthesia services to patients receiving treatment/injections at Rogers Park.

260. Paulina Anesthesia, under Sirajudeen's layperson direction, hires or contracts with licensed medical professionals, including physicians and/or Certified Registered Nurse Anesthetists (CRNAs), to administer anesthesia.

261. By owning and directing Paulina Anesthesia—an entity whose sole purpose requires the employment and supervision of licensed medical staff to perform its core service—Sirajudeen is causing a lay-owned corporation to illegally practice medicine.

262. This corporate structure places Sirajudeen, the lay owner and corporate officer, in a position of control over the professional medical judgment and services rendered by the licensed anesthesiologists and CRNAs, which is the exact harm the CPOM doctrine is designed to prevent.

263. Paulina Anesthesia is an anesthesia service company and is not a licensed hospital. Therefore, it is not entitled to the narrow exception to the CPOM doctrine, making its lay-owned structure inherently illegal.

264. Sirajudeen exercises supervisory responsibility over the staff, nurses, and physicians that work at Paulina Anesthesia.

265. Sirajudeen has authority and responsibility for hiring and terminating employees and/or independent contractors of Paulina Anesthesia.

266. By submitting these documents, Paulina Anesthesia is falsely representing that the licensed medical professionals exercised independent medical judgment and decision-making concerning the patient—a representation that is contradicted by the evidence of corporate control over the medical protocol.

267. Allstate would not have authorized any payment had it known that Paulina Anesthesia was illegally owned and operated.

268. All of the fraudulent bills submitted by Paulina Anesthesia traveled through the U.S. Mail and/or interstate wires.

269. Allstate is entitled to recover payments in connection with the fraudulent billing by Paulina Anesthesia.

270. The Defendants created and illegally operated healthcare clinics, including Deen Health, Rogers Park, and Paulina Anesthesia, to generate patients wherein they could bill for unnecessary healthcare services pursuant to the predetermined treatment protocol.

### 2. Improper and Medically Unnecessary Patient Referrals and Treatment Protocol

271. A violation of the fee splitting provisions set forth in 225 ILCS 60/22.2 constitutes an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act. 225 ILCS 60/22.2(g). *See also* 815 ILCS 505.

272. Specifically, "[a] licensee under [the Illinois Medical Practice Act ("MPA")] may not directly or indirectly divide, share or split any professional fee or other form of compensation for professional services with anyone in exchange for a referral or otherwise." 225 ILCS 60/22.2(a).

273. The Defendants engaged in a systematic, undisclosed, and unlawful arrangement to compensate various pain management physicians, including but not limited to Shoeb Mohiuddin, M.D. ("Mohiuddin"), in exchange for patient referrals.

274. This unlawful arrangement involved a systematic and illicit patient referral network designed specifically to generate claims for medically unnecessary treatments and services between participating providers, resulting in increased profits for each provider.

275. Under this unlawful arrangement, Pandya, through the Pandya healthcare businesses, would improperly cross-refer patients for unnecessary pain management services (often when the patients had already reported improvement in their conditions) to Dr. Mohiuddin and other affiliated pain management specialists.

-44-

276.    In return, Dr. Mohiuddin and his pain management practice, and others, would reciprocate by referring patients for unnecessary chiropractic and physical therapy services back to the Pandya healthcare businesses. This reciprocal arrangement was often predicated on Dr. Mohiuddin using space at the Pandya healthcare businesses' locations to examine patients free of charge.

277.    The referral for extended chiropractic and physical therapy services further bolstered the scheme by creating the illusion that the patients needed the unnecessary treatment, which in turn provided a basis for prescribing subsequent pain injections.

278.    Dr. Mohiuddin and other affiliated pain management specialists would improperly and unlawfully refer patients requiring pain injection procedures to Rogers Park. At this location, Dr. Mohiuddin and the affiliated specialists would perform the injections, thereby allowing Sirajudeen, Thowfeek, and Peterson Surgery to bill for unnecessary and exorbitant surgery center fees and anesthesia fees through Rogers Park and Paulina Anesthesia, respectively.

279.    The financial benefit and volume-based nature of this reciprocal referral agreement constitute an illegal exchange of value (a quid pro quo) for patient referrals.

280.    This improper referral loop was designed to, and did in fact, drive patient volume to the Pandya healthcare businesses and the Sirajudeen healthcare businesses—and to the affiliated pain management specialists—without regard for medical necessity, patient choice, or compliance with fee-splitting and self-referral laws.

281.    The Defendants intentionally obfuscated the referral scheme from Allstate and others because they knew that Allstate would not have paid the claims directly or as part of bodily

injury case payments had it known that the Defendants were unlawfully participating in an unlawful quid-pro-quo referral agreement.

a.  Improper Referrals Start at Defendant Chiropractic Clinics

282.  Pandya holds significant dominion over the Pandya healthcare businesses.

283.  Upon information and belief, the Pandya healthcare businesses, including 87th St. Rehab, New Life, and ARMV, operate as a single, connected entity, sharing common bank accounts, management, employees, and standardized practices and procedures.

284.  Pandya exercised direct control over the personnel decisions of the Pandya healthcare businesses, including, but not limited to, the hiring and termination of employees and independent contractors such as medical assistants, chiropractors, and other clinical and administrative staff.

285.  Pandya, through 87th St. Rehab, New Life, and ARMV, participated in the cross-referral scheme by (1) paying kickbacks and splitting fees; (2) providing Dr. Mohiuddin and affiliated pain management specialists with access to a pool of Pandya's patients; and (3) engaging in mutual cross-referral arrangements for the purpose of procuring and sharing patients, thereby maximizing profits.

286.  The referral scheme routinely begins at 87th St. Rehab, New Life, or ARMV where Allstate claimants are routinely subjected to medically unnecessary and unsupported therapeutic modalities, which is pleaded in greater detail below.

287.  Chiropractors employed at the aforementioned clinics, at the direction of Pandya, purposefully refer Allstate claimants to Dr. Mohiuddin, and other participating physicians for unneeded and unwarranted pain management services.

288.    This circular referral strategy intentionally creates the illusion that conservative chiropractic treatment was insufficient or failed, thereby attempting to justify the scheme's most invasive and expensive aspect: medically unnecessary injections and procedures performed at Rogers Park.

289.    By way of example, Allstate claimant, A.G. (Claim No. 0695352633), was involved in a rear-end motor vehicle accident on December 11, 2022. A.G. initially refused treatment at the scene, later presenting to Northwestern Medicine Lake Forest Hospital, where X-rays of the cervical and lumbar spine were negative.

290.    A.G. subsequently treated with New Life, receiving prescribed physical therapy. New Life then referred A.G. to Dr. Mohiuddin.

291.    During his deposition, A.G. testified that the New Life provider affirmatively instructed him that he needed to get an injection from a pain management physician.

292.    A true and accurate excerpt from A.G.'s testimony is depicted below:

> Q.    And who referred you to Regenerative Pain and Spine?
> A.    **The doctor.**
> Q.    Which doctor? The chiropractor?
> A.    **Yes, the chiropractor.**
> Q.    And specifically what did the chiropractor say about Regenerative Pain and Spine?
> A.    **About that, that I had to go there so that I could be sure that I was fine after the accident or so that I could get an injection to calm the pain.**

293.    This is significant given that Chiropractors are regulated under the MPA, which defines the scope of a "Chiropractic physician" as a person licensed to treat human ailments without the use of drugs (prescription medication or otherwise) or surgery. 225 ILCS 60/2.

294.    Per protocol, Dr. Mohiuddin and other affiliated pain management physicians, prescribed various pain injections including, facet joint injections ("FJIs") or epidural steroid injections ("ESIs") and further prescribed continued physical therapy to be performed at New Life.

295.    In the case of A.G., Dr. Mohiuddin prescribed multiple FJIs, which were performed at Rogers Park on February 27, 2023. This sequence demonstrates that the injection was preordained and the referral back to New Life and the referral to Rogers Park was guaranteed.

296.    New Life billed $13,460.00 for physical therapy. Rogers Park billed $15,930.00 (for surgery center fees) and Dr. Mohiuddin separately billed $8,405.00 for professional services. The total billing for these services purportedly provided to A.G. is approximately $37,795.00.

297.    To facilitate the guaranteed referral to affiliated pain management physicians, chiropractic providers affiliated with 87th St. Rehab, New Life, and ARMV were provided pre-printed referral forms. These forms included options for pain management, orthopedics, and medical imaging, making it almost inevitable for the provider to refer patients for these services.

298.    A true and accurate representative of a pain management consultation reflecting such referral activity is depicted below:

NEW LIFE MEDICAL CENTER
REFERRAL SHEET

4149 W 26th St
Chicago IL 60623
773-542-1111

Patient Name: [redacted]                                    Date: 07/25/2023

Areas for evaluation:

Headache  Dizziness  Neck Pain  Upper Back Pain  Mid-Back Pain  Low Back Pain
L  SI Joint Pain  R  L  Shoulder Pain  R  L  Wrist Pain  R  L  Hip Pain  R  L  Knee Pain  R
L  Ankle Pain  R  Radicular Pain  L  Upper  R  L  Lower  R ____ Other ____

Referred to:

☑  Pain Management evaluation

☐  Orthopedic evaluation

☐  MRI _____ AREAS

Physician _____
Dr. Josue Ortiz

299.    In turn, affiliated pain management physicians, like Dr. Mohiuddin, routinely used intake paperwork that documented the referral source.

300.    A true and accurate excerpt of a sample intake form from Dr. Mohiuddin noting the referral source as "NLMC," which is New Life, is depicted below:



301.     Whenever Dr. Mohiuddin received a referral from the Pandya healthcare businesses, he routinely referred the Allstate claimant back to 87th St. Rehab, New Life, or ARMV for additional physical therapy.

302.     Allstate's investigation revealed that these subsequent physical therapy referrals by Dr. Mohiuddin were made without regard to the patient's individual medical condition or response to prior physical therapy.

303.     Allstate would not have authorized any payment had it known of the Defendants' unlawful referral arrangement.

304.     All of the fraudulent bills submitted by New Life based on unlawful referrals traveled through the U.S. Mail and/or interstate wires.

305.     Allstate is entitled to recover payments in connection with the billing derived from unlawful referrals by and to New Life.

306.     All of the fraudulent bills submitted by 87th St. Rehab based on unlawful referrals traveled through the U.S. Mail and/or interstate wires.

307.     Allstate is entitled to recover payments in connection with the billing derived from unlawful referrals by and to 87th St. Rehab.

308. All of the fraudulent bills submitted by ARMV based on unlawful referrals traveled through the U.S. Mail and/or interstate wires.

309. Allstate is entitled to recover payments in connection with the billing derived from unlawful referrals by and to ARMV.

b.     Unlawful Referrals by Affiliated Physicians to Rogers Park

310. Sirajudeen and Thowfeek established a network of real estate and medical businesses to facilitate the illegal payment of kickbacks and fee-splitting, primarily by allowing physicians, such as Dr. Mohiuddin, free or below-fair-market-value access to clinic spaces, staff, and a patient pool.

311. In exchange for this unlawful inducement, these physicians referred patients to Rogers Park, where it billed for unnecessary surgery center fees at exorbitant prices. Furthermore, the Defendants engaged in a pattern of financially abusive practices, including the strategic dissolution of multiple intertwined corporate entities all while maintaining control over the assets and continuing the illicit scheme. This coordinated activity violated fundamental provisions of the Illinois Medical Practice Act and constitutes a broader pattern of unjust enrichment and corporate misconduct.

312. Wahid Investments, LLC ("Wahid Investments") was formed in 2016 by Sirajudeen.

313. Sirajudeen was the sole manager of Wahid Investments from its formation in 2016 until 2021.

314. From 2022 until 2024, Thowfeek was the sole manager of Wahid Investments.

-51-

315.    In 2016, Wahid Investments became the owner of the property located at 4909 W. Division Street, Chicago, IL 60651 (the "W. Division Location").

316.    The W. Division Location, owned by Wahid Investments, served as the principal location for at least two healthcare businesses owned by Sirajudeen: West Side Health, LLC and the Defendant, Deen Health.

317.    West Side Health, LLC had an involuntary dissolution in November 2022.

318.    Deen Health had an involuntary dissolution on July 14, 2023.

319.    Wahid Investments had an involuntary dissolution on November 8, 2024.

320.    Ortho Spine Surgical LLC ("Ortho Spine") was owned and controlled by Sirajudeen.

321.    Sirajudeen managed Idea Health System LLC ("Idea Health"), which managed 95th St. LLC, the purchaser of the 1915-1925 E. 95th Street property. Thowfeek signed mortgage documents as a member of 95th St. LLC.

322.    Sirajudeen and Thowfeek, through their control of 95th St. LLC, provided the location at 1925 E. 95th Street to doctors for surgical operations free of charge.

323.    Both Ortho Spine Surgical LLC (May 10, 2023) and the property-owning entities, 95th St. LLC and Idea Health System LLC (mid-2023), underwent dissolution in the same general time frame.

324.    The property used by Ortho Spine (1915-1925 E. 95th Street) has delinquent property taxes since 2023.

325. Following the involuntary dissolution of the property-owning entity (95th St. LLC), the ownership status of the property is unclear, as no subsequent transfer documents have been recorded with the Cook County Register of Deeds.

326. Sirajudeen also owned and managed Chicago Polyclinic, LLC, d/b/a Devon Polyclinic, which was located at 2446 W Devon Avenue, Chicago, IL 60659 (the "W. Devon Location"), until it was involuntarily dissolved on November 10, 2023.

327. Chicago Polyclinic, LLC, is one of the entities named in the recent indictment of Sirajudeen, where Sirajudeen and his co-defendants are charged with defrauding the United States government of over $189,000,000.00 through fraudulent COVID-19 testing. *United States v. Anosh Ahmed*, No. 1:25-CR-00321 (N.D. Ill. 2025).

328. Dr. Mohiuddin admitted that he saw patients, including Allstate claimants, at the 95th Street location, the W. Division location, and the W. Devon location.

329. True and accurate excerpts of three separate invoices submitted to Allstate by Dr. Mohiuddin's company, Regenerative Pain & Spine, LLC ("Regenerative"), are depicted below and demonstrate that he utilized Sirajudeen and Thowfeek's property to examine Allstate claimants:





330.    A true and accurate excerpt of Dr. Mohiuddin's testimony concerning his treatment of Allstate claimants at Sirajudeen and Thowfeek's properties is depicted below:

Q   So back in -- on the initial exam that was done in May of 2021, you -- it was at this office at 2446 West Devon. When did you stop going there?

A   I would say at some -- like, within a few months later, at that place.

Q   It was just a temporary thing?

A   Yeah, it was a temporary thing. I had, like, a -- like, I had a clinic not too far that was, like, trying to -- getting fixed up, down the street from there. And you know, that place was just getting too busy. Like, it was just a temporary place.

Q   Now, I noticed on your last visit on June 30th with Ms. [redacted] it has a location address of 1925 East 95th Street. This is a place called Ortho Spine Surgical. Do you still go there?

A   I don't go there anymore.

Q   When did you go there?

A I went there from 2020 until earlier this year.

Q Like 20 --

*　　*　　*

> A  Or like -- sorry, yeah.  2023, yeah.  Last year.
>
> Q  Now, did -- were you, like -- did you work for this place, or did you just rent space there?
>
> A  Rented space.
>
> Q  Okay.  Did -- were there other offices that you had, around the -- at the time you treated Ms. ▮ were there other offices that you would see patients to do exams at?
>
> A  These were like the -- these were the two locations, and then maybe a third was on, I think, maybe, like, 2446 West Division, or something like that. I had something on -- in Division as well, back then.

331.    Based upon information and belief, Dr. Mohiuddin was not charged rent to use the Sirajudeen and Thowfeek properties to examine and/or consult with Allstate claimants.

332.    Based upon information and belief, if any "rent" payments were made, they were merely a pretext to conceal an improper referral agreement. Pursuant to this agreement, Dr. Mohiuddin and other affiliated pain management physicians would direct their patients to Rogers Park where they would perform medically unnecessary injection procedures, specifically ESIs and FJIs. These procedures could have been performed in office-based clinic settings rather than at a surgery center, like Rogers Park, which, in turn, would charge Allstate for grossly excessive and fraudulent surgical facility fees for the medically unnecessary procedures performed.

333.    The fact that Dr. Mohiuddin could do injection procedures like ESIs and FJIs at his own office, which was located at 2335 W Fullerton Ave., Chicago, IL 60647 further demonstrates the improper referrals to Rogers Park.

334.    A true and accurate excerpt of Dr. Mohiuddin's testimony concerning this capability is depicted below:

> Q    And could you do those injections in your office?
> A    Back then I didn't have ultrasound. But now I do, so yeah.
> Q    So you could actually do those procedures in your own office today, as opposed to doing them in a surgical center?
> A    Yes.
> Q    And if you did them in your office there wouldn't be a separate facility fee bill; correct?
> A    I don't believe so. I --

335.    Based on Allstate's investigation, Dr. Mohiuddin and other Rogers Park-affiliated pain management physicians purposely failed to disclose to patients, including Allstate claimants, that the required injection-based procedures (including ESIs and FJIs) could have been safely and effectively performed in their office-based settings.

336.    Dr. Mohiuddin and other Rogers Park-affiliated pain management physicians knew or should have known that directing patients to an ambulatory surgical center, like Rogers Park, for these procedures, rather than performing them in their respective offices, would result in significantly higher costs due to the imposition of facility fees.

337.    By failing to inform patients that the procedures could be performed in an office-based setting, Dr. Mohiuddin and other Rogers Park-affiliated pain management physicians engaged in a pattern of material misrepresentation and omission regarding the cost and necessary venue for the treatment.

338. Driven by profit, and lacking legitimate medical justification, pain management physicians, including Dr. Mohiuddin, consistently administered injections at Rogers Park instead of their own offices.

339. By directing Allstate claimants to Rogers Park, Rogers Park was able to bill Allstate claimants for unnecessary and exorbitant facility fees.

340. Pursuant to Rogers Park's own paperwork, submitted as part of HFSRB application 24-009 (requesting transfer of ambulatory surgical center license to new location as discussed when describing Rogers Park), provided that Dr. Mohiuddin was the primary physician that performed pain management procedures at Rogers Park in 2023, performing about seven times as many procedures as the next physician on the list.

341. A true and accurate copy of the paperwork submitted by Rogers Park in application 24-009, providing information for procedures done at Rogers Park in 2023 is depicted below:

**RPSC ROGERS PARK**
SURGERY CENTER

www.rogersparksurgery.com

**ATTCHEMENT -1**

| PHYSICIAN NAME | PHYSICIAN SPECIALITY | HISTORICAL CASES AT ROGERS PARK ONE DAY SURGERY CENTER (1/1/23-1/31/23) |
|---|---|---|
| Dr. Tim Heilizer | General Surgery | 1 |
| Dr. Robert Erickson | Neurosurgery | 6 |
| Dr. Samuel Park | Orthopedic Surgery | 17 |
| Dr. Chandrashekhar Sompalli | Orthopedic Surgery | 1 |
| Dr. Thomas Poepping | Orthopedic Surgery | 5 |
| Dr. Robert Fink | Orthopedic Surgery | 5 |
| Dr. Gregory Markarian | Orthopedic Surgery | 2 |
| Dr. Christos Giannoulias | Orthopedic Surgery | 2 |
| Dr. Shoeb Mohiuddin | Pain Management | 344 |
| Dr. Krishna Chunduri | Pain Management | 55 |
| Dr. Michell Malek | Pain Management | 32 |
| Dr. Joel Anderson | Podiatry | 11 |
| TOTAL | | 481 |

342. This example demonstrates that even though Dr. Mohiuddin had all the necessary equipment to conduct procedures at his own office, the vast majority of procedures by Dr. Mohiuddin were performed at Rogers Park.

343. This referral scheme between Regenerative and Rogers Park was used to enrich Sirajudeen and Dr. Mohiuddin, masquerade the kickbacks Dr. Mohiuddin received, either directly, or in the form of being able to use Sirajudeen healthcare businesses facilities and their personnel, likely free of charge, and all in disregard of Allstate claimants' actual medical needs.

344. Based upon the evidence gathered during Allstate's investigation, Allstate has determined that each invoice submitted by Rogers Park for services administered at Rogers Park,

was fraudulent due to the fact that the service could have been administered in a Dr. Mohiuddin's pain management office clinic, thereby eliminating the need for a surgery center fee.

345. Based on Allstate's investigation, any service and surgery center fees billed by Rogers Park for injection-based procedures performed on Allstate claimants by Dr. Mohiuddin's pain management office are fraudulent.

346. Dr. Mohiuddin's pain management office and Rogers Park misrepresented that surgery center services were medically necessary when Dr. Mohiuddin's pain management office administered injection-based services to Allstate claimants at Rogers Park.

347. Allstate would not have authorized payment if it had known Dr. Mohiuddin's pain management office and/or Rogers Park directed patients to Rogers Park based on profit rather than medical necessity.

348. Allstate reasonably relied on the truthfulness of these invoices and records when paying first-party and bodily-injury claims.

349. All of the fraudulent bills submitted by Rogers Park for unlawful and unnecessary surgery center fees traveled through the U.S. Mail and/or interstate wires.

350. Allstate is entitled to recover payments in connection with all claims identified in Exhibit 1.

c.     Unlawful Referrals by Rogers Park to Paulina Anesthesia

351. When affiliated pain physicians prescribed and performed injection procedures at Rogers Park, those patients—including Allstate claimants—were routinely and universally billed for medically unnecessary doses of anesthesia administered – in some cases by physicians and

-60-

nurses controlled by Rogers Park and in other cases by Paulina Anesthesia – which were owned by Sirajudeen.

352. To justify the use of an ambulatory surgical center, Dr. Mohiuddin and other Rogers Park-affiliated pain management physicians routinely subjected a large number of Allstate claimants to excessive and unnecessary doses of anesthesia and sedatives during injections.

353. To substantiate the need for anesthesia, Dr. Mohiuddin and other Rogers Park-affiliated pain management physicians falsely alleged that the Allstate claimants had needle phobia or anxiety caused by the procedure in nearly every case where methods other than local anesthesia were used.

354. However, the phobia or anxiety excuse were often left undocumented from the Allstate claimants' medical records from the prescribing providers, Rogers Park and Paulina Anesthesia.

355. Allstate claimants referred to Rogers Park for injection procedures were denied the opportunity to select an alternative, non-affiliated anesthesia business, and were not given a choice of whether to have their procedures with anesthesia or not, resulting in anesthesia being administered during injection-based procedures regardless of medical necessity.

356. By directing Allstate claimants to Rogers Park, the affiliated pain management physicians facilitated, in addition to facility fees, Defendant Sirajudeen's ability to bill Allstate for unnecessary and exorbitant anesthesia fees through Paulina Anesthesia.

357. Allstate claimants referred to Rogers Park were subjected to doses of anesthesia that were medically unnecessary, excessive, and often dangerous for the procedures being performed, solely for the purpose of generating fraudulent reimbursement claims.

358. The administration of anesthesia at this level was not dictated by the patients' medical needs but rather by the scheme's need to generate fraudulent revenue. This fraudulent practice of forcing medically unnecessary anesthesia upon claimants was also implemented at other facilities controlled or affiliated with the Defendants.

359. Routinely, during injection procedures, the anesthesia was administered by physicians or nurses under Defendant Sirajudeen's control, further ensuring the profitability of the scheme.

360. Affiliated pain management physicians and staff misrepresented that the anesthesia services were medically necessary when affiliated pain management physicians associated with both Rogers Park and Paulina Anesthesia administered injection-based services to Allstate claimants at Rogers Park.

361. Allstate would not have authorized payment for these services if it had known that the affiliated pain management physicians were ordering and administering unnecessary and dangerous anesthesia services based on financial profit rather than objective medical necessity.

362. A true and accurate excerpt from the testimony of Allstate claimant, S.T. (Claim No. 0621995587), who received a facet joint injection by Dr. Mohiuddin's pain management office at Rogers Park, with Paulina Anesthesia providing the anesthesia services, is depicted below:

> Q   Okay. Were you put out under anesthesia, like, for the shot, or were you awake?
> A   They were giving anesthesia.
> Q   Did they tell you in advance that they were going to put you out under anesthesia for the shots, or did you just find out that day?
> A   No, they used to tell me in advance.
> Q   Did they tell you you had a choice to have them done without anesthesia? Without being put to sleep?

                              *       *       *

> A   No, they said I will need anesthesia.
> Q   Okay. Did they tell you why?
> A   No, they didn't give me any reason.

363.   Rogers Park and Dr. Mohiuddin deliberately hid Sirajudeen's ownership of Paulina Anesthesia from Allstate claimants.

364.   Neither the affiliated pain management physician, Rogers Park, nor Paulina Anesthesia informed Allstate claimants that anesthesia services would be charged additionally and separately from the injection procedure.

365.   Neither the affiliated pain management physician, Rogers Park, nor Paulina Anesthesia informed Allstate claimants of the cost of the anesthesia services.

366.   The Defendants utilized the unlawful referrals to generate patients wherein they could bill for unnecessary healthcare services pursuant to the predetermined treatment protocol.

367. Allstate would not have authorized payment if it had known pain management providers and staff were ordering unnecessary and dangerous anesthesia services based on profit rather than medical necessity.

368. Allstate reasonably relied on the truthfulness of these invoices and records when paying first-party and bodily-injury claims.

369. All of the fraudulent bills submitted by Paulina Anesthesia for unlawful and unnecessary anesthesia services traveled through the U.S. Mail and/or interstate wires.

370. Allstate is entitled to recover payments in connection with all claims identified in Exhibit 2.

d.      Unlicensed and Medically Unnecessary DME Distribution

371. In Illinois, any entity functioning as a Home Medical Equipment ("HME") distributor must maintain a valid license issued by the Illinois Department of Financial and Professional Regulation (IDFPR).

372. Any provider engaged in the sale, delivery, or distribution of home medical equipment, including TENS units, is required to be licensed under the Act. 225 ILCS 51/15.

373. Pursuant to the Illinois Home Medical Equipment and Services Provider License Act ("the Act"), "home medical equipment" specifically includes transcutaneous electrical nerve stimulator (TENS) units. 225 ILCS 51/10(6)(F).

374. No entity may provide, or hold itself out as providing, home medical equipment and services, nor use the title "home medical equipment and services provider" in connection with its business, without a valid license issued by the IDFPR. 225 ILCS 51/15(a).

375. Any entity that practices, offers to practice, or holds itself out as a home medical equipment and services provider without the requisite license is subject to a civil penalty not to exceed $10,000 per offense, in addition to any other penalties provided by law. 225 ILCS 51/85.

376. While the Act provides limited exemptions from licensure for individual healthcare practitioners (such as physicians and chiropractors) who use such equipment to treat their own patients, this exemption is strictly construed. 225 ILCS 51/15(b)(6).

377. Crucially, this licensure exemption does not apply to healthcare practitioners who provide home medical equipment and services through a separate legal entity. 225 ILCS 51/15(b).

378. RPAV is not, and has never been, licensed by the IDFPR as a home medical equipment and services provider, rendering its business activities and subsequent billings unlawful under Illinois law.

379. RPAV submitted false billings to Allstate for DME supplies, and related services, wherein RPAV mispresented that the equipment was medically necessary and had been dispensed by a lawfully authorized and legally distinct entity.

380. RPAV further engaged in a fraudulent billing scheme by misrepresenting to Allstate that the DME at issue was lawfully dispensed to Allstate claimants in compliance with all applicable Illinois licensing and regulatory requirements.

381. In reasonable and justifiable reliance upon RPAV's material misrepresentations and omissions, Allstate was induced to, and did, issue payments to or for the benefit of RPAV.

382. RPAV participated in a sophisticated scheme devised to exploit the medical expense and bodily-injury coverages available to its customers.

383. RPAV perpetrated this scheme by maintaining the outward appearance of a legitimate licensed business engaged in the lawful dispensing of DME products.

384. RPAV's primary objective is to bill for the maximum volume of DME products possible, without regard for whether such products are actually provided, medically necessary, or lawfully dispensed.

385. RPAV's purpose was not to provide legitimate medical equipment or patient care, but rather to systematically extract payments from Allstate through fraudulent means.

386. RPAV submitted fraudulent billings for DME products in connection with numerous Allstate claimants, including those identified in Exhibit 3.

387. To facilitate this scheme, RPAV induced medical providers at New Life to issue DME prescriptions for their patients, and to exclusively direct those patients to have those prescriptions filled exclusively through RPAV.

388. Upon information and belief, RPAV provides compensation or other financial incentives to medical providers in exchange for these prescription referrals.

389. Upon information and belief, RPAV maintains no physical location or warehouse facility where it distributes or provides DME to patients.

390. Allstate's investigation revealed that RPAV distributes its DME exclusively at New Life locations to ensure a captive stream of billing opportunities.

391. RPAV furnishes these medical providers with pre-printed prescription forms, titled "Durable Medical Equipment (DME)," which are designed to standardize and expedite the issuance of unnecessary equipment.

392.     By way of example, a representative sample of the DME form created and utilized by RPAV is depicted  below:

393.     The pre-printed prescription form is rudimentary and lacks any field or prompt requiring the healthcare provider to attest to the medical necessity of the specific device being prescribed.

394.     Upon information and belief, patients at New Life are denied any meaningful opportunity to source the prescribed DME products or related supplies from alternative vendors, distributors, or pharmacies.

395.     RPAV fails to disclose the price of the DME products to Allstate claimants at the point of service or at any time before the equipment is dispensed.

-67-

396. Allstate claimants are never informed that the same DME products could be purchased independently at a significantly lower market price.

397. RPAV dispenses this equipment "as-is" without providing any "value-added" services, such as customized fitting, additional supplies, or extended warranties that might justify a premium price.

398. The equipment dispensed by RPAV primarily consists of Transcutaneous Electrical Nerve Stimulation (TENS) units, which are portable devices that retail online for less than $70.00.

399. Despite the negligible retail cost, RPAV bills Allstate $600.00 for each dispensed TENS unit—a markup exceeding 850%.

400. Additionally, RPAV dispenses lumbar spine back braces for which it charges Allstate $2,500.00 per unit.

401. In the open marketplace, comparable prescribed lumbar spine back braces typically cost only a few hundred dollars.

402. RPAV intentionally omits the make, model, and manufacturer of the DME from its records and billing statements to obscure the actual retail value and conceal the unconscionable markup from Allstate.

403. Neither RPAV nor the referring medical providers offer any clinical justification or documentation establishing the medical necessity of these specific, high-cost products.

404. Consequently, RPAV's demands for payment are not only excessive but are predicated on a scheme to defraud Allstate through price-gouging and the exploitation of uninformed claimants.

405. Allstate's investigation has revealed that every DME product purportedly dispensed by RPAV was provided on the same date and at the same physical location where the claimant received medically unnecessary services from a New Life provider.

406. In its billing submissions to Allstate, RPAV expressly identified New Life locations as the place of service for the dispensing of its equipment.

407. RPAV systematically submitted Health Insurance Claim Forms ("HICF") to Allstate to secure reimbursement for the DME and related supplies allegedly provided to claimants.

408. A true and accurate excerpt of a representative HICF submitted by RPAV to Allstate with a service location of New Life is depicted below:



409. No other paperwork was provided by RPAV regarding the DME products, the identity of the specific DME products provided, who provided the DME, and whether the Allstate claimant was educated on the product and its use.

410. As the prescribing provider, New Life providers failed to document whether continued use of the TENS units was warranted, safe, and/or medically necessary before providing it to Allstate claimants.

411. There is no information provided by RPAV, or the medical provider that documents the medical necessity of the DME to Allstate patients.

412. The DME was simply a means by which Pandya could increase the value of his reimbursement from Allstate.

413. The treatment and billing of claimant G.M. (Claim No. 0778443985) serves as a precise demonstration of RPAV's fraudulent scheme as described in the preceding paragraphs.

414. On December 13, 2024, G.M. was involved in a motor vehicle accident and subsequently reported injuries to his mid-back, low-back, and left shoulder.

415. G.M. first sought treatment at New Life on December 18, 2024, where he began receiving chiropractic treatment from Deepak Mandral, D.C. ("Dr. Mandral").

416. Beginning on January 14, 2025, and pursuant to a referral from New Life, G.M. also received specialized treatment from Regenerative, which included a series of lumbar facet injections performed on March 17, 2025.

417. During an encounter on April 3, 2025, at New Life, G.M. reported significant clinical improvement in his lower back symptoms following the injection procedures.

418. New Life records from this same period similarly documented a marked improvement in G.M.'s pain levels and functional status.

419. Despite G.M.'s documented significant improvement and the success of the injection therapy, RPAV dispensed a TENS unit and a lumbar spine back brace to G.M. on April 9, 2025 at New Life.

420. The dispensing of this equipment was not based on any new clinical deficit or medical necessity; rather, it was issued pursuant to the predetermined treatment protocol designed to maximize billing regardless of the patient's actual recovery.

421. According to the limited documentation provided, Dr. Mandral—the New Life provider—prescribed the DME for RPAV to bill, further illustrating the unlawful referral and billing conduit between the two entities.

422. A true and accurate excerpt of the minimal paperwork provided to justify this DME—which fails to establish medical necessity—is depicted below:

423.    Aside from the rudimentary pre-printed form, RPAV and New Life failed to provide any clinical notes, diagnostic findings, or documentation of any kind to substantiate the medical necessity of these DME products.

424.    Upon information and belief, RPAV and New Life failed to disclose the cost of the equipment to G.M. and deprived G.M. of any opportunity to purchase a TENS unit or lumbar spine back brace from an alternative provider or retail pharmacy.

425.    Remarkably, New Life discharged G.M. on April 14, 2025—a mere five days after the expensive DME was dispensed—underscoring that the equipment was not intended for clinical care, but rather to maximize the "billable" value of the claim before discharge.

426.    Following the discharge, RPAV submitted a fraudulent invoice to Allstate for the TENS unit and lumbar spine back brace, reflecting the unconscionable markups for the medically unnecessary device.

427. A true and accurate copy of the RPAV invoice submitted for claimant G.M. is provided below:



428. Following the issuance of the invoice, RPAV submitted a HICF to Allstate that explicitly provides a New Life facility as the "Place of Service," confirming that RPAV operates as a captive billing entity within the clinic rather than as a licensed, separate, and distinct DME provider.

429. A true and accurate excerpt of the HICF submitted by RPAV for claimant G.M. is depicted below:



430. The billing records for claimant G.M. serve as a representative demonstration of the fraudulent scheme perpetrated by RPAV. As evidenced by the clinical timeline, G.M. was involved in an accident in December 2024 and subsequently sought treatment at New Life and Regenerative. By early April 2025, medical records from both facilities explicitly documented that G.M. had achieved significant clinical improvement and a marked reduction in pain levels following a series of injections and physical therapy.

431. Despite this documented recovery, RPAV dispensed an expensive TENS unit and a lumbar spine back brace to G.M. on April 9, 2025, a mere five days before the patient was discharged from care. This equipment was not provided to address a specific clinical need but was

instead issued pursuant to a predetermined protocol designed to maximize the billable value of the claim before the patient's treatment concluded. The dispensing of this equipment was facilitated by a rudimentary, pre-printed prescription form executed by a New Life provider, further illustrating the unlawful referral conduit existing between the two entities.

432.    RPAV subsequently submitted a fraudulent HICF invoice to Allstate, identifying the New Life clinic as the place of service. This submission confirms that RPAV does not operate as a legitimate, independent distributor but rather as a captive billing entity used to exploit insurance coverage. The documentation for G.M.—including the HICF—contains materially false representations regarding the necessity, legality, and cost of the equipment.

433.    Claimant G.M. is a representative example demonstrating that RPAV engaged in the unlicensed dispensing of medical equipment pursuant to an unlawful referral relationship that was clinically unnecessary and part of a predetermined treatment protocol. These records reflect a systematic effort to induce payment from Allstate through the use of fraudulent documentation and the exploitation of the claimant's injury status.

434.    Allstate would not have authorized any payment had it known that RPAV was illegally dispensing DME as an unlicensed provider.

435.    All of the fraudulent bills submitted by RPAV traveled through the U.S. Mail and/or interstate wires.

436.    Allstate is entitled to recover payments in connection with the fraudulent billing by RPAV.

### 3.   Billing for Medically Unnecessary Services

437.    The Defendants engaged in a predetermined treatment protocol designed to provide unnecessary healthcare services solely to maximize billings and concomitant profit.

438.    The American Medical Association defined medical necessity as: "Healthcare services or products that a prudent physician would provide to a patient for the purpose of preventing, diagnosing or treating an illness, injury, disease, or symptoms in a manner that is (a) in accordance, with generally accepted standards of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the patient, treating physician, or other health care provider," (Institute of Medicine, Committee on Defining and Revising an Essential Health Benefits Package for Qualified Health Plans (2011)).

439.    Based on Allstate's investigation, AMS facilitated and executed the creation of fraudulent billing records on behalf of the Defendant providers named herein.

440.    Based on Allstate's investigation, AMS served as a common conduit between the Defendant providers. Specifically, AMS created the false billing ledgers for New Life, 87th St. Rehab, ARMV, Rogers Park, Deen Health, Paulina Anesthesia, RPAV, and Dr. Mohiuddin's business, Regenerative.

441.    AMS utilized a standardized, fraudulent template to generate bills for all Defendant entities. This "cookie-cutter" billing scheme resulted in the submission of claims to Allstate that were clinically identical across different patients and different providers, demonstrating the bills were products of a pre-determined fraudulent formula rather than actual patient care.

442. Billing ledgers submitted to Allstate by AMS contained uniform identifiers unique to AMS for each of the Defendant providers.

443. A true and accurate representative sample of a Rogers Park's ledger, with the AMS Account number highlighted, that was submitted to Allstate is depicted below:



444. A true and accurate representative sample of a New Life's ledger, with the AMS Account number highlighted, that was submitted to Allstate is depicted below:



445.    AMS was responsible for altering data provided by the clinics to ensure that every bill met a specific "profit profile." This included "upcoding" simple visits to high-complexity codes and "unbundling" services to create the appearance of more extensive treatment than was actually performed at the Defendant providers.

446.    The billing ledgers submitted by AMS often listed healthcare services that were medically unnecessary or never administered as represented, if at all.

447.    AMS intentionally created these line items to inflate the total claim value, acting with the specific intent to defraud Allstate.

448.    By centralizing the creation of false bills, AMS enabled the Defendants to hide their individual fraudulent acts within a high volume of seemingly "standard" medical billing, which in reality was a coordinated submission of false records.

449.    AMS was an active and direct participant in the Defendants' scheme.

450. According to the testimony of Soto (owner and operator of AMS), AMS's role included the initial creation of the bills through their submission to insurance companies, including Allstate.

451. Soto further testified that the Defendants maintained continuous access to the billing records generated by AMS, providing them with full visibility into the billing activity.

452. Ultimately, the Defendant Medical Companies and their owners are responsible for the misrepresentations contained in their bills submitted to Allstate.

453. A true and accurate excerpt from Soto's deposition testimony details these billing practices as they related specifically to Rogers Park:

> Q.   And then the bills that you were shown earlier -- show them again. Did you draft that document -- that bill?
> A.   Yes.

*        *        *

> Q.   You draft it and then you send it to Rogers Park, and they basically put their, I guess, title on it and rubber stamp it?
> A.   No. We submit it. They give us all the documents that we submitted to the attorney or to the insurance. We submit the bills.
> Q.   Understood.
> A.   They have access to it on the software, but we submit it.

454.     While AMS was responsible for generating the ledgers and CPT codes, the HICF prominently featured the electronic signatures of the respective medical providers, which serves as a clear indication of their imprimatur on each bill submitted to Allstate.

455.     Each medical provider bears a non-delegable responsibility for ensuring the accuracy and legitimacy of the billing associated with their professional services. The act of submitting or facilitating fraudulent or excessive billing can constitute a formal violation of the Illinois Medical Practice Act pursuant to 225 ILCS 60/22.

456.     Based upon the findings of Allstate's investigation, the proposed Defendants engaged in a pattern of widespread fraudulent billing that specifically included the unbundling of services; charging for services that were never rendered; as represented, if at all, charging for services not covered under the applicable policies; and charging for medically unnecessary services at excessive rates.

457.     AMS performed an integral role in facilitating these various schemes by managing the primary billing and collection functions for both the healthcare services purportedly provided by the Defendants.

458.     The Defendants' goal was not the legitimate treatment and care of patients, but rather to bill Allstate claimants for as many healthcare services as possible, regardless of whether the healthcare services are medically necessary or lawful.

459.     Defendants intentionally prioritized maximizing billings to Allstate claimants, regardless of medical necessity or legality, with the knowledge that Allstate (the primary target of their fraud scheme) would rely on their fraudulent bills, records, and liens (and the false representations contained therein) and make payment.

460.    The vast majority of Allstate claimants allegedly treated by the Defendants appeared to have only soft-tissue injuries, with no documented objective findings to justify the predetermined treatment protocols, excessive testing, or repeated treatments they received.

461.    The records submitted by Defendants, sent through the U.S. Mail and/or interstate wires, indicate extensive use of healthcare services described herein.

462.    These healthcare services were utilized broadly and indiscriminately, without regard for a patient's presenting complaints, noted progress, patient's age, diagnosis, or severity.

463.    Importantly, there is no meaningful assessment of patient response to the predetermined healthcare services; nor is there any alteration of treatment plan following these interventions.

464.    In sum, the totality of the purported healthcare services purportedly provided by the Sirajudeen healthcare businesses and the Pandya healthcare businesses were medically unnecessary, unsubstantiated, excessive, and duplicative.

> a.    Medically Unnecessary Chiropractic and Physical Therapy Services

465.    The Chiropractic Entities[4] regularly submitted bills to Allstate seeking payment for treatment and services that were (1) medically unnecessary; (2) unreasonable; and (3) not rendered as represented to Allstate claimants.

466.    The Defendants breached the standard of care governing their respective fields of physical therapy and chiropractic medicine by failing to provide treatment that met the accepted professional benchmarks for safety and efficacy.

---

[4] The Chiropractic Entities include 87th St. Rehab, New Life, ARMV, Deen Health and Rogers Park.

467. Despite Allstate claimants routinely presenting with soft-tissue injuries lacking objective deficits, the Chiropractic Entities ignored the requirement for individualized treatment planning. Instead, they utilized predetermined, indiscriminate protocols—including excessive testing and repetitive procedures—without regard for the patient's age, specific diagnosis, severity, or documented progress. Such broad application of treatment, devoid of clinical justification, constitutes a departure from the accepted standard of care for both physical therapy and chiropractic disciplines.

468. The Chiropractic Entities failed to implement quantifiable, visit-specific treatment goals or validated functional outcome measures. Instead of using objective data to guide clinical decisions, the providers relied on subjective, static, and templated documentation.

469. The Chiropractic Entities systematically billed for treatment sessions that were rendered beyond the point of maximum expected medical improvement (e.g., beyond an initial, medically necessary trial of care), thus fraudulently classifying medically unnecessary maintenance or supportive care as acute, skilled treatment.

470. The Chiropractic Entities routinely failed to document the required objective clinical findings (such as restricted joint motion or soft-tissue dysfunction) necessary to support the ongoing billing of skilled manual therapy (CPT 97140) procedures.

471. The Chiropractic Entities systematically billed for therapeutic exercise (CPT 97110) that lacked documentation of necessary elements, including evidence of muscle weakness or functional loss requiring skilled intervention, and failed to demonstrate progression or modification across visits correlating to the claimant's functional improvement.

472. The Chiropractic Entities routinely billed for passive modalities that were inappropriate for extended use, including electrical muscle stimulation (CPT 97014), traction (CPT 97012), ultrasound (CPT 97035), and in-office heat and cold packs (CPT 97010), without objective documentation of acute functional deficits or measurable improvement that would justify continued use beyond a brief initial period.

473. Pursuant to a routine billing protocol, the Chiropractic Entities repeatedly ordered or facilitated medically unnecessary and premature advanced imaging, including Cervical and Lumbar MRIs, before a full and documented trial of conservative care was completed and without objective indicators or progressive neurological deficits.

474. The Chiropractic Entities routinely used MRI findings, which often revealed common, chronic degenerative changes (such as disc bulges or spondylosis) frequently observed in asymptomatic adults, to fraudulently justify the continuation of extended and unnecessary treatment plans.

475. The Chiropractic Entities routinely and unlawfully referred claimants to pain management and other external providers for escalation of care (including advanced injections or procedures) that was not medically necessary, as the claimant's own records often documented improvement, stable symptoms, lack of deterioration, and no demonstrated failure of an adequate course of conservative management.

476. In sum, the totality of the purported care provided to the patients of the Chiropractic Entities Pain (and concomitant bills to Allstate) was medically unnecessary, unsubstantiated, excessive, and duplicative.

477.    If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary, and therefore, is non-compensable.

478.    Allstate would not have authorized any payment had it known that the treatment billed by the Chiropractic Entities was not medically necessary.

479.    All of the fraudulent bills submitted by the Chiropractic Entities traveled through the U.S. Mail and/or interstate wires.

480.    Allstate is entitled to recover payments in connection with the fraudulent billing by the Chiropractic Entities, including those claims identified in Exhibits 6, 10, and 20.

i.      *Billing for Medically Unnecessary Healthcare Services at 87th St. Rehab, New Life, and ARMV*

481.    87th St. Rehab, New Life, and ARMV subjected Allstate claimants to a predetermined treatment protocol that included a battery of unnecessary chiropractic and physical therapy services.

482.    Under the direction of Defendant Pandya, chiropractors at 87th St. Rehab, New Life, and ARMV followed standardized, predetermined treatment protocols that failed to consider the individual medical needs of Allstate claimants.

483.    87th St. Rehab, New Life, and ARMV and their providers, including Aldrin Carrion, D.C., routinely billed Allstate claimants for services that were not medically necessary, thereby exploiting payors.

484.    The physical therapy services provided at 87th St. Rehab, New Life, and ARMV similarly lacked medical necessity wherein they were systematically administered solely to support fraudulent billing.

485.    These predetermined treatment protocols were not specifically tailored to patient's needs, lacked measurable treatment goals, and failed to document patient progress.

486.    The 87th St. Rehab, New Life, and ARMV Defendants utilized identical template forms   (often prepopulated) to document patient evaluations and treatments that lacked the individualized assessments necessary to reflect unique patient needs.

487.    A true and accurate representative sample of forms utilized by  New Life is depicted below:

488. The systematic use of these uniform forms demonstrates a lack of personalized care. This pattern indicates a billing-centric model designed to prioritize patient volume over the delivery of legitimate, individualized healthcare treatment.

489. Irrespective of their specific injuries, symptoms, or individual needs, nearly all Allstate claimants treated at these clinics were subjected to the same predetermined chiropractic regimen.

490. Pursuant to a rigid, non-clinical clinic protocol, virtually every Allstate claimant was evaluated by a chiropractor and then immediately referred for an identical physical therapy course. This standardized regimen typically consisted of electrical stimulation, hot/cold packs, and therapeutic exercises.

491. This therapy was routinely administered 2–3 times per week for a fixed duration of 4–6 weeks, without regard for the patient's clinical response, measurable progress, or objective need for ongoing care.

492. Following the predetermined course of therapy, claimants were frequently referred for imaging and pain management services. This escalation was driven by standard clinic protocol rather than an actual deterioration of the patient's condition or a documented failure to respond to conservative care.

493. Defendant Pandya, through Defendants, 87th St. Rehab, New Life, and ARMV, engaged in improper billing practices and maintained systematic documentation irregularities at both clinics, deliberately creating records that concealed the lack of medical necessity.

494. Subsequent progress notes were demonstrably templated and repetitive, lacked visit-specific findings, and contained no quantifiable goals or objective measurements of patient

improvement. This documentation failure further establishes the absence of objective medical necessity for the continued billing of services.

495. Claimant Y.R. (Claim No. 061019837) serves as a representative example of this pattern of unnecessary billing at New Life, which includes services without objective clinical support, measurable functional deficits, or adherence to recognized, evidence-based standards of care.

496. New Life billed Y.R. for an initial office visit pursuant to CPT 99203.

497. Initial office visits/examinations are billed using a CPT code that starts with the numbers "9920;" re-examinations are billed using a CPT code that starts with the numbers "9921."

498. The final number to complete each five-digit CPT code for these evaluations is one (1) through five (5), depending on the complexity of the evaluation performed.

499. To properly bill using Level 3 complexity codes, the physician must document a detailed history and a detailed examination for a new patient (99203), or an expanded problem-focused history and examination for an established patient (99213), alongside medical decision-making of low complexity.

500. The AMA guidance mandates that Level 3 encounters typically involve 30 minutes of total time on the date of the encounter.

501. New Life has systematically submitted billing charges to Allstate asserting the performance of Level 3 examinations (CPT codes 99203 and 99213) as a default practice, regardless of the clinical necessity or services actually rendered. *See* Exhibits 4-5.

502. All bills submitted under CPT codes 99203 and 99213, including those contained in Exhibits 4 and 5 (including Y.R.'s bills), were fraudulent whereas they were issued as a matter

of routine course, rather than being predicated on an independent assessment of the medical decision-making (MDM) or the specific time thresholds required for such codes.

503. Thereafter, New Life billed Y.R. for nine chiropractic treatment sessions between July 8, 2022, and August 30, 2022, all of which demonstrably lacked medical necessity.

504. Treatment beyond the initial evaluation on July 8, 2022, failed to meet accepted evidence-based criteria for ongoing chiropractic care, which mandates objective documentation of restricted joint motion, soft-tissue dysfunction, or measurable functional loss.

505. The treating provider's own initial documentation from July 8, 2022, noted normal range of motion in all planes and a normal neurologic status (including strength, reflexes, and sensation). Without these documented objective deficits, continued passive and active therapies were not expected to yield further benefit and therefore constitute medically unnecessary maintenance care rather than acute treatment.

506. In addition to billing for its own medically unnecessary and upcoded services, New Life leveraged these improper encounters to generate further fraudulent claims by unlawfully funneling patients, including Y.R. to preferred external providers to facilitate the Defendants' predetermined treatment protocol.

507. Specifically, New Life orchestrated an improper and unnecessary referral for a consultation with an external pain management provider, Dr. Mohiuddin, on July 20, 2022, despite the absence of clinical indications requiring specialist intervention.

508. The consultation lacked medical necessity because there was no documented clinical rationale in the patient's record, no objective findings of deterioration, and no documented

failure of an adequate course of conservative management at New Life to justify an unwarranted escalation to advanced pain management services.

509. Claimant J.J. (Claim no. 0674129192) serves as a representative example of the 87th St. Rehab's systematic practice of billing for medically unnecessary treatment and procedures.

510. On June 20, 2022, 87th St. Rehab billed for a Level 3 new claimant examination (CPT 99203) from Aldrin Carrion, D.C., in connection with J.J. following a motor vehicle accident.

511. Like New Life, 87th St. Rehab systematically submitted billing charges to Allstate asserting the performance of Level 3 evaluations (CPT codes 99203 and 99213) as a default practice, regardless of the clinical necessity or services actually rendered. *See* Exhibits 4-5.

512. The bills 87th St. Rehab submitted pursuant to CPT codes 99203 and 99213 (including those to J.J.), were fraudulent whereas they were issued as a matter of routine course, rather than being predicated on an independent assessment of the medical decision-making (MDM) or the specific time thresholds required for such codes. *See* Exhibits 4 and 5.

513. The records documenting J.J.'s initial chiropractic examination failed to identify objective mechanical restriction or functional impairment necessary to warrant the subsequent extensive course of skilled manual therapy and active rehabilitation.

514. The examination recorded normal range of motion in all cervical, lumbar, and bilateral shoulder planes, and a normal neurological status. The only objective findings were orthopedic tests recorded as nonspecific and inconsistent with reproducible pathology.

515. Despite a lack of objective clinical deficits, J.J. was immediately prescribed an excessive treatment plan of three visits per week for six to eight weeks, consisting of therapeutic exercise (CPT 97110), manual therapy (CPT 97140), and electrical muscle stimulation (CPT 97014).

516. The ongoing treatment was not supported by medical necessity because there was no restricted joint motion, soft-tissue dysfunction, or measurable functional loss documented to justify the continued use of passive or active procedures.

517. Progress notes for the subsequent eighteen sessions for J.J. were consistently generic, containing no visit-specific findings, no measurable treatment goals, and only subjective statements of "improved" without quantifiable correlation to function or ability to perform daily activities.

518. The cervical and lumbar MRIs ordered for J.J. on June 24, 2022, were medically unnecessary and clinically premature, as they were requested without indicators or documented neurological deficits and prior to the completion of a standard conservative care trial.

519. The subsequent referral for J.J. to a pain management physician on June 29, 2022, was likewise medically unnecessary; clinical progress notes documented the patient's ongoing improvement and the absence of failed conservative care, yet the referral was issued regardless of this positive clinical trajectory.

520. In a further effort to misrepresent the scope of its services, 87th Street falsely represented that external pain management providers were members of its own internal staff, thereby obscuring the nature of the improper referral scheme.

521. A true an accurate excerpt from the 87th St. Rehab's website is depicted below:

-90-

> At 87th ST. Rehab, we offer our patients a comprehensive injury care program. Our experienced professionals include medical doctors, chiropractic physicians, surgeons, and physical therapists, who specialize in treating acute and chronic pain that is often the result of work-related injuries, personal injuries and sports injuries.

https://87thstrehabcenter.com/about-us/.

522.     The services purportedly administered to J.J. demonstrably lacked medical necessity.

523.     The manual therapy (CPT Code 97140) billed required objective evidence of restricted motion or soft-tissue dysfunction and a minimum of fifteen minutes of skilled contact, none of which were documented in the records. Generic reporting of "spasm" without objective confirmation or time elements does not establish medical necessity.

524.     Likewise, the billed therapeutic exercise (CPT Code 97110) was provided from a checklist and was unmodified across visits, with no documented evidence of muscle weakness, loss of flexibility, or change in strength, motion, or endurance required to justify skilled supervision.

525.     The electrical muscle stimulation (CPT Code 97014) was billed without documentation of acute muscle spasm or functional deficit requiring skilled supervision, and

without tracking of pain or objective functional response to support continued use beyond an initial period.

526. Allstate would not have authorized any payment to 87th St. Rehab and New Life had it known that CPT Codes 97014, 97110, 97140, 99203, and 99213 were not medically necessary.

527. All of the fraudulent bills submitted by 87th St. Rehab and New Life for CPT Codes 97014, 97110, 97140, 99203, and 99213, including those identified in Exhibits 4-8, traveled through the U.S. Mail and/or interstate wires.

528. Allstate is entitled to recover payments to 87th St. Rehab and New Life in connection with the fraudulent billing for CPT Codes 97014, 97110, 97140, 99203, and 99213.

ii. _Billing for Medically Unnecessary Chiropractic Services at Deen Health_

529. Deen Health subjected Allstate claimants to a predetermined treatment protocol that included a battery of unnecessary chiropractic and physical therapy services.

530. Deen Health fraudulently billed Allstate claimants for unnecessary chiropractic and physical therapy services.

531. Chiropractors at Deen Health routinely followed standardized, predetermined treatment plans that failed to account for the individualized medical needs of patients.

532. These treatment protocols lacked measurable goals and did not incorporate regular evaluations of patient progress, resulting in services being billed without demonstrated clinical necessity.

533. Records maintained by Deen Health lacked adequate detail and failed to document the specific services rendered to Allstate claimants.

534. Instead of providing individualized encounter notes, Deen Health consistently used generic annotations that merely listed treatments provided, without describing the services in sufficient detail—particularly when services required one-on-one interaction with a provider.

535. These generalized records, along with statements from Allstate claimants, establish that many billed services lacked appropriate documentation or, in some instances, did not occur at all.

536. For example, Dr. Wleklinski, a chiropractor who provided services at Deen Health, testified in 2021 regarding his practices in signing encounter notes.

537. A true and accurate excerpt from Dr. Wleklinski's 2021 deposition is depicted below:

> Q. And you drafted up a two page note or report from that date of service. Correct?
> A. Correct.
> Q. The signature that is on the form and the date, do you actually physically sign each of these or is this some sort of computer generated document signature?
> A. I signed each of these soap notes myself.
> Q. And do you sign them contemporaneously with the date of service?
> A. No. I sign them after I receive all of the notes, and I sign them all at one time.
> Q. Is that at the end of your treatment?
> A. Yes.
> Q. So in this case am I correct that the last date that you treated Mr. ▇▇▇▇ would have been September 23 of 2019?

\*       \*       \*

> A.  Yes.
> Q.  And at the end Deen Health System would have provided you all of the typed up soap notes, and you would have signed them all?
> A.  Yes.
> Q.  Would you have reviewed them at the end as well for accuracy?
> A.  Yes.

538.    These encounter notes were not reviewed for their accuracy at the time the services were rendered.

539.    Instead, these medical service providers relied on Deen Health to provide this information once all chiropractic services for the Allstate claimant were completed at Deen Health, several weeks or several months after the services were rendered.

540.    Later in the deposition, Dr. Wleklinski was confronted with discrepancies regarding an entry for therapeutic exercises.

541.    A true and accurate excerpt from this portion of the deposition demonstrates material inconsistencies in the records and is depicted below:

Q. When you see him on June 26, his neck pain is a four. His left knee pain is a four, and his low back is a four out of five?

A. Yes.

Q. And the same modalities are provided?

A. Yes.

Q. And you note that there were two units of exercise done. At what point would the exercise go to two units?

\*     \*     \*

A. What date did that start?

Q. I think there's two units on June 26.

A. I have to consult my records. June 26, I got it. Two units of what therapy?

Q. Exercise.

A. Exercise 15 to 25 minutes, is that the one you're talking about?

Q. Do you know why you indicated two units were done this day?

A. I don't recall.

Q. Was the patient getting better at that time, so you were giving him more exercises to do?

A. It's possible. I don't remember.

542. This testimonial evidence illustrates that providers at Deen Health routinely failed to document services rendered to Allstate claimants in a timely and accurate manner, omitting key details about the nature and duration of treatments.

543. The testimony also indicates that Dr. Wleklinski signed encounter notes prepared by Deen Health staff months after the relevant patient visits, without verifying their contents.

544.     Dr. Wleklinski and other providers at Deen Health relied on the clinic, through AMS, to prepare and complete medical records and permitted Deen Health to bill, collect, and retain payments for these improperly documented services.

545.     Deen Health routinely implemented a fraudulent, standardized protocol of care that prioritized billing over clinical need, leading to the provision and billing of chiropractic and physical therapy services without the requisite objective clinical documentation needed to establish medical necessity.

546.     Claimant E.S. (Claim No. 0668913270) serves as a representative example of Defendant, Sirajudeen, through Defendant, Deen Health's practice of extending care and billing for procedures beyond the point of objective medical necessity and failing to utilize evidence-based criteria.

547.     On May 9, 2022, E.S. received an initial new claimant examination (CPT 99203) from Daphne Roscoe, D.C., at Deen Health.

548.     The claimant was prescribed an excessive and predetermined plan of two to three chiropractic sessions per week for four to eight weeks.

549.     Throughout the extended course of treatment, the clinical records failed to document quantifiable treatment goals or objective measurement of functional loss that would support the expectation of material recovery from ongoing skilled care.

550.     Subjective complaints, including persistent stiffness, intermittent tingling, and generalized pain, were essentially unchanged for much of the care, and pain scores showed no progressive improvement correlating with the treatment provided.

551. Objective findings remained static, documenting the same paraspinal tenderness, mild spasm, and guarded motion without evidence of evolving or resolving pathology or documented functional gains.

552. Treatment sessions billed by Deen Health, were not predicated on demonstrated improvement in functional capacity and therefore constitute maintenance therapy rather than medically necessary acute or rehabilitative care.

553. Sirajudeen, through Deen Health, billed for the use of multiple passive modalities that were not medically necessary.

554. On May 11, 2022, Deen Health billed for in-office heat and ice treatment (CPT 97010) to E.S., a modality recommended for self-care that records indicated the claimant was already performing at home, demonstrating the lack of necessity for professional supervision.

555. On May 11, 2022, Deen Health billed for ultrasound therapy (CPT 97035) to E.S., a modality for which medical necessity is not supported for neck pain, and the records lacked documentation of essential encounter-specific information such as settings, body part treated, or response to the therapy.

556. On May 11, 2022, Deen Health billed for traction (CPT 97012) to E.S., a procedure not supported by clinical guidelines for acute nonspecific neck or back pain, and which may delay recovery by stressing healing tissues; the records lacked documentation of the required type, intensity, and duration.

557. None of the manual therapy (CPT 97140) billed by Deen Health for services were medically necessary because the notes failed to document the treating provider, the specific

techniques used, the body part treated, or a functional response to justify ongoing skilled intervention.

558. None of the therapeutic exercises (CPT Code 97110) billed by Deen Health for services to E.S. were medically necessary because there was no indication of progression or improved functional capacity of objective limitations that would support the need for ongoing skilled supervision beyond the initial trial.

559. Allstate would not have authorized any payment to Deen Health had it known that CPT Codes 97014, 97110, 97140, 99203, and 99213 were not medically necessary.

560. All of the fraudulent bills submitted by Deen Health for CPT Codes 97014, 97110, 97140, 99203, and 99213, including those identified in Exhibits 4-8, traveled through the U.S. Mail and/or interstate wires.

561. Allstate is entitled to recover payments to Deen Health in connection with the fraudulent billing for CPT Codes 97014, 97110, 97140, 99203, and 99213.

> iii. <u>Billing for Medically Unnecessary Chiropractic Services at Rogers Park</u>

562. Rogers Park subjected Allstate claimants to a predetermined treatment protocol that included a battery of unnecessary chiropractic and physical therapy services.

563. Rogers Park routinely implemented a fraudulent, standardized protocol of care that prioritized billing over clinical need, leading to the provision and billing of chiropractic and physical therapy services without the requisite objective clinical documentation needed to establish medical necessity.

564. Claimant D.A. (Claim No. 0724851704) serves as a representative example of Rogers Park's practice of engaging in the systematic billing for excessive, unnecessary, and improperly documented chiropractic services, specifically by relying on passive care and extending treatment beyond the point of maximum expected recovery. Here, Rogers Park engaged in a practice of extending treatment beyond the point of maximum medical benefit, thereby improperly billing for services that constitute medically unnecessary maintenance care.

565. Following an initial new claimant examination (CPT 99203) on August 9, 2023, Daphne Roscoe, D.C., prescribed the predetermined plan of two to three sessions per week for four to eight weeks, which was excessive and not predicated on evidence-based criteria.

566. The records for D.A. consistently failed to document quantifiable treatment goals, follow-up re-examinations demonstrating functional change, or the use of validated outcome measures necessary to justify the continuation of skilled care after the initial trial period.

567. The Rogers Park clinical notes for D.A. reference subjective complaints and objective findings (paraspinal tenderness, mild spasm, guarded motion, stable neurological status) that remained essentially unchanged throughout the treatment period, indicating a lack of functional progress warranting ongoing skilled care.

568. The treatment provided to D.A. was not expected to yield further recovery, and therefore constitutes medically unnecessary maintenance therapy, which was fraudulently billed as acute rehabilitative care.

569. Rogers Park routinely utilized and billed for multiple passive modalities without objective evidence that these services facilitated D.A.'s participation in active rehabilitation or resulted in measurable functional improvement.

570. Rogers Park billed for in-office heat and ice treatment (CPT 97010) on August 14, 2023, despite records indicating D.A. was already performing this modality at home, confirming the procedure was not medically necessary as it did not require skilled medical supervision.

571. Rogers Park billed for ultrasound therapy (CPT 97035) on August 14, 2023, a procedure not supported as medically necessary for the claimant's neck pain, and documentation was insufficient as it lacked encounter-specific details regarding settings, treated body part, or response to therapy.

572. None of the manual therapy (CPT 97140) billed by Rogers Park were for services that were medically necessary because the notes failed to document the provider, specific techniques used, the body part treated, or an objective response justifying the ongoing skilled intervention.

573. None of the therapeutic exercise (CPT 97110) billed by Rogers Park for services to D.A. were medically necessary as the services were delivered via the same, unmodified exercises throughout the course of care, with no documentation of progression or improved functional capacity of objective limitations that would support ongoing skilled intervention.

574. None of the special reports (CPT Code 99080) billed by Rogers Park in connection with patient D.A. (Allstate Claim No. 0724851704) were for services that were medically necessary because there was no supporting documentation (e.g., a report, evidence of care coordination, or a specific clinical task) to justify the charge, rendering the service medically unnecessary.

575. Allstate would not have authorized any payment to Rogers Park had it known that CPT Codes 97010, 97035, 99080, 97110, and 97140 were not medically necessary.

576. All of the fraudulent bills submitted by Rogers Park for CPT Codes 97010, 97035, 97110, and 97140, including those identified in Exhibits 7-10, traveled through the U.S. Mail and/or interstate wires.

577. Allstate is entitled to recover payments to Rogers Park in connection with the fraudulent billing for CPT Codes 97010, 97035, 99080, 97110, and 97140.

> b. Billing for Medically Unnecessary Injections/Facility Fee and Anesthesia Services

578. Dr. Mohiuddin and other pain management physicians engaged in a systemic pattern of prescribing and performing excessive, medically unnecessary, and profit-driven injection-based therapies, including FJIs and ESIs, often at their financially associated facility, Rogers Park.

579. These physicians followed a predetermined protocol aggressively focused on injection-based therapies, frequently without proper medical justification or prior response to conservative treatment.

580. The procedures lacked documented evidence of objective benefit or functional improvement. Medical records failed to document the patient's response or the integration of diagnostic data to inform treatment decisions.

581. There was no medical justification to perform these injections at Rogers Park. These types of procedures are routinely performed in an office-based environment.

582. As discussed herein, the Defendants engaged in an unlawful referral relationship to ensure that Rogers Park could bill Allstate for unnecessary interventional pain procedures.

583. Compounding matters, Allstate claimants were subject to unnecessary and dangerous anesthesia while receiving these pain injections at Rogers Park.

584. The concomitant referral to Paulina Anesthesia was part of the unlawful relationship, which was integral to the Defendants' scheme to falsely inflate the value of insurance claims.

585. Allstate claimants were subjected to unwarranted, invasive procedures and excessive, dangerous doses of anesthesia due to the scheme's focus on escalating care for financial gain rather than patient need. Procedures were frequently planned and performed without the foundational prerequisite of a proper in-person physical examination, even when clinically required for diagnosis (e.g., for facet joint pain), rendering the procedures clinically unjustified.

586. This practice of medically unnecessary intervention was closely linked to a financial self-dealing arrangement. The financial incentive driving the unnecessary procedures was a concealed self-referral arrangement between the physicians and Rogers Park, violating professional conduct and state law.

587. Patient records were devoid of consent disclosures, eliminating the claimants' ability to choose an alternative surgery center, which often resulted in significantly higher, inflated costs. This practice prioritized the provider's financial gain over the patient's best interests regarding both health and cost.

588. The procedures were executed pursuant to an improper financial arrangement where referrals were exchanged for professional fees or other compensation, violating the Illinois Medical Practice Act (MPA). Rogers Park billed Allstate exorbitant and medically unjustified

facility fees—further inflated through unbundling (discussed below)—which were unnecessary costs driven by the fraudulent scheme to escalate care.

589. By submitting bills and records, Rogers Park misrepresented that the referrals were legitimate and lawful.

590. Allstate would not have authorized payment had it been aware of the self-referral violation and the lack of patient choice.

591. Claimant K.P. (Claim No. 0681819413) serves as a representative example of this fraudulent pattern, illustrating both the lack of medical justification and the flawed clinical process.

592. K.P. had already demonstrated significant improvement with conservative care, with her pain level decreasing from 7-8/10 to 4/10. This substantial pre-procedure improvement negated the need for the invasive bilateral L4-S1 lumbar facet joint injections administered by Dr. Mohiuddin.

593. Dr. Mohiuddin planned the injections without performing a physical examination during the preceding telemedicine visit on December 2, 2022. Proceeding with a surgical/interventional procedure to K.P. without the required in-person physical diagnosis (facet joint pain) confirms that the procedure was presumptive and performed solely for-profit generation, not clinically justified patient care.

594. The entirety of the bills submitted by Rogers Park for services allegedly administered to K.P. at Rogers Park are fraudulent due to the self-referral scheme and the systemic performance of unnecessary procedures.

595. Another representative example is claimant W.J. (Claim No. 0712811314), where medically unnecessary advanced imaging and invasive procedures were ordered despite evidence of symptom resolution with conservative treatment.

596. W.J. was involved in an accident on April 26, 2023. His treatment history demonstrates a pattern of inappropriately escalating care for profit generation.

597. Despite showing steady improvement with physical therapy, Dr. Mohiuddin ordered unnecessary advanced imaging (MRIs of the cervical and lumbar spine). An escalation to MRIs is not indicated in a patient who is improving with conservative measures.

598. This unjustified diagnostic escalation was immediately followed by an escalation to invasive treatment, despite further evidence of symptomatic resolution. Just prior to the first set of injections, on July 7, 2023, W.J indicated that his pain was "very mild." This significant pain reduction with conservative care negated the need for invasive intervention. Nonetheless, bilateral L4-S1 facet joint injections were performed on July 10, 2023 at Rogers Park under anesthesia billed by Paulina Anesthesia.

599. The lack of necessity for these procedures is confirmed by the subsequent physical therapy note on July 11, 2023, which documented that W.J.'s condition had resolved, with no symptoms in the neck, low back, or left knee, and an excellent prognosis. Despite this clear resolution and the expected improvement over time with continued conservative care, Dr. Mohiuddin ordered a second set of injections.

600. During the July 26, 2023 follow-up, Dr. Mohiuddin ordered cervical facet joint injections. These bilateral C3-C5 facet joint injections were performed on July 31, 2023. This

second set of injections was unnecessary given the lack of symptoms documented in the physical therapy record days earlier.

601. In summary, both the MRIs and the two sets of facet joint injections (July 10, 2023, and July 31, 2023) were not necessary. They represent an aggressive, medically unjustified, and profit-driven escalation of care, culminating in unnecessary facility services billed by Rogers Park and unnecessary anesthesia services billed by Paulina Anesthesia.

602. All of the fraudulent bills submitted by Rogers Park for unnecessary facility fees, including those identified in Exhibit 1, traveled through the U.S. Mail and/or interstate wires.

603. Allstate is entitled to recover payments from Rogers Park in connection with the fraudulent billing for unnecessary facility fees.

604. Allstate would not have authorized any payment to Rogers Park had it known that the pain intervention procedures were not necessary.

605. Allstate is entitled to recover payments from Rogers Park in connection with the fraudulent billing for unnecessary pain intervention procedures.

606. Allstate would not have authorized any payment to Paulina Anesthesia had it known that the anesthesia services were damaging and not necessary.

607. All of the fraudulent bills submitted by Paulina Anesthesia for unnecessary and damaging anesthesia traveled through the U.S. Mail and/or interstate wires.

608. Allstate is entitled to recover payments from Paulina Anesthesia in connection with the fraudulent anesthesia for unnecessary and damaging anesthesia.

c.    Billing for Services That Were Not Rendered as Represented

609.    The services purportedly provided by the Defendant medical entities were billed using CPT codes, and/or Healthcare Common Procedure Coding System ("HCPCS") codes,[5] which are published annually by the American Medical Association ("AMA"). Providers have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

i.    *Fraudulent Unbundling of Services by Rogers Park*

610.    "Unbundling" of CPT codes represents an example of a fraudulent and abusive billing tactic.

611.    Unbundling occurs when multiple CPT codes are billed for the component parts of a procedure when there is a single code available that includes the complete procedure.

612.    Allstate is not required to pay the Defendants for unbundled services and is entitled to recover any payments tendered to the Defendants as a result of unbundling services.

613.    Rogers Park engaged in systematic unbundling in connection with various injection procedures administered to Allstate claimants, thereby inflating the total charges submitted to Allstate.

614.    Specifically, Rogers Park routinely billed for fluoroscopic guidance pursuant to CPT code 77003 in conjunction with ESIs.

---

[5] HCPCS codes are alphanumeric codes for medical supplies, products, and services.

615. Fluoroscopic guidance is an essential element of multiple injection procedures, including ESIs, and should not be reported separately from the CPT codes that already include imaging guidance as part of their definitions.

616. For example, CPT codes 62321 and 62323, which Rogers Park routinely used to bill for ESIs, specifically include imaging guidance (fluoroscopy or CT) in their descriptions and reimbursement values.

617. The same applies to CPT codes 64479 and 64483 for transforaminal ESIs, CPT codes 64490 through 64492 for facet joint injections, and CPT codes 64493 and 64494 for medial branch block injections.

618. Because these CPT codes explicitly include fluoroscopic guidance, the separate billing of CPT code 77003 for fluoroscopy constitutes impermissible unbundling.

619. Accordingly, Rogers Park's charges for fluoroscopic guidance in connection with these procedures are not separately reportable and must be excluded.

620. Allstate would not have authorized any payment to Rogers Park had it known that CPT Code 77003 was unbundled and not permissible.

621. All of the fraudulent bills submitted by Rogers Park for CPT Code 77003, including those identified in Exhibit 11, traveled through the U.S. Mail and/or interstate wires.

622. Allstate is entitled to recover payments to Rogers Park in connection with the fraudulent billing for CPT Code 77003.

623. In addition to false billing for fluoroscopy, Rogers Park also routinely unbundled other services and supplies that are an inherent part of the billed injection procedures.

624. For example, Rogers Park submitted separate charges for use of the recovery room, surgical trays, spinal needles, syringes, and normal saline—despite the fact that these items are standard and already included in the facility fees under CPT codes such as 62321, 62323, 64490, 64491, 64493, and 64494.

625. Below is a true and accurate representative example of a bill submitted by Rogers Park to Allstate, which reflect these improper charges:



626. These CPT codes can only be billed separately from the facility fees if they are services or supplies beyond what is already accounted for in the procedure code billed.

627. Allstate's investigation found no supporting documentation to establish that these additional charges reflected services or supplies beyond what is already accounted for in the relevant CPT codes.

628. Therefore, Rogers Park's separate billing for "recovery room," "surgical tray," "spinal needle," "5 cc syringe," and "normal saline" also constitutes improper unbundling.

629. These items are not separately reimbursable and must be excluded from any total reimbursement calculation.

630. Allstate would not have authorized any payment to Rogers Park had it known that billing for the recovery room, surgical trays, spinal needles, syringes, and normal saline were unbundled and not permissible.

631. All of the fraudulent bills submitted by Rogers Park for the recovery room, surgical trays, spinal needles, syringes, and normal saline, including those identified in Exhibits 12-16, traveled through the U.S. Mail and/or interstate wires.

632. Allstate is entitled to recover payments to Rogers Park in connection with the fraudulent billing for the recovery room, surgical trays, spinal needles, syringes, and normal saline.

        *ii.      Fraudulent Unbundling of Anesthesia Services by Paulina Anesthesia*

633. Virtually all of the procedures performed on Allstate claimants did not require anesthesia.

634. Nevertheless, Paulina Anesthesia systematically billed Allstate, which included unbundling services to inflate its charges, frequently billing in excess of $2,000 per procedure.

635. Below is a true and accurate representative sample of charges submitted by Paulina Anesthesia, which reflect this unbundling scheme:

636. These charges included separate billing for supply items and intravenous fluids, such as "Ringer's Lactate" under CPT code J7120.

637. Such separate charges for routine supplies and fluids constitute unbundling, as these items are already included in the reimbursement provided under CPT code 01938 for Monitored Anesthesia Care (MAC).

638. Allstate would not have authorized any payment to Paulina Anesthesia had it known that fraudulently billed supply items were not medically necessary.

639.     All of the fraudulent bills submitted by Paulina Anesthesia for fraudulently billed supply items, including those identified in Exhibit 17, traveled through the U.S. Mail and/or interstate wires.

640.     Allstate is entitled to recover payments to Paulina Anesthesia in connection with the fraudulent billing for fraudulently billed supply items.

iii.     *Fraudulent Billing for COVID-19 Products and/or Services by  87th St. Rehab and New Life*

641.     87th St. Rehab and New Life fraudulently charged for COVID-19 products and services.

642.     The AMA released CPT Code 99072 on September 8, 2020, to account for additional expenses associated with providing care during the COVID-19 public health emergency.

643.     The Centers for Medicare & Medicaid Services (CMS) categorized CPT Code 99072 as a bundled service and did not provide separate reimbursement for it. Instead, CMS implemented general increases in supply pricing.

644.     CPT Code 99072 was intended to reimburse providers only for reasonable and documented expenses exceeding the standard cost of an in-person visit, such as the use of personal protective equipment (PPE), cleaning supplies, or extended staff time.

645.     87th St. Rehab and New Life routinely billed CPT Code 99072 per patient visit without providing any supporting documentation, itemized expenses, or explanation of additional services incurred to justify the charge.

646. Allstate's investigation found no evidence—either in medical records or in claimant testimony—that 87th St. Rehab or New Life incurred or provided any extra services, materials, or staffing beyond ordinary office visit protocols, such as providing masks or routine sanitation.

647. A true and accurate representative sample of the boilerplate language used in daily reports by 87th St. Rehab and New Life to justify CPT 99072 is depicted below:



648. No other documentation or justification accompanied these charges.

649. Despite the termination of reimbursement for CPT 99072 on or about May 11, 2023, both 87th St. Rehab and New Life continued to bill Allstate under this code.

650. For example, New Life submitted a HICF for services provided on August 22, 2023—well after CPT 99072 was no longer reimbursable.

651. A true and accurate representative sample of this claim form is included below:

652. These unsupported and unreasonable charges further illustrate that 87th St. Rehab and New Life deliberately included fraudulent services and charges in their billing practices to inflate the cost of physical therapy services submitted to Allstate.

653. Allstate would not have authorized any payment to 87th St. Rehab and New Life had it known that they were submitting fraudulent billing for COVID-19 products pursuant to CPT code 99072.

654.     All of the fraudulent bills submitted by 87th St. Rehab and New Life for COVID-19 products pursuant to CPT code 99072, including those identified in Exhibit 18, traveled through the U.S. Mail and/or interstate wires.

655.     Allstate is entitled to recover payments to 87th St. Rehab and New Life in connection with the fraudulent billing for COVID-19 products pursuant to CPT code 99072.

####                    d.          Billing For Services That Misrepresented the Provider Location

656.     In numerous instances, Allstate claimants seeking treatment from New Life did not receive their initial clinical evaluations at a New Life facility; instead, they underwent these assessments at a separate, unaffiliated entity under the direction of a physical therapist.

657.     These evaluations were performed by Khaled Rashad, P.T., D.P.T. ("Rashad"), acting in his capacity as the owner and operator of Liberty Physical Therapy and Rehabilitation ("Liberty Physical Therapy")—an entity legally distinct from New Life.

658.     Although Rashad operates Liberty Physical Therapy at several Chicago locations, including 6526 S. Pulaski Rd., Chicago, IL 60629, the billing records and clinical reports misrepresented that these services were performed at New Life.

659.     This practice constitutes a deceptive misrepresentation of the medical record and a violation of Illinois law regarding the corporate practice of medicine and professional licensing, as New Life sought reimbursement for services performed at an unauthorized location by staff not employed by the billing entity.

660.     To facilitate this scheme, New Life staff systematically redirected Allstate claimants to Liberty Physical Therapy, effectively outsourcing clinical evaluations while retaining the billing rights under New Life's name to obscure the true location of service.

661.    A true and accurate excerpt of the recorded statement provided by claimant R.V. (Claim No. 0710357054) is depicted below, confirming that the claimant was directed away from New Life to an off-site facility for the initial evaluation:

```
ATTORNEY.--CLARIFY ONE--

Q.  OH--

ATTORNEY.--THING ACTUALLY THE NAME--

Q   --OR THE--

ATTORNEY.--OF THE THERAPY CLINIC THAT YOU WENT TO, UM, YOU

        THE WHERE WAS THE CLINIC LOCATED--

A.  IT'S A RIGHT OFF OF 65TH AND PULASKI.

ATTORNEY.OKAY HAVE YOU EVER HEARD THE TERM M AND R RUDRA

        NEW LIFE MEDICAL.
```

\*      \*      \*

```
A.  I BELIEVE, THEY CALLED ME AND THEN THEY DIRECTED ME TO

    THAT PHYSICAL THERAPY LOCATION JUST CLOSER TO ME.

ATTORNEY.OKAY AND SO WAS THIS THE ADDRESS OF THE ACTUAL

        CLINIC YOU WENT TO WAS IT 6526TH SOUTH PULASKI

        ROAD.

A.  YES.
```

662.    Under the Illinois Physical Therapy Act, a physical therapist may provide services either with or without a referral. However, if no valid referral exists, the therapist is statutorily mandated to notify the patient's treating healthcare professional within five business days of the initial visit. 225 ILCS 90/1.2(b).

663.    The Act strictly defines a "referral" as a formal authorization from a licensed physician (or other authorized practitioner) who maintains medical supervision of the patient and provides a specific diagnosis or verification that the treatment is appropriate. *Id.* § 90/1(6).

664.    In a systematic effort to evade the five-day notification requirement and create a veneer of medical necessity, the healthcare documentation for Allstate claimants treated by Rashad at Liberty Physical Therapy were falsely populated with a designated referring physician.

665.    Specifically, these records consistently identified "Manish Pandya, *M.D.*" as the referring physician, despite the fact that Pandya is *not* a medical doctor, and often had no prior clinical relationship with the claimants and had not provided a legitimate medical diagnosis or verification prior to the physical therapy assessment.

666.    By naming Pandya as a "referring physician" in instances where no bona fide referral occurred, Rashad and Liberty Physical Therapy misrepresented the clinical record to circumvent the statutory obligations set forth in 225 ILCS 90/1.2.

667.    A true and accurate representative example of these manufactured referring physician notations, as contained within Rashad's initial examination records, is depicted below:

-116-



Patient Name:
Date of Birth:
Referring Physician(s): PANDYA, MANISH MD

668.    These encounters at Liberty Physical Therapy constituted the actual initial point of clinical contact for the Allstate claimants. Contrary to the billing representations, the records contain no evidence that New Life performed any clinical evaluations, established any diagnoses, or provided any medical oversight prior to these physical therapy assessments.

669.    At the conclusion of these evaluations, Rashad executed "certifications of medical necessity" for ongoing physical therapy. These documents were not personally reviewed or signed by a physician; instead, they bore a generic ink stamp reading "M. Pandya, *M.D.*" (emphasis added).

670.    The use of this stamp was a deceptive device intended to create the false appearance that the services were being rendered under Pandya's direct supervision, care, and medical necessity—as required for reimbursement—when, in fact, Pandya had no meaningful clinical involvement.

671.    A true and correct copy of a representative sample of this "certification" and the automated physician stamp is depicted below:



Certification of Medical Necessity: It will be understood that the treatment plan mentioned above is certified medically necessary by the documenting therapist and referring physician mentioned in this report. Unless the physician indicates otherwise through written correspondence with our office, all further referrals will act as certification of medical necessity on the treatment plan indicated above.

Thank you for this referral. If you have questions regarding this plan of care, please contact me at (773)585-9460.

Please sign and return: Fax#: (773)585-7030

I certify the need for these services furnished under this plan of treatment and while under my care.

Physician/Non-Physician Practitioner (NPP) Signature:

Khaled Rashad, PT, DPT, OCS
License #IL
*Electronically Signed by Khaled Rashad, PT, DPT, OCS on April 28, 2023 at 5:24 pm*

Date:_____

M. PANDYA MD
Time:_____

672.    Clinical records confirm that no independent New Life medical provider exercised actual medical supervision or verified the clinical necessity of physical therapy in cases where Rashad performed the initial evaluation.

673.    Following these initial evaluations, Rashad—operating through his own entity, Liberty Physical Therapy—rendered all subsequent physical therapy services to the Allstate claimants until their discharge.

674.    During these treatment periods, there is no evidence that the Allstate claimants' physicians were ever notified within five (5) business days of the initial visit, representing a direct violation of the notification mandate under 225 ILCS 90/1.2(b).

675.    Rashad was the exclusive author of the initial evaluations and the subsequent daily SOAP notes; no New Life staff member contributed to the clinical assessment or treatment of these claimants.

676.    Despite providing the facility, equipment, and professional staff, Liberty Physical Therapy did not submit any bills to Allstate for these services.

677. Instead, New Life appropriated and rebranded the evaluations and notes generated by Rashad at his Liberty Physical Therapy facility, falsely submitting them as its own clinical records to induce payment from Allstate.

678. Furthermore, in matters where Rashad performed the initial evaluation, New Life's records are devoid of any documentation indicating that its own healthcare professionals rendered any services.

679. To further the deception, New Life's billing ledgers consistently and falsely identified the provider as "Khaled Rashad **D.C.**" fraudulently representing to Allstate that the services were performed by a Doctor of Chiropractic rather than a Physical Therapist. Rashad is *not* licensed as a chiropractor.

680. This misidentification of Rashad's credentials was designed to bypass insurer scrutiny regarding the "Direct Access" notification requirements and the lack of a valid medical referral.

681. A true and correct representative sample of a ledger submitted by New Life for services rendered exclusively by Rashad—illustrating the fraudulent use of the "D.C." designation—is depicted below:

-119-

**M&R RUDRA NEW LIFE MEDICAL**
**KHALED M. RASHAD D.C.**
PATIENT ACCOUNT LEDGER

As Of   August 25, 2023

PATIENT NAME: ▮▮▮▮▮▮▮▮▮▮▮       AMS ACCT #:   LP000120
D.O.I.:   4/16/2023

| D.O.S. | PROCEDURE | CHARGE AMOUNT | PAYMENT | BALANCE |
|---|---|---|---|---|
| 4/28/2023 | PHYSICAL THERAPY AND INITIAL | $ 535.00 | $ - | $ 535.00 |
| 5/1/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 5/8/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 5/10/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 5/15/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 5/19/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 5/22/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 5/26/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 5/31/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 6/2/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 6/5/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 6/7/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 6/12/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 6/14/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 6/19/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 6/21/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 6/28/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 6/30/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 7/5/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 7/7/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 7/10/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |
| 7/12/2023 | PHYSICAL THERAPY | $ 400.00 | $ - | $ 400.00 |

682.    New Life fraudulently misrepresented that Pandya had referred the claimants and maintained clinical supervision over their care; these misrepresentations were calculated to facilitate Rashad's unauthorized provision of services and to provide a "medical" veneer to services performed entirely outside of New Life's facility.

683.    Upon information and belief, Pandya, through New Life, engaged in this scheme to circumvent statutory notification requirements under 225 ILCS 90/1.2(b) and to bypass the necessity of a legitimate medical evaluation, thereby ensuring the claimants remained within the closed referral loop.

684.    Furthermore, this arrangement constitutes an illegal fee-splitting scheme prohibited by Illinois law. New Life functioned as a mere billing shell, "appropriating" services performed

-120-

by an independent third party (Rashad/Liberty) and submitting them to Allstate at an inflated or consolidated rate.

685. Specifically, New Life retained a portion of the insurance reimbursements for services it did not perform, supervise, or provide facility space for, subsequently distributing a "split" or kickback to Rashad for his role in the scheme—all while masking the true identity and credentials of the provider to avoid detection.

686. This fraudulent scheme allowed Rashad to render services devoid of individualized medical necessity while enabling Pandya and New Life to profit from professional fees for which they provided no clinical value, in violation of the Illinois Medical Practice Act and the Illinois Physical Therapy Practice Act.

687. Allstate would not have authorized any payment to New Life had it known that they falsely billed for services performed by Rashad at Liberty Physical Therapy.

688. All of the fraudulent bills submitted by New Life for services performed by Rashad at Liberty Physical Therapy traveled through the U.S. Mail and/or interstate wires.

689. Allstate is entitled to recover payments to New Life in connection with the fraudulent services performed by Rashad at Liberty Physical Therapy.

e.     Billing for Services That Were Not Rendered

690. New Life, acting under the direction of Pandya, engaged in a systematic and fraudulent pattern of billing for services that were not rendered, as evidenced by the documented discrepancies between their billing ledgers and the actual experiences of the claimants.

691. This scheme involved the submission of claims for complex chiropractic adjustments and time-intensive therapeutic procedures that claimants, such as N.J. (Claim No. 0655151538), explicitly testified were never actually provided.

692. By fabricating attendance logs and clinical entries to reflect treatments that allegedly occurred after patients had already discontinued care or refused specific procedures, New Life generated a fictitious paper trail designed to exhaust insurance limits and illicitly maximize revenue.

693. The fraudulent nature of New Life's billing and referral practices is vividly illustrated by the treatment of claimant N.J.

694. On January 10, 2022, N.J. was involved in a motor vehicle accident and diagnosed at a hospital with minor injuries; diagnostic imaging of her head and cervical spine was unremarkable. The hospital specifically directed N.J. to follow up with her primary care provider.

695. Ignoring this medical advice, N.J. appeared for an initial visit at New Life on January 17, 2022. Despite the unremarkable hospital scans from one-week prior, New Life's records fabricated a clinical justification for an aggressive treatment protocol.

696. Although New Life submitted a billing ledger for January 17, 2022, claiming that several healthcare services were performed, the claimant's own testimony refutes this.

697. During her deposition on February 2, 2023, N.J. testified under oath that absolutely no treatment was performed during her initial evaluation at New Life.

698. A true and accurate excerpt of this testimony is depicted below:

> 4    Q   On your first visit there at the clinic on
> 5 Illinois Avenue in January of 2022, did you receive
> 6 any treatment there on your first visit, or was it
> 7 just the exam?
> 8    A   It was just the exam.

699.    New Life's documentation for this initial encounter provides that N.J. received electrical muscle stimulation during the visit.

700.    A true and accurate excerpt of N.J.'s medical records and the bills submitted by New Life are depicted below:





701.    N.J.'s sworn testimony directly contradicts New Life's records and bills.

702. Following the initial assessment, New Life directed N.J. to Imaging Centers of America for MRIs of the cervical and lumbar spine on February 1, 2022.

703. New Life further directed the claimant into their referral network for pain management.

704. On February 22, 2022, N.J. commenced a specialized course of treatment with Dr. Mohiuddin at Regenerative. This intensive care included medically unnecessary bilateral cervical facet joint injections on April 13, 2022, and bilateral lumbar facet joint injections on April 18, 2022, both performed at the Rogers Park facility.

705. N.J. remained under the exclusive clinical direction of Dr. Mohiuddin for her injury-related care until she was formally released on May 3, 2022.

706. Despite N.J.'s transition to specialized pain management on February 22, 2022, New Life's billing ledgers falsely purport that she continued to receive routine chiropractic adjustments and therapeutic services at its facility.

707. During her deposition, N.J confirmed that she ceased attending New Life once she met with Dr. Mohiuddin.

708. A true and accurate excerpt from her deposition is depicted below:

> Q  So after you started going to see the pain doctor and he recommended that you get injections, did you continue to go for anymore chiropractic care?
> A  No.
> Q  And is that because the treatments were now going to be injections?
> A  Yes.

709. New Life intentionally submitted claims for routine manipulations that were factually baseless—as N.J. had already ceased attending the clinic—and were clinically inconsistent with the invasive injection therapy she was concurrently receiving from Dr. Mohiuddin.

710. Because New Life performed no clinical oversight or treatment and N.J. was no longer even a patient at their facility, New Life had no lawful basis to bill for these services.

711. A true and accurate excerpt from New Life's billing ledger is depicted below:

| 3/8/2022 | PHYSICAL THERAPY | $ | 70.00 | $ | - | $ | 70.00 |
| 3/10/2022 | DISCHARGE | $ | 155.00 | $ | - | $ | 155.00 |

712. The discrepancies found in the N.J. records are not isolated errors; they are the direct result of a systemic business model where clinical reality is discarded in favor of predetermined billing outcomes.

713. This confirms that New Life was billing for services to exhaust the available insurance coverage.

714. The fraudulent billing of the N.J. claim provides a clear window into the systemic operations of the Pandya healthcare businesses. By maintaining fictitious billing entries for a patient who had long since discontinued care, New Life and its management demonstrated a calculated intent to defraud that far exceeds mere clerical error. These practices were designed to prioritize the systematic exhaustion of insurance policy limits over legitimate medical necessity.

715. Allstate would not have authorized any payments to New Life had it known that they were billing for services not rendered.

716. All of the fraudulent bills submitted by New Life for services not rendered traveled through the U.S. Mail and/or interstate wires.

717. Allstate is entitled to recover payments to New Life in connection with billing for services not rendered.

### 4. Billing For Unnecessary Transportation Fees

718. Rogers Park falsely billed for transportation charges to Allstate claimants that were not necessary.

719. For procedures performed at Rogers Park, transportation for Allstate claimants was usually arranged directly by the medical providers, including Rogers Park.

720. This transportation was provided through third-party services, such as Uber.

721. However, Rogers Park failed to provide any receipts, invoices, or other documentation from these third-party transportation companies when billing for these services.

722. Instead, Rogers Park submitted only an internal transportation form along with its billing, routinely charging $200 per patient under CPT code 99082.

723. A true and accurate representative sample of the form used by Rogers Park is depicted below:

724. According to the AMA, CPT Code 99082 is intended for "unusual travel," including situations where a physician or qualified healthcare professional must transport and escort a patient.

725. This code belongs to the category of special service codes (99000–99082) in the AMA CPT code manual, used to report ancillary services provided in connection with a medical procedure.

726. Rogers Park provided no documentation—such as travel logs, staff time records, or third-party billing—to support the use of CPT Code 99082 or the $200 charge per visit.

727. There was no evidence that the transportation involved any "unusual travel" or that Rogers Park incurred any actual cost justifying the amount billed.

728. These referrals were part of a coordinated scheme between pain management physicians and Rogers Park to funnel Allstate claimants to Rogers Park, where they could bill for higher-cost services, including unnecessary charges such as CPT 99082.

729. Allstate claimants were neither informed of their right to choose a treatment facility nor provided an opportunity to select a location; instead, they were directed exclusively to the Rogers Park location, regardless of whether a more convenient alternative was available. The consistent and predetermined referral of Allstate claimants to Rogers Park—regardless of convenience or medical necessity—was intended to justify inflated transportation, facility, and anesthesia charges.

730. These transportation charges were not based on actual incurred costs or clinical need but were part of a prearranged treatment protocol designed to maximize billing to Allstate through unnecessary and excessive charges.

731. Allstate would not have authorized any payments to Rogers Park had it known that they were submitting fraudulent billing for transportation charges.

732. All of the fraudulent bills submitted by Rogers Park for transportation charges, including those identified in Exhibit 19, traveled through the U.S. Mail and/or interstate wires.

733. Allstate is entitled to recover payments to Rogers Park in connection with the fraudulent billing for transportation charges.

## V. SPECIFIC ALLEGATIONS OF MAIL FRAUD AND WIRE FRAUD RACKETEERING ACTIVITY

734. The Defendants created, prepared, and submitted false documentation, and intentionally violated the laws of the United States by creating schemes to defraud and obtain

money and property by means of false and fraudulent pretenses in representations, and by placing or causing to be placed, in a post office and/or authorized depository for mail documents to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) for the purpose of executing such fraudulent schemes and attempting to do so.

735. The Defendants prepared fraudulent bills and supporting medical documentation (as described herein) to send to personal injury attorneys, who in turn, included the fraudulent bills and records in demand packages submitted through the U.S. Mail and/or interstate wires to Allstate (as the insurers of the allegedly at fault driver in the underlying automobile accident).

736. The Defendants knew that personal injury attorneys would then use the bills and records to extract payments from Allstate.

737. The Defendants knew Allstate would make payments on the claims based on the fraudulent bills and records, and Allstate used the U.S. Mail and/or interstate wires to send the payments.

738. Unless otherwise pled to the contrary, all documents, invoices, HICFs, narrative reports, letters, and requests for payments in connection with the insurance claims referenced throughout the balance of this Complaint traveled through the U.S. Mail and/or interstate wires.

739. Every automobile insurance claim detailed herein involved at least two uses of the U.S. Mail and/or interstate wires, including the mailing and/or wiring of invoices, HICFS, narrative reports, and payments, and caused various other mailings and/or wires in the ordinary course of the claims process.

A.      **M & R RUDRA INCORPORATED D/B/A NEW LIFE MEDICAL CENTER ENTERPRISE**

740.    Pandya and AMS participated in the creation, operation, and control of New Life for the purpose of generating fraudulent reports and invoices.

741.    Pandya and AMS participated in the creation and control of generating fraudulent invoices for New Life, which were sent through the U.S. Mail and/or interstate wires—i.e., the racketeering activity.

742.    By their acts and/or omissions, Pandya and other New Life providers and staff participated in an improper referral scheme by purposefully referring Allstate claimants to pain management physicians, without regard for medical necessity to bolster the appearance that the Allstate claimants were more injured than they truly were.

743.    In addition, New Life, its owners, providers and staff, facilitated and participated in the predetermined treatment protocol by providing services outlined by Pandya, regardless of medical necessity. This protocol was also designed to bolster the appearance that Allstate claimants were more injured than they truly were, lending a false air of legitimacy to the medically unnecessary services rendered at New Life.

744.    Pandya and AMS, through New Life, enriched themselves through the submission of fraudulent bills to Allstate claimants for unnecessary and unlawful services.

745.    New Life, through the operation and control by Pandya, and in collaboration with AMS, was the means by which they caused the fraudulent invoices of New Life to be submitted to Allstate claimants and Allstate through the U.S. Mail and/or interstate wires.

746.     Pandya, AMS, New Life, and its providers and staff, personally used the U.S. Mail and/or interstate wires (or caused the U.S. Mail and/or interstate wires to be used) to further this fraudulent scheme by causing invoices and records from New Life to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail and/or interstate wires would follow in the ordinary course of business.

747.     Pandya and AMS caused New Life to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal law each time that New Life mailed and/or wired a demand for payment (i.e., invoice) to Allstate.

748.     Persons acting under Pandya and AMS' direction and control provided unnecessary medical services to Allstate claimants, and generated fraudulent invoices as a result, which rendered New Life completely ineligible for reimbursement under state and federal law.

749.     Because New Life was not lawfully eligible to seek or collect benefit payments under state and federal law, Pandya and AMS purposely caused New Life to make a misrepresentation each and every time that New Life mailed a document to Allstate claiming eligibility for reimbursement.

750.     Pandya and AMS committed mail fraud and/or wire fraud through the New Life enterprise because: (a) New Life was not lawfully eligible to seek or collect benefit payments; (b) New Life and AMS were caused to seek reimbursement from Allstate even though New Life was not entitled to such reimbursement; and (c) New Life and AMS used (or were caused to use) the U.S. Mail and/or interstate wires to seek reimbursement.

751.     At all relevant times, Pandya and AMS knew that New Life (including its employees, owner(s), contractors, and agents), a claimant, an insurance carrier, claimant's

attorney, and/or Allstate would use (or be caused to use) the U.S. Mail and/or interstate wires in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by New Life.

752. Allstate estimates that the unlawful operation of the New Life enterprise generated hundreds of mailings and/or interstate wires throughout the relevant time period.

753. A table highlighting the relevant examples of mailings and/or interstate wires made in furtherance of this scheme is annexed hereto at Exhibit 21 and incorporated by reference as if set forth in its entirety.

### B. 87TH STREET REHAB CLINIC PLLC ENTERPRISE

754. Pandya and AMS participated in the creation, operation, and control of 87th St. Rehab for the purpose of generating fraudulent reports and invoices.

755. Pandya and AMS participated in the creation and control of generating fraudulent invoices for 87th St. Rehab, which were sent through the U.S. Mail and/or interstate wires—i.e., the racketeering activity.

756. By their acts and/or omissions, Pandya and other 87th St. Rehab providers and staff participated in an improper referral scheme by purposefully referring Allstate claimants to pain management physicians without regard for medical necessity to bolster the appearance that the Allstate claimants were more injured than they truly were.

757. In addition, 87th St. Rehab, its owners, providers and staff, facilitated and participated in the predetermined treatment protocol by providing services outlined by Pandya, regardless of medical necessity. This protocol was also designed to bolster the appearance that

Allstate claimants were more injured than they truly were, lending a false air of legitimacy to the medically unnecessary services rendered at 87th St. Rehab.

758. 87th St. Rehab, its owners, providers and staff, in league with AMS, enriched themselves through the creation and submission of fraudulent bills to Allstate claimants for unnecessary and unlawful services.

759. 87th St. Rehab was operated and controlled by Pandya, who utilized the entity as the primary means to submit fraudulent invoices to Allstate and its claimants via the U.S. Mail and/or interstate wires.

760. Pandya, AMS, 87th St. Rehab, and its providers and staff personally used the U.S. Mail and/or interstate wires (or caused the U.S. Mail and/or interstate wires to be used) to further this fraudulent scheme by causing invoices and records from 87th St. Rehab to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail and/or interstate wires would follow in the ordinary course of business.

761. Pandya and AMS caused 87th St. Rehab to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal law each time that 87th St. Rehab mailed and/or wired a demand for payment (i.e., invoice) to Allstate.

762. Persons acting under Pandya and AMS's direction and control provided unnecessary medical services to Allstate claimants, and generated fraudulent invoices as a result, which rendered 87th St. Rehab completely ineligible for reimbursement under state and federal law.

763. Because 87th St. Rehab was not lawfully eligible to seek or collect benefit payments under state and federal law, Pandya and AMS purposely caused 87th St. Rehab to make

a misrepresentation each and every time that 87th St. Rehab mailed a document to Allstate claiming eligibility for reimbursement.

764.    Pandya and AMS committed mail fraud and/or wire fraud through the 87th Street Rehab enterprise because: (a) 87th St. Rehab was not lawfully eligible to seek or collect benefit payments; (b) 87th St. Rehab and AMS were caused to seek reimbursement from Allstate even though 87th St. Rehab was not entitled to such reimbursement; and (c) 87th St. Rehab and AMS used (or was caused to use) the U.S. Mail and/or interstate wires to seek reimbursement.

765.    At all relevant times, Pandya and AMS knew that 87th St. Rehab (including its employees, owner(s), contractors, and agents), a claimant, an insurance carrier, claimant's attorney, and/or Allstate would use (or be caused to use) the U.S. Mail and/or interstate wires in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by 87th St. Rehab.

766.    Allstate estimates that the unlawful operation of the 87th Street Rehab enterprise generated hundreds of mailings and/or interstate wires throughout the relevant time period.

767.    A table highlighting the relevant examples of mailings and/or interstate wires made in furtherance of this scheme is annexed hereto at Exhibit 22 and incorporated by reference as if set forth in its entirety.

**C.    DEEN HEALTH SYSTEM LLC ENTERPRISE**

768.    Sirajudeen and AMS participated in the creation, operation, and control of Deen Health for the express purpose of generating fraudulent medical reports and invoices.

769.    Sirajudeen and AMS exercised exclusive control over Deen Health to facilitate the generation and submission of fraudulent billing.

770. Through their acts and omissions, Sirajudeen, AMS, and Deen Health's providers and staff participated in an improper referral scheme, purposefully referring Allstate claimants to other medical providers without regard for medical necessity. This scheme was intended to inflate the perceived severity of the claimants' injuries.

771. Deen Health, its owners, and its staff implemented a predetermined treatment protocol—dictated by Sirajudeen—regardless of the clinical needs of the patients. This protocol was designed to create a false appearance of legitimacy for medically unnecessary services.

772. By directing the clinical decisions of medical providers, Sirajudeen, through Deen Health, engaged in the unauthorized practice of medicine.

773. The corporate practice of medicine by a layperson is strictly prohibited under Illinois law.

774. Sirajudeen and AMS, through Deen Health, enriched themselves by submitting fraudulent bills to Allstate and its claimants for these unnecessary and unlawful services.

775. Deen Health, under the operation and control of Sirajudeen, and in collaboration with AMS, served as the vehicle by which they caused fraudulent invoices to be submitted to Allstate and its claimants via the U.S. Mail and/or interstate wires.

776. Sirajudeen, AMS, Deen Health, and its staff utilized the U.S. Mail and/or interstate wires (or caused the U.S. Mail and/or interstate wires to be used) to further this fraudulent scheme by mailing and/or wiring invoices and records to Allstate and/or claimants' counsel, with the knowledge that such mailings and/or wires would occur in the ordinary course of business.

777. Sirajudeen and AMS caused Deen Health to falsely certify its eligibility for reimbursement under state and federal law each time Deen Health mailed and/or wired a demand for payment to Allstate.

778. Under Sirajudeen and AMS's direction and control, Deen Health provided unnecessary medical services and generated fraudulent invoices, rendering the entity ineligible for reimbursement under applicable laws.

779. Because Deen Health was ineligible to seek benefit payments, Sirajudeen and AMS caused the entity to make a material misrepresentation every time Deen Health mailed a document to Allstate claiming eligibility for reimbursement.

780. Sirajudeen committed mail fraud and/or wire fraud through the Deen Health enterprise because: (a) Deen Health was not lawfully eligible to collect benefit payments; (b) Deen Health and AMS were caused to seek reimbursement from Allstate despite having no entitlement to such funds; and (c) Deen Health and AMS used the U.S. Mail and/or interstate wires to facilitate these reimbursement requests.

781. At all relevant times, Sirajudeen and AMS knew that Deen Health, its agents, insurance carriers, and attorneys would use the U.S. Mail and/or interstate wires in connection with these fraudulent claims, including the issuance of payments based on documentation mailed and/or wired by Deen Health.

782. Allstate estimates that the unlawful operation of the Deen Health enterprise resulted in hundreds of fraudulent mailings and/or interstate wires throughout the relevant period.

783. A table highlighting representative examples of mailings and/or interstate wires made in furtherance of this scheme is annexed hereto as Exhibit 23 and incorporated by reference as if set forth fully herein.

### D. ROGERS PARK ONE DAY SURGERY CENTER INC. ENTERPRISE

784. Sirajudeen, Thowfeek, AMS, and Peterson Surgery participated in the creation, operation, and control of Rogers Park for the express purpose of generating fraudulent medical reports and invoices.

785. Sirajudeen, Thowfeek, AMS, and Peterson Surgery exercised joint control over the generation and submission of fraudulent billing records for Rogers Park.

786. Through their acts and omissions, Sirajudeen, Thowfeek, AMS, and Peterson Surgery orchestrated an improper referral scheme by deliberately directing medical providers to refer Allstate claimants to Rogers Park for injection procedures. These referrals were made without regard for medical necessity and were designed to inflate the perceived severity of claimants' injuries, thereby lending a false air of legitimacy to unnecessary medical services.

787. These medically unnecessary services served solely to inflate the resulting medical bills submitted to Allstate.

788. Sirajudeen, Thowfeek, AMS, and Peterson Surgery enriched themselves through the submission of fraudulent invoices to Allstate and its claimants for these unnecessary and unlawful services.

789. Rogers Park, under the operation and control of Sirajudeen, Thowfeek, AMS, and Peterson Surgery, served as the vehicle by which they caused fraudulent invoices to be submitted to Allstate and its claimants via the U.S. Mail and/or interstate wires.

790. Sirajudeen, Thowfeek, AMS, and Peterson Surgery utilized the U.S. Mail and/or interstate wires (or caused the U.S. Mail and/or interstate wires to be used) to further this fraudulent scheme by mailing and/or wiring invoices and records from Rogers Park to Allstate and/or claimants' counsel, with the knowledge that such mailings and/or wires would occur in the ordinary course of business.

791. Sirajudeen, Thowfeek, AMS, and Peterson Surgery caused Rogers Park to falsely certify its eligibility for reimbursement under state and federal law each time Rogers Park mailed and/or wired a demand for payment to Allstate.

792. Persons acting under the direction and control of Sirajudeen, Thowfeek, AMS, and Peterson Surgery provided unnecessary medical services and generated fraudulent invoices, rendering Rogers Park ineligible for reimbursement under applicable laws.

793. Because Rogers Park was ineligible to seek benefit payments, Sirajudeen, Thowfeek, AMS, and Peterson Surgery caused the entity to make a material misrepresentation every time Rogers Park mailed and/or wired a document to Allstate claiming eligibility for reimbursement.

794. Sirajudeen, Thowfeek, AMS, and Peterson Surgery committed mail fraud and/or wire fraud through the Rogers Park One Day Surgery Center, Inc. enterprise because: (a) Rogers Park was not lawfully eligible to collect benefit payments; (b) Rogers Park and AMS were caused to seek reimbursement from Allstate despite having no entitlement to such funds; and (c) Rogers Park and AMS used the U.S. Mail and/or interstate wires to facilitate these reimbursement requests.

795. At all relevant times, Sirajudeen, Thowfeek, AMS, and Peterson Surgery knew that Rogers Park, its agents, insurance carriers, and attorneys would use the U.S. Mail and/or interstate wires in connection with these fraudulent claims, including the issuance of payments based on documentation mailed by Rogers Park.

796. Allstate estimates that the unlawful operation of the Rogers Park One Day Surgery Center, Inc. enterprise resulted in hundreds of fraudulent mailings and/or interstate wires throughout the relevant period.

797. A table highlighting representative examples of mailings and/or interstate wires made in furtherance of this scheme is annexed hereto as Exhibit 24 and incorporated by reference as set forth fully herein.

E. **PAULINA ANESTHESIA, INC. ENTERPRISE**

798. Sirajudeen, Rogers Park, and AMS participated in the creation, operation, and control of Paulina Anesthesia for the express purpose of generating fraudulent medical reports and invoices.

799. Sirajudeen, Rogers Park, and AMS exercised exclusive control over the generation and submission of fraudulent billing records for Paulina Anesthesia.

800. Sirajudeen, Rogers Park, and AMS enriched themselves through the submission of fraudulent bills to Allstate and its claimants for medically unnecessary and unlawful services.

801. Paulina Anesthesia, under the operation and control of Sirajudeen, served as the vehicle by which they caused fraudulent invoices to be submitted to Allstate and its claimants via the U.S. Mail and/or interstate wires.

802. Sirajudeen, Rogers Park, and AMS utilized the U.S. Mail and/or interstate wires (or caused it to be used) to further this fraudulent scheme by mailing and/or wiring invoices and records from Paulina Anesthesia to Allstate and/or claimants' counsel, with the knowledge that such mailings and/or wires would occur in the ordinary course of business.

803. Sirajudeen, Rogers Park, and AMS caused Paulina Anesthesia to falsely certify its eligibility for reimbursement under applicable state and federal law each time the entity mailed and/or wired a demand for payment to Allstate.

804. Persons acting under Sirajudeen, Rogers Park, and AMS's direction and control provided unnecessary medical services to Allstate claimants and generated fraudulent invoices as a result, rendering Paulina Anesthesia ineligible for reimbursement under state and federal law.

805. Because Paulina Anesthesia was not lawfully eligible to seek or collect benefit payments, Sirajudeen, Rogers Park, and AMS caused the entity to make a material misrepresentation every time Paulina Anesthesia mailed and/or wired a document to Allstate claiming eligibility for reimbursement.

806. Sirajudeen, Rogers Park, and AMS committed mail fraud and/or wire fraud through the Paulina Anesthesia enterprise because: (a) Paulina Anesthesia was not lawfully eligible to collect benefit payments; (b) Paulina Anesthesia, Rogers Park, and AMS was caused to seek reimbursement from Allstate despite having no entitlement to such funds; and (c) Paulina Anesthesia. Rogers Park, and AMS used the U.S. Mail and/or interstate wires to facilitate these reimbursement requests.

807. At all relevant times, Sirajudeen, Rogers Park, and AMS knew that Paulina Anesthesia, its agents, insurance carriers, and attorneys would use the U.S. Mail and/or interstate

wires in connection with these fraudulent claims, including the issuance of payments based on documentation mailed by the entity.

808.    Allstate estimates that the unlawful operation of the Paulina Anesthesia enterprise resulted in hundreds of fraudulent mailings and/or interstate wires throughout the relevant period.

809.    A table highlighting representative examples of mailings and/or interstate wires made in furtherance of this scheme is annexed hereto as Exhibit 25 and incorporated by reference as set forth fully herein.

F.    **AMS MEDICAL BILLING CONSULTANTS INC. ENTERPRISE**

810.    Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV participated in the creation, operation, and control of AMS for the express purpose of generating fraudulent medical reports and invoices.

811.    Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV exercised exclusive control over the generation and submission of fraudulent billing records for AMS.

812.    Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV enriched themselves through the submission of fraudulent bills to Allstate and its claimants for medically unnecessary and unlawful services.

813.    AMS, under the operation and control of Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia,

and RPAV, served as the vehicle by which they caused fraudulent invoices to be submitted to Allstate and its claimants via the U.S. Mail and/or interstate wires.

814. Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV utilized the U.S. Mail and/or interstate wires (or caused it to be used) to further this fraudulent scheme by mailing and/or wiring invoices and records from AMS to Allstate and/or claimants' counsel, with the knowledge that such mailings and/or wires would occur in the ordinary course of business.

815. Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV caused AMS to falsely certify its eligibility for reimbursement under applicable state and federal law each time the entity mailed and/or wired a demand for payment to Allstate.

816. Persons acting under Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV's direction and control provided unnecessary medical services to Allstate claimants and generated fraudulent invoices as a result, rendering AMS ineligible for reimbursement under state and federal law.

817. AMS operated with full knowledge that RPAV was an unlicensed distributor and therefore legally ineligible to participate in the legitimate DME reimbursement.

818. Despite this knowledge, AMS conspired to generate and submit fraudulent invoices on behalf of RPAV that did not reflect the true cost or value of the DME provided.

819. AMS intentionally billed for the DME purportedly distributed by RPAV to Allstate claimants at excessive, up-coded rates that bore no relation to standard market pricing or actual costs incurred.

820. Because AMS was not lawfully eligible to seek or collect benefit payments, Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV caused the entity to make a material misrepresentation every time AMS mailed and/or wired a document to Allstate claiming eligibility for reimbursement.

821. Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV committed mail fraud and/or wire fraud through the AMS enterprise because: (a) AMS was not lawfully eligible to collect benefit payments; (b) AMS, Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV were caused to seek reimbursement from Allstate despite having no entitlement to such funds; and (c) AMS. Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV used the U.S. Mail and/or interstate wires to facilitate these reimbursement requests.

822. At all relevant times, Rogers Park, Sirajudeen, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV knew that AMS, its agents, insurance carriers, and attorneys would use the U.S. Mail and/or interstate wires in connection with these fraudulent claims, including the issuance of payments based on documentation mailed by the entity.

823. Allstate estimates that the unlawful operation of the AMS enterprise resulted in hundreds of fraudulent mailings and/or interstate wires throughout the relevant period.

824. A table highlighting representative examples of mailings and/or interstate wires made in furtherance of this scheme is annexed hereto as Exhibits 21-25 and incorporated by reference as set forth fully herein.

## VI. SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

825. The Defendants falsely represented that they were eligible for reimbursement every time they submitted a claim to Allstate.

826. At all relevant times, to induce Allstate to promptly pay charges submitted by the Defendants, the Defendants falsely certified to Allstate the medical necessity of healthcare services allegedly provided by the Defendants.

827. The Defendants' acts were self-concealing by their very nature.

828. At the time it made these payments, Allstate was not aware of the fraud scheme alleged herein despite its reasonable due diligence because the Defendants went to great lengths to fraudulently conceal their scheme.

### A. M & R RUDRA INCORPORATED D/B/A NEW LIFE MEDICAL CENTER FRAUDULENT CONCEALMENT

829. At all relevant times during the operation of the New Life enterprise, Pandya and AMS purposefully caused New Life to falsely certify its eligibility for reimbursement under applicable state and federal laws. These certifications were intended to induce Allstate into

-144-

promptly paying for false, fraudulent, and medically unnecessary services purportedly rendered to Allstate claimants.

830. Pandya, and those acting under his direction and control, purposefully concealed the lack of medical necessity for the services purportedly provided and billed by New Life.

831. Pandya, and those working under his direction and control, created and submitted records to Allstate (or caused their creation and submission) that falsely purported to justify the medical necessity of services provided by New Life.

832. Pandya was responsible for: (a) directing the fraudulent services purportedly rendered to Allstate claimants through New Life; (b) creating, altering, and/or fabricating records submitted to Allstate; (c) billing Allstate for fraudulent medical services; (d) falsely charging for services with the knowledge that they were not lawfully reimbursable; and (e) billing for services that were, in many instances, not actually provided as represented. Consequently, New Life was caused to falsely claim eligibility each time it sought reimbursement from Allstate.

833. Specifically, Pandya, through New Life, misrepresented his status as a medical doctor.

834. Moreover, Pandya, through New Life, misrepresented Rashad's status as a chiropractor.

835. Pandya, through New Life, misrepresented itself as the treating provider when services were performed by Liberty.

836. Pandya, and those persons working under his control, caused New Life to create and submit claim reimbursement documents and payment demands for services that were: (a)

unlawful; (b) medically unnecessary; (c) fraudulent; and/or (d) not actually provided as represented.

837. Such conduct is unlawful and rendered each individual claim fraudulent under applicable state and federal laws.

838. Many of these fraudulent acts—including billing for services never actually provided—are not readily evident within the four corners of the documents submitted to Allstate. Allstate reasonably relied upon these documents when adjusting claims and tendering payment for each discrete claim at issue.

839. AMS functioned as the central "billing factory" for New Life, where it exercised total control over the transformation of raw patient data into finalized, fraudulent claims for reimbursement.

840. In creating these bills, AMS intentionally selected CPT codes that did not correspond to the actual services performed.

841. AMS utilized a fraudulent practice of "automated billing," wherein the firm generated bills for a pre-set battery of services regardless of whether those services were actually rendered as represented, if at all by the New Life providers. This ensured a high-margin, "cookie-cutter" bill was produced for every Allstate claimant, irrespective of their actual clinical needs.

842. Consequently, each time Pandya and AMS, and those acting under his control, caused New Life to submit reimbursement demands to Allstate, Pandya and AMS, in turn, necessarily and falsely certified that New Life was, in all respects, eligible for reimbursement under applicable state and federal laws.

843.     Pandya and AMS's fraudulent and unlawful acts regarding their participation in the New Life enterprise was not, and could not have been, known to Allstate until shortly before the commencement of this action.

### B.     87TH STREET REHAB CLINIC PLLC – FRAUDULENT CONCEALMENT

844.     At all relevant times during the operation of the 87th Street Rehab Clinic PLLC enterprise, Pandya and AMS purposely caused 87th St. Rehab to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate claimants.

845.     Pandya (along with those individuals working under his control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by 87th St. Rehab.

846.     Pandya (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by 87th St. Rehab to Allstate claimants.

847.     Pandya was responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate claimants through 87th St. Rehab; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate claimants; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate claimants through 87th St. Rehab; (d) falsely charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws; and (e) billing Allstate for services that were, in many instances, not actually provided as represented, 87th

St. Rehab was caused to falsely claim eligibility each and every time that 87th St. Rehab sought reimbursement from Allstate.

848. As alleged above, Pandya (or those persons working under his control) and AMS caused 87th St. Rehab to create and submit to Allstate claim reimbursement documents and demands for payment relative to services that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or, (d) not actually provided as represented.

849. Such conduct is unlawful and rendered each such claim fraudulent under applicable state and federal laws.

850. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

851. AMS functioned as the central "billing factory" for 87th St. Rehab, where it exercised total control over the transformation of raw patient data into finalized, fraudulent claims for reimbursement.

852. In creating these bills, AMS intentionally selected CPT codes that did not correspond to the actual services performed.

853. AMS utilized a fraudulent practice of "automated billing," wherein the firm generated bills for a pre-set battery of services regardless of whether those services were actually rendered as represented, if at all by the 87th St. Rehab providers. This ensured a high-margin, "cookie-cutter" bill was produced for every Allstate claimant, irrespective of their actual clinical needs.

854. Thus, every time that Pandya and AMS (along with those individuals working under their control) caused 87th St. Rehab to submit reimbursement demands to Allstate, Pandya and AMS (and those individuals working under their control) necessarily certified that 87th St. Rehab was, in all respects, eligible to be reimbursed under applicable state and federal laws.

855. The full extent of Pandya and AMS' fraudulent and unlawful acts relative to their participation in 87th Street Rehab PLLC enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## C. DEEN HEALTH SYSTEM LLC – FRAUDULENT CONCEALMENT

856. At all relevant times during the operation of the Deen Health System LLC enterprise, Sirajudeen and AMS purposely caused Deen Health to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate claimants.

857. Sirajudeen (along with those individuals working under his control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by Deen Health.

858. Sirajudeen (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by Deen Health to Allstate claimants.

859. At all times relevant to this scheme, Deen Health was purposefully structured to conceal the fact that it was owned, operated, and controlled by a non-physician layperson. This concealment was a deliberate effort to circumvent state laws and the doctrine that prohibits the

corporate practice of medicine that requires medical entities to be owned by licensed healthcare professionals.

860. The intentional masking of Deen Health's true ownership was a foundational element of the fraud, designed to give the entity a "veneer of legitimacy" while allowing unlicensed individuals to direct medical protocols, dictate billing volumes, and siphoning off insurance proceeds for personal financial gain.

861. Sirajudeen is responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate claimants through Deen Health; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate claimants; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate claimants through Deen Health; (d) falsely charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws; and (e) billing Allstate for services that were, in most instances, never actually provided as represented, Deen Health was caused to falsely claim eligibility each and every time that Deen Health sought reimbursement from Allstate.

862. As alleged above, Sirajudeen (or those persons working under their control) caused Deen health to create and submit to Allstate claim reimbursement documents and demands for payment relative to services that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or, (d) not actually provided as represented.

863. Such conduct is unlawful and rendered each such claim fraudulent under applicable state and federal laws.

864. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

865. AMS functioned as the central "billing factory" for Deen Health, where it exercised total control over the transformation of raw patient data into finalized, fraudulent claims for reimbursement.

866. In creating these bills, AMS intentionally selected CPT codes that did not correspond to the actual services performed.

867. AMS utilized a fraudulent practice of "automated billing," wherein the firm generated bills for a pre-set battery of services regardless of whether those services were actually rendered as represented, if at all by the Deen Health providers. This ensured a high-margin, "cookie-cutter" bill was produced for every Allstate claimant, irrespective of their actual clinical needs.

868. Thus, every time that Sirajudeen and AMS (along with those individuals working under their control) caused Deen Health to submit reimbursement demands to Allstate, Sirajudeen and AMS (and those individuals working under his control) necessarily certified that Deen Health was, in all respects, eligible to be reimbursed under applicable state and federal laws.

869. The full extent of Sirajudeen and AMS's fraudulent and unlawful acts relative to their participation in Deen Health System LLC enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

D.    ROGERS PARK ONE DAY SURGERY CENTER, INC. – FRAUDULENT CONCEALMENT

870.    At all relevant times during the operation of the Rogers Park One Day Surgery Center, Inc. enterprise, Sirajudeen, Thowfeek, AMS, and Peterson Surgery purposely caused Rogers Park to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate claimants.

871.    Sirajudeen, Thowfeek, and Peterson Surgery (along with those individuals working under their control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by Rogers Park.

872.    Sirajudeen, Thowfeek, and Peterson Surgery, (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by Rogers Park to Allstate claimants.

873.    At all times relevant to this scheme, Rogers Park was purposefully structured to conceal the fact that it was owned, operated, and controlled by a non-physician layperson. This concealment was a deliberate effort to circumvent state laws and the doctrine that prohibit the corporate practice of medicine that requires medical entities to be owned by licensed healthcare professionals.

874.    The intentional masking of Rogers Park's true ownership was a foundational element of the fraud, designed to give the entity a "veneer of legitimacy" while allowing unlicensed

individuals to direct medical protocols, dictate billing volumes, and siphoning off insurance proceeds for personal financial gain.

875. Because Sirajudeen, Thowfeek, and Peterson Surgery, were responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate claimants through Rogers Park; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate claimants; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate claimants through Rogers Park; (d) falsely charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws, Rogers Park was caused to falsely claim eligibility each and every time that Rogers Park sought reimbursement from Allstate.

876. As alleged above, Sirajudeen, Thowfeek, and Peterson Surgery (or those persons working under their control) caused Rogers Park to create and submit to Allstate claim reimbursement documents and demands for payment relative to services purportedly provided by Rogers Park that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or, (d) not actually provided as represented.

877. Such conduct is unlawful and rendered each such claim fraudulent under applicable state and federal laws.

878. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services never actually provided, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

879. AMS functioned as the central "billing factory" for Rogers Park, where it exercised total control over the transformation of raw patient data into finalized, fraudulent claims for reimbursement.

880. In creating these bills, AMS intentionally selected CPT codes that did not correspond to the actual services performed.

881. AMS utilized a fraudulent practice of "automated billing," wherein the firm generated bills for a pre-set battery of services regardless of whether those services were actually rendered as represented, if at all by the Rogers Park providers. This ensured a high-margin, "cookie-cutter" bill was produced for every Allstate claimant, irrespective of their actual clinical needs.

882. Thus, every time that Sirajudeen, Thowfeek, AMS, and Peterson Surgery (along with those individuals working under their control) caused Rogers Park to submit reimbursement demands to Allstate, Sirajudeen, Thowfeek, AMS, and Peterson Surgery (and those individuals working under their control) necessarily certified that Rogers Park was, in all respects, eligible to be reimbursed under applicable state and federal laws.

883. The full extent of Sirajudeen, Thowfeek, AMS, and Peterson Surgery's, fraudulent and unlawful acts relative to their participation in the Rogers Park One Day Surgery Inc. enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

E.    PAULINA ANESTHESIA, INC. – FRAUDULENT CONCEALMENT

884. At all relevant times during the operation of the Paulina Anesthesia, Inc. enterprise, Sirajudeen, Rogers Park, and AMS purposely caused Paulina Anesthesia to falsely certify that it was, in all respects, eligible to be reimbursed under applicable state and federal laws as a means

to induce Allstate to promptly pay charges related to false, fraudulent, and unnecessary medical services purportedly provided to Allstate claimants.

885. Sirajudeen (along with those individuals working under his control) purposely concealed the lack of necessity for the medical services purportedly provided and charged for by Paulina Anesthesia.

886. Sirajudeen (or those working under his direction and control) created and submitted to Allstate (or caused the creation and submission of) records that falsely purported to justify the necessity of the medical services purportedly provided by Paulina Anesthesia to Allstate claimants.

887. At all times relevant to this scheme, Paulina Anesthesia was purposefully structured to conceal the fact that it was owned, operated, and controlled by a non-physician layperson. This concealment was a deliberate effort to circumvent state laws and the doctrine that prohibit the corporate practice of medicine that requires medical entities to be owned by licensed healthcare professionals.

888. The intentional masking of Paulina Anesthesia's true ownership was a foundational element of the fraud, designed to give the entity a "veneer of legitimacy" while allowing unlicensed individuals to direct medical protocols, dictate billing volumes, and siphoning off insurance proceeds for personal financial gain.

889. Because Sirajudeen was responsible for: (a) directing the fraudulent services purportedly rendered on behalf of Allstate claimants through Paulina Anesthesia; (b) creating, altering, and/or fabricating records submitted to Allstate in support of services purportedly rendered on behalf of Allstate claimants; (c) billing Allstate for the fraudulent medical services purportedly rendered on behalf of Allstate claimants through Paulina Anesthesia; and (d) falsely

charging for the services with the knowledge that these services were not lawfully reimbursable under applicable laws, Paulina Anesthesia was caused to falsely claim eligibility each and every time that Paulina Anesthesia sought reimbursement from Allstate.

890. As alleged above, Sirajudeen (or those persons working under his control) caused Paulina Anesthesia to create and submit to Allstate claim reimbursement documents and demands for payment relative to services purportedly provided by Paulina Anesthesia that were: (a) unlawful; (b) unnecessary; (c) fraudulent; and/or (d) not actually provided as represented.

891. Such conduct is unlawful and rendered each such claim fraudulent under applicable state and federal laws.

892. Many of the false, fraudulent, and unlawful acts, including, among other things, charging for services that were unlawfully rendered, are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete claim at issue in this matter.

893. AMS functioned as the central "billing factory" for Paulina Anesthesia, where it exercised total control over the transformation of raw patient data into finalized, fraudulent claims for reimbursement.

894. In creating these bills, AMS intentionally selected CPT codes that did not correspond to the actual services performed.

895. AMS utilized a fraudulent practice of "automated billing," wherein the firm generated bills for a pre-set battery of services regardless of whether those services were actually rendered as represented, if at all by the Paulina Anesthesia providers. This ensured a high-margin,

"cookie-cutter" bill was produced for every Allstate claimant, irrespective of their actual clinical needs.

896. Thus, every time that Sirajudeen, Rogers Park, and AMS (along with those individuals working under his control) caused Paulina Anesthesia to submit reimbursement demands to Allstate, Sirajudeen, Rogers Park, and AMS (and those individuals working under their control) necessarily certified that Paulina Anesthesia was, in all respects, eligible to be reimbursed under applicable state and federal laws.

897. The full extent of Sirajudeen, Rogers Park, and AMS's fraudulent and unlawful acts relative to their participation in the Paulina Anesthesia, Inc. enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## VII. ALLSTATE'S JUSTIFIABLE RELIANCE

898. At all relevant times, the Defendants acted with the intent to conceal from Allstate their misconduct in connection with the scheme to defraud.

899. As the Defendants did not render lawful and reasonably necessary healthcare treatment, each bill and accompanying documentation mailed by or on behalf of the Defendants to Allstate constitutes a material misrepresentation.

900. The Defendants submitted, or caused to be submitted, records, and itemized billing statements detailing the healthcare services rendered to Allstate claimants.

901. The Defendants created records, reports, and bills knowing that these documents would be submitted to Allstate in support of settlement demand letters, which contained representations that the healthcare services were rendered, lawful, and necessary to address the injuries purportedly suffered by the Allstate claimants.

902. The Defendants knowingly misrepresented and concealed material facts to prevent Allstate from discovering that the Defendants billed Allstate for (1) services rendered pursuant to illegal ownership of the Sirajudeen healthcare businesses; (2) unlawful referrals by all Defendants; (3) fraudulent ambulatory surgery center fees; (4) fraudulent anesthesia fees; (5) billing for medically unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; (6) the fraudulent practice of unbundling medical services to inflate reimbursement; and (7) billing for services that were not performed as represented.

903. Each claim submitted to Allstate by (or on behalf of) the Defendants misrepresented that the Defendants were legally eligible to be reimbursed.

904. Each individual billing statement submitted to Allstate references the date of service(s).

905. The Defendants' records identify the claimants' name, date of loss, date of service, the type of product and service purportedly provided, and the amount billed for such service.

906. The Defendants knowingly misrepresented and concealed material facts to prevent Allstate from discovering that the healthcare services provided by the Defendants were not lawfully rendered and not compensable under Illinois law.

907. When Allstate receives treatment documentation from a provider, such documentation is reviewed and processed in accordance with the applicable statutes and regulations governing the adjustment of insurance claims.

908. The facially valid documents submitted to Allstate by the Defendants were designed to, and did in fact, induce Allstate to rely on the documents.

-158-

909. Allstate believed the Defendants bills and records (including the misrepresentations in every claim) and directly relied on those representations when making payments.

910. The Defendants knew that the medical bills that contained false representations would be submitted by claimants and/or their counsel to Allstate seeking payments. Indeed, this was the Defendants' specific intent—that Allstate would believe and rely on these false statements in the Defendants' medical records to induce it to make payments.

911. The sole purpose of the Defendants making material misrepresentations in their medical bills and records was to steal from Allstate.

912. In fact, Allstate was the intended target of the Defendants' fraud scheme. The Defendants scheme to defraud was not perpetrated against their patients, Allstate claimants or Allstate insureds.

913. Specifically, records and invoices are reviewed to determine (a) whether the purported healthcare treatment is a covered service, (b) whether coverage exists under the applicable policy of insurance, and (c) the sufficiency of the charged amount under the applicable fee schedule(s).

914. Moreover, when Allstate receives a settlement demand from a claimant or the claimant's personal injury attorney, the contents of the demand are analyzed to determine (a) whether coverage exists under the applicable policy of insurance, and (b) whether the claimant's alleged injuries warrant a payment or settlement sufficient to compensate the claimant for the expenses incurred, and any bodily injury suffered as a result of the covered event (i.e., the subject motor vehicle accident).

915. Allstate diligently reviewed each of the Defendants' submissions upon receipt.

916.    The Defendants' wrongdoing was not discovered until recently despite Allstate's due diligence in adjusting insurance claims submitted by the Defendants.

917.    Given the clandestine nature of the Defendants' scheme, it was impossible for Allstate to discover a clear pattern of misconduct during Allstate's investigation into each discrete insurance claim associated with the Defendants' scheme.

918.    Despite its due diligence, Allstate did not discover the Defendants' deception and the resulting injuries caused by such deception until shortly before filing this Complaint.

919.    Had Allstate not been misled by the representations contained in the Defendants' documentation and associated settlement demands, no payments would have been made on these claims.

920.    The Defendants' scheme was wholly dependent on Allstate relying on their misrepresentations and subsequently making payments based on omissions, and the false information contained within the bills, records, and liens.

## VIII.   DAMAGES

921.    The Defendants are sophisticated parties that routinely interact with insurers. As such, the Defendants are keenly familiar with the operation of the insurance industry. The Defendants used this knowledge to defraud Allstate.

922.    The Defendants knew Allstate would rely on the Defendants' false medical documentation when paying claims. They also knew that their false medical documentation would result in much higher payments by Allstate.

923.    The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid acts, omissions, and violations of federal and state law.

924. Allstate's injury is the harm caused by the Defendants' pattern of predicate acts (mailing and/or wiring of false medical documentation).

925. Allstate's damages sought herein are ascertainable and calculable and are not the cause of any independent factors.

926. Allstate's damage was the result of the Defendants' preconceived purpose and the specifically intended consequence of the Defendants' racketeering activity.

927. Allstate is the best person/entity to pursue these damages in this lawsuit.

928. Allstate's injuries are neither remote nor attenuated whereas Allstate was the primary victim of the Defendants' fraud scheme alleged herein.

929. The Defendants' patients (Allstate claimants) were not victims of the Defendants' pattern of racketeering activity. Arguably, the Allstate claimants benefited by receiving larger payments based on Allstate's reliance in the Defendants' false medical documentation.

930. Indeed, the Defendants used the Allstate claimants and the bodily-injury claim process as vehicle to consummate their fraud scheme.

931. Allstate's damages calculation includes those monies that it paid to Defendants in connection with first-party insurance claims.

932. In addition, Allstate's damage calculation includes monies that it intended would be paid to the Defendants from the payments made to bodily-injury claimants.

933. There is a direct causal relationship between the Defendants' racketeering activity (mailing and/or wiring of false medical documentation) and Allstate's damages (the precise amount Allstate considered due and owing to the Defendants when making payments to

Defendants or in connection with bodily-injury claims). As such, the Defendants' fraudulent conduct was the proximate cause of the injury suffered by Allstate.

934. Allstate does not seek damages for anything more than what it considered to be due and payable to the Defendants based on its reliance on the Defendants' bills and records.

935. But for the submission of false medical documentation by the Defendants, Allstate would not have paid monies for the Defendants' fraudulent healthcare services. As a result, the Defendants' fraudulent claims were the factual cause of the injury suffered by Allstate.

936. Had Allstate not been misled by the representations contained in the Defendants' documentation, no payments would have been made on these claims.

937. All of the payments were made based on the Defendants' material misrepresentations.

938. None of the payments identified in Exhibits 26-36 were for legitimate healthcare services.

939. There is a direct relationship between the amount of the Defendants fraudulent bills and the amount paid to claimants. *See* Exhibits 26-36.

940. Indeed, Allstate intended, and the Defendants did, in fact, receive these payments identified in Exhibits 26-36.

941. In addition, the Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate its damages with specificity at this stage of the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made to  87th St. Rehab, ARMV, New Life, Deen

Health, Rogers Park, Paulina Anesthesia, and RPAV, in connection with claims made under applicable state laws, the exact amount to be determined at trial, including:

a. Payments made to M & R Rudra Incorporated d/b/a New Life Medical Center totaling at least $448,037.40, the exact amount to be determined at trial. The charts at Exhibits 26-27 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to M & R Rudra Incorporated d/b/a/ New Life Medical Center in connection with first-party and third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

b. Payments made to 87th Street Rehab Clinic PLLC totaling at least $101,289.76, the exact amount to be determined at trial. The charts at Exhibits 28-29 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to 87th Street Rehab Clinic PLLC in connection with first-party and third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

c. Payments made to Deen Health System LLC totaling at least $91,243.47, the exact amount to be determined at trial. The charts at Exhibits 30-31 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Deen Health System, LLC in connection with first-party and third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

d. Payments made to Rogers Park One Day Surgery Center, Inc. totaling at least $968,182.78, the exact amount to be determined at trial. The chart at Exhibit 32 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Rogers Park One Day Surgery Center, Inc. in connection with third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

e. Payments made to Paulina Anesthesia, Inc. totaling at least $50,217.72, the exact amount to be determined at trial. The chart at Exhibit 33 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Paulina Anesthesia, Inc. in connection with third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

f. Payments made to RPAV Management DME Inc. totaling at least $4,625.44, the exact amount to be determined at trial. The chart at Exhibit 34 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to RPAV Management DME Inc. in connection with third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

g. Payments made to ARMV Shiva Medical Corporation d/b/a Advanced Medical Center totaling at least $23,236.14, the exact amount to be determined at trial. The charts at

Exhibits 35-36 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to ARMV Shiva Medical Corporation d/b/a Advanced Medical Center in connection with first-party and third-party claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

## IX.  CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### M & R RUDRA INCORPORATED D/B/A NEW LIFE MEDICAL CENTER ENTERPRISE
### (Against Manish D. Pandya, D.C. and AMS Medical Billing Consultants Inc.)

942.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

943.    M & R Rudra Incorporated d/b/a New Life Medical Center ("New Life") constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

944.    In connection with each of the claims identified within the Complaint, Manish D. Pandya, D.C. ("Pandya") and AMS Medical Billing Consultants Inc. ("AMS") (collectively the "Count I Defendants") intentionally caused to be prepared and mailed false medical documentation by New Life, or knew that such false medical documentation would be mailed in the ordinary course of New Life's business, or should have reasonably foreseen the mailing and/or wiring of such false documentation by New Life and/or by a personal injury attorney on behalf of a patient of New Life would occur, in furtherance of the Count I Defendants' scheme to defraud.

945.    The objective of the New Life enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on the omissions and misrepresentations contained therein when making payments that the Defendants ultimately received.

946. New Life is an Illinois corporation with its principal place of business at 4111 W. 26th St., Chicago, IL. At all times relevant, Defendant Pandya acted as the President and operator of New Life.

947. AMS is an Illinois corporation managed and presided over by Mary Soto. AMS functioned as the exclusive billing agent and clearinghouse for the fraudulent claims generated by New Life, and the other provider Defendants.

948. The Count I Defendants worked together to advance the alleged racketeering operation by creating and mailing and/or wiring false medical records and bills misrepresenting that healthcare services were medically necessary or rendered as represented, if at all.

949. Defendant Pandya, through New Life, participated in an improper patient referral scheme where named and unnamed providers, in violation of the Self-Referral Act, were paid, in cash or kind, for patient referrals, regardless of whether medical services were medical necessary or rendered as represented, if at all.

950. Had the Count I Defendants refrained from creating false records and bills and participating in the referral scheme on behalf of New Life, then New Life would not have been able to submit false records and invoices to the Allstate claimants.

951. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to New Life for the benefit of the Count I Defendants that would not otherwise have been made.

952. The Count I Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long

period of time, thus enabling the Count I Defendants to continue this unlawful scheme without being detected.

953. The mail fraud and wire fraud racketeering activity described herein are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the U.S. Mail and/or interstate wires to induce Allstate to rely on the Count I Defendants misrepresentations to make payments.

954. The Count I Defendants repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

955. Allstate would not have allocated payments for the New Life's medical bills if it knew that the Count I Defendants' medical documentation was fraudulent.

956. The Count I Defendants employed two (2) or more mailings and/or wires to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 21.

957. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

958. The unlawful activities and other misconduct alleged herein had the direct effect of causing funds to be transferred from Allstate to New Life for the benefit of the Count I Defendants.

959. The Count I Defendants intentionally submitted, or caused to be submitted, documentation to Allstate for medical services purportedly performed by New Life. The Defendants knew these claims would be billed and transmitted to Allstate—whether by New Life, AMS, or a patient's personal injury attorney—for the express purpose of securing payment.

Among other things, the Count I Defendants sent notes, invoices, health insurance claim forms, and other documents, letters, and/or requests for payment that were routinely delivered to Allstate through the U.S. Mail and/or interstate wires.

960.  Policies of insurance were delivered to Allstate claimants through the U.S. Mail and/or interstate wires.

961.  Payments made by Allstate were delivered through the U.S. Mail and/or interstate wires.

962.  As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate purportedly provided by New Life for collecting payment from Allstate under the medical expense and bodily-injury benefits portion of the Allstate policies and applicable Illinois laws.

963.  In reasonable reliance upon, the mailing and/or wiring and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts for the benefit of the Count I Defendants that would not otherwise have been paid.

964.  The Count I Defendants' pattern of preparing and mailing and/or wiring or causing and/or directing the preparation and mailing and/or wiring of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count I Defendants to continue perpetrating this scheme without being detected.

965.  The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

966. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to New Life for the benefit of the Count I Defendants.

967. Allstate is in the business of writing insurance and paying claims in the State of Illinois. Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

968. The Count I Defendants associated with the foregoing enterprise and participated in the conduct of this enterprise through a pattern of racketeering activities.

969. By means of the Count I Defendants' violations of 18 U.S.C. § 1962©, Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by the Count I Defendants, and others acting in concert with the Count I Defendants, together with the costs of suit, including reasonable attorneys' fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### M & R RUDRA INCORPORATED D/B/A NEW LIFE MEDICAL CENTER ENTERPRISE
### (Against Manish D. Pandya, D.C., and AMS Medical Billing Consultants Inc.)

970. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

971. Through their participation in the operation and management of M & R Rudra Incorporated d/b/a New Life Medical Center ("New Life"), Manish D. Pandya, D.C. ("Pandya"), and AMS Medical Billing Consultants Inc. ("AMS") ("Count II Defendants") conspired with participating physicians and providers to violate 18 U.S.C. § 1962(c).

972. The Count II Defendants worked together with participating chiropractors and physicians to advance the alleged racketeering operation.

-168-

973. Defendant, Pandya, owned, operated and controlled New Life. Pandya, with the assistance of AMS, and other named and unnamed providers, created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

974. Defendant, Pandya, through New Life, participated in an improper and unlawful patient referral scheme wherein Pandya paid or was paid by participating physicians, in cash or kind, for patient referrals.

975. The objective of the New Life Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

976. The mail fraud and/or wire fraud predicate acts are related in that they shared the common objective of defrauding Allstate and other insurance companies. Specifically, the Count II Defendants utilized the U.S. Mail and/or interstate wires to submit false medical documentation, intending for Allstate to rely on those misrepresentations and issue payments.

977. The Count II Defendants repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

978. Allstate would not have allocated payments for New Life's medical bills if it knew that the New Life's medical documentation was fraudulent.

979. The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of New Life by means of a pattern of racketeering activity, including numerous acts of mail fraud and/or wire fraud as set forth in Exhibit 21, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

980. The conspiracy's central purpose was to secure payments from Allstate for New Life, despite New Life being legally ineligible to receive such payments due to the Count II Defendants' unlawful conduct.

981. The Count II Defendants knowingly joined this conspiracy and agreed to perform overt acts to achieve its objectives, including the preparation and submission of insurance claim documents containing material misrepresentations and omissions.

982. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Defendants' unlawful conduct described herein.

983. By violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count II Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Count II Defendants, and others acting in concert with the Count II Defendants, together with the costs of suit, including reasonable attorneys' fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**87TH STREET REHAB CLINIC PLLC ENTERPRISE**
**(Against Manish D. Pandya, D.C. and AMS Medical Billing Consultants Inc.)**

984. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

985. 87th Street Rehab Clinic PLLC ("87th St. Rehab") constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

986. In connection with each of the claims identified in the within Complaint, Manish D. Pandya, D.C. ("Pandya") and AMS Medical Billing Consultants Inc. ("AMS") (collectively the "Count III Defendants") intentionally caused to be prepared and mailed false medical documentation by 87th St. Rehab, or knew that such false medical documentation would be mailed in the ordinary course of 87th St. Rehab's business, or should have reasonably foreseen the mailing and/or wiring of such false documentation by 87th St. Rehab and/or by a personal injury attorney on behalf of a patient of 87th St. Rehab would occur, in furtherance of the Count III Defendants' scheme to defraud.

987. The objective of the 87th St. Rehab enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on the omissions and misrepresentations contained therein when making payments that the Defendants ultimately received.

988. Defendant 87th St. Rehab Center, Inc. is an Illinois corporation located at 1701 E 87th St, Chicago, IL. At all times relevant, Defendant Manish D. Pandya served as its President, owner, and/or agent, overseeing the daily operations and clinical data generation of the facility.

989. AMS is an Illinois corporation managed and presided over by Mary Soto ("Soto"). AMS functioned as the exclusive billing agent and clearinghouse for the fraudulent claims generated by 87th St. Rehab.

990. At all times relevant, Defendant Pandya served as its President, owner, and/or agent, overseeing the daily operations and clinical data generation of the 87th St. Rehab facility.

991. The Count III Defendants worked together to advance the alleged racketeering operation by creating and mailing and/or wiring false medical records and bills misrepresenting that healthcare services were medically necessary or rendered as represented, if at all.

992. The Count III Defendants, through 87th St. Rehab, participated in an improper patient referral scheme where named and unnamed providers, in violation of the Self-Referral Act, were paid, in cash or kind, for patient referrals, regardless of whether medical services were medically necessary or rendered as represented, if at all.

993. Had the Count III Defendants refrained from creating false records and bills and participating in the referral scheme on behalf of 87th St. Rehab, then 87th St. Rehab would not have been able to submit false records and invoices to the Allstate claimants.

994. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to 87th St. Rehab for the benefit of the Count III Defendants that would not otherwise have been made.

995. The Count III Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III Defendants to continue this unlawful scheme without being detected.

996. The mail fraud and/or wire fraud racketeering activity described herein is related in that the predicate acts shared the common objective of defrauding Allstate (and other insurance companies). The Count III Defendants carried out this scheme by submitting false medical documentation through the U.S. Mail and/or interstate wires to induce Allstate to rely on their material misrepresentations and issue payments.

997. The Count III Defendants repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

998. Allstate would not have allocated payments for 87th St. Rehab's medical bills if it knew that the Count III Defendants' medical documentation was fraudulent.

999. The Count III Defendants employed two (2) or more mailings and/or wires to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 22.

1000. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1001. The unlawful activities and other misconduct alleged had the direct effect of causing funds to be transferred from Allstate to 87th St. Rehab for the benefit of the Count III Defendants.

1002. The Count III Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by 87th St. Rehab, which they knew would be billed by 87th St. Rehab, and submitted to Allstate by 87th St. Rehab, AMS, and/or by a personal injury attorney on behalf of a patient of 87th St. Rehab, in order to collect payment from Allstate.

1003. Among other things, the Count III Defendants routinely sent notes, invoices, health insurance claim forms, and other documents, letters, or requests for payment to Allstate through the U.S. Mail and/or interstate wires.

1004. Policies of insurance were delivered to Allstate claimants through the U.S. Mail and/or interstate wires.

1005. Payments made by Allstate were delivered through the U.S. Mail and/or interstate wires.

1006. As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate purportedly provided by 87th St. Rehab for collecting payment from Allstate under the medical expense and bodily-injury benefits portion of the Allstate policies and applicable Illinois laws.

1007. In reasonable reliance upon the mailing and/or wiring and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts for the benefit of the Count III Defendants that would not otherwise have been paid.

1008. The Count III Defendants' pattern of preparing and mailing and/or wiring or causing and/or directing the preparation and mailing and/or wiring of these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count III Defendants to continue perpetrating this scheme without being detected.

1009. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

1010. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to 87th St. Rehab for the benefit of the Count III Defendants.

1011.   Allstate is in the business of writing insurance and paying claims in the State of Illinois.  Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

1012.   The Count III Defendants associated with the foregoing enterprise and participated in the conduct of this enterprise through a pattern of racketeering activities.

1013.   By means of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by the Count III Defendants, and others acting in concert with the Count III Defendants, together with the costs of suit, including reasonable attorneys' fees.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### 87TH STREET REHAB CLINIC PLLC ENTERPRISE
### (Against Manish D. Pandya, D.C. and AMS Medical Billing Consultants Inc.)

1014.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1015.   Through their participation in the operation and management of 87th Street Rehab Clinic PLLC ("87th St. Rehab"), Manish D. Pandya, D.C. ("Pandya"), and AMS Medical Billing Consultants Inc. ("AMS") ("Count IV Defendants") conspired with participating physicians and providers to violate 18 U.S.C. § 1962(c).

1016.   The Count IV Defendants worked together with participating chiropractors and physicians to advance the alleged racketeering operation.

1017.   Defendant, Pandya, owned, operated and controlled 87th St. Rehab.  Pandya, with the assistance of AMS, and other named and unnamed providers, created false medical records

and invoices to support medically unnecessary services that were not rendered as represented, if at all.

1018. Defendant, Pandya, through 87th St. Rehab, participated in an improper and unlawful patient referral scheme wherein Pandya paid or was paid by participating physicians, in cash or kind, for patient referrals.

1019. The objective of the 87th St. Rehab Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

1020. The mail fraud and/or wire fraud predicate acts are related in that they shared the common objective of defrauding Allstate and other insurance companies. Specifically, the Count IV Defendants utilized the U.S. Mail and/or interstate wires to submit false medical documentation, intending for Allstate to rely on those misrepresentations and issue payments.

1021. The Count IV Defendants repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

1022. Allstate would not have allocated payments for 87th St. Rehab's medical bills if it knew that the 87th St. Rehab's medical documentation was fraudulent.

1023. The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of 87th St. Rehab by means of a pattern of racketeering activity, including numerous acts of mail fraud and/or wire fraud as set forth in Exhibit 22, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

1024. The conspiracy's central purpose was to secure payments from Allstate for 87th St. Rehab, despite 87th St. Rehab being legally ineligible to receive such payments due to the Count II Defendants' unlawful conduct.

1025. The Count IV Defendants knowingly joined this conspiracy and agreed to perform overt acts to achieve its objectives, including the preparation and submission of insurance claim documents containing material misrepresentations and omissions.

1026. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Defendants' unlawful conduct described herein.

1027. By violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count IV Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Count IV Defendants, and others acting in concert with the Count IV Defendants, together with the costs of suit, including reasonable attorneys' fees.

## COUNT V
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## DEEN HEALTH SYSTEM LLC ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj and AMS Medical Billing Consultants Inc.)**

1028. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1029. Deen Health System LLC ("Deen Health"), constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1030. In connection with each of the claims identified within the Complaint, Deen Health, Mohamed Sirajudeen a/k/a Mohamed Siraj ("Sirajudeen") and AMS Medical Billing Consultants Inc. ("AMS") (the "Count V Defendants") intentionally caused to be prepared and mailed false medical documentation by Deen Health, or knew that such false medical documentation would be mailed in the ordinary course of Deen Health's business, or should have reasonably foreseen the mailing and/or wiring of such false documentation by Deen Health and/or by a personal injury attorney on behalf of a patient of Deen Health would occur, in furtherance of the Count V Defendants' scheme to defraud.

1031. The objective of the Deen Health enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on the omissions and misrepresentations contained therein when making payments that the Defendants ultimately received.

1032. Deen Health is an Illinois corporation with its principal place of business in Illinois. At all times relevant, Defendant Sirajudeen acted as the President and operator of Deen Health.

1033. AMS is an Illinois corporation managed and presided over by Mary Soto ("Soto"). AMS functioned as the exclusive billing agent and clearinghouse for the fraudulent claims generated by Deen Health and the other provider Defendants.

1034. The Count V Defendants worked together to advance the alleged racketeering operation by creating and mailing and/or wiring of false medical records and bills misrepresenting that healthcare services were medically necessary or rendered as represented, if at all.

1035. Defendant Sirajudeen, through Deen Health, participated in an improper patient referral scheme where named and unnamed providers, in violation of the Self-Referral Act, were

paid, in cash or kind, for patient referrals, regardless of whether medical services were medically necessary or rendered as represented, if at all.

1036.   Had the Count V Defendants refrained from creating false records and bills and participating in the referral scheme on behalf of Deen Health, then Deen Health would not have been able to submit false records and invoices to the Allstate claimants.

1037.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Deen Health for the benefit of the Count V Defendants that would not otherwise have been made.

1038.   The Count V Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V Defendants to continue this unlawful scheme without being detected.

1039.   The mail fraud and/or wire fraud racketeering activities described herein are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the U.S. Mail and/or interstate wires to induce Allstate to rely on the Count V Defendants misrepresentations to make payments.

1040.   The Count V Defendants repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

1041.   Allstate would not have allocated payments for Deen Health's medical bills if it knew that the Count V Defendants' medical documentation was fraudulent.

1042. The Count V Defendants employed two (2) or more mailings and/or wires to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 23.

1043. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1044. The unlawful activities and other misconduct alleged herein had the direct effect of causing funds to be transferred from Allstate to Deen Health for the benefit of the Count V Defendants.

1045. The Count V Defendants intentionally submitted, or caused to be submitted, documentation to Allstate for medical services purportedly performed by Deen Health. The Defendants knew these claims would be billed and transmitted to Allstate—whether by Deen Health, AMS, or a patient's personal injury attorney—for the express purpose of securing payment. Among other things, the Count V Defendants sent notes, invoices, health insurance claim forms, and other documents, letters, and/or requests for payment that were routinely delivered to Allstate through the U.S. Mail and/or interstate wires.

1046. Policies of insurance were delivered to Allstate claimants through the U.S. Mail and/or interstate wires.

1047. Payments made by Allstate were delivered through the U.S. Mail and/or interstate wires.

1048. As documented above, the Count V Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate purportedly

provided by Deen Health for collecting payment from Allstate under the medical expense and bodily-injury benefits portion of the Allstate policies and applicable Illinois laws.

1049. In reasonable reliance upon the mailing and/or wiring and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts for the benefit of the Count V Defendants that would not otherwise have been paid.

1050. The Count V Defendants' pattern of preparing and mailing and/or wiring or causing and/or directing the preparation and mailing and/or wiring of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count V Defendants to continue perpetrating this scheme without being detected.

1051. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

1052. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Deen Health for the benefit of the Count V Defendants.

1053. Allstate is in the business of writing insurance and paying claims in the State of Illinois. Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

1054. The Count V Defendants associated with the foregoing enterprise and participated in the conduct of this enterprise through a pattern of racketeering activities.

1055. By means of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by

them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VI
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## DEEN HEALTH SYSTEM LLC ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj and AMS Medical Billing Consultants Inc.)**

1056. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1057. Through their participation in the operation and management of Deen Health System LLC, ("Deen Health"), Mohamed Sirajudeen a/k/a Mohamed Siraj ("Sirajudeen") and AMS Medical Billing Consultants Inc. ("AMS") ("Count VI Defendants") conspired with participating physicians to violate 18 U.S.C. § 1962(c).

1058. The Count VI Defendants worked together with others to advance the alleged racketeering operation.

1059. Defendant, Sirajudeen owned, operated, and controlled Deen Health.

1060. Sirajudeen, with the assistance of AMS and of others, created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

1061. Defendant, Sirajudeen, through Deen Health, participated in an improper and unlawful patient referral scheme wherein Sirajudeen paid, or was paid by, participating physicians, in cash or kind, for patient referrals.

1062. The objective of the Deen Health System, LLC Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

1063. The mail fraud and/or wire fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the U.S. Mail and/or interstate wires to induce Allstate to rely on the Count VI Defendants misrepresentations to make payments.

1064. The Count VI Defendants repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

1065. Allstate would not have allocated payments for Deen Health's medical bills if it knew that the Deen Health's medical documentation was fraudulent.

1066. The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Deen Health by means of a pattern of racketeering activity, including numerous acts of mail fraud and/or wire fraud as set forth in Exhibit 23, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

1067. The purpose of the conspiracy was to obtain payments from Allstate for Deen Health, notwithstanding that Deen Health was ineligible to collect such payments due to the Count VI Defendants' unlawful conduct.

1068. The Count VI Defendants knowingly joined this conspiracy and agreed to perform acts to achieve its objectives, including, but not limited to, the preparation of insurance claim documents containing material misrepresentations and/or material omissions.

1069. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Count VI Defendants' unlawful conduct described herein.

1070. By violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count VI Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Count VI Defendants, and others acting in concert with the Count VI Defendants, together with the costs of suit, including reasonable attorneys' fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962©**
**ROGERS PARK ONE DAY SURGERY CENTER, INC. ENTERPRISE**
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Narjisha Thowfeek, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, and AMS Medical Billing Consultants Inc.)**

1071. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1072. Rogers Park One Day Surgery Center, Inc. ("Rogers Park"), constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1073. In furtherance of their operation and management of Rogers Park, Mohamed Sirajudeen a/k/a Mohamed Siraj ("Sirajudeen"), Narjisha Thowfeek ("Thowfeek"), Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center ("Peterson Surgery"), and AMS Medical Billing Consultants Inc. ("AMS") (the "Count VII Defendants") intentionally prepared and mailed, or caused to be mailed, false medical documentation to Allstate. The Count VII Defendants knew, or should have reasonably foreseen, that such documentation would be mailed in the ordinary

course of business—whether by Rogers Park, AMS, or third-party personal injury attorneys—to further their scheme to defraud.

1074. Defendant, Sirajudeen, owned, operated and controlled Rogers Park until on or about August 2024.

1075. Defendant, Thowfeek, through ownership of Peterson Surgery, owned, operated and controlled Rogers Park from on or about August 2024, until the present time.

1076. Sirajudeen was responsible for all of activity that occurred at Rogers Park until on or about August 2024.

1077. Thowfeek, through Peterson Surgery is responsible for all of activity that occurs at Rogers Park since on or about August 2024.

1078. AMS was in charge of creating the bills, and of collections of bills for Rogers Park.

1079. The Count VII Defendants created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

1080. Defendants Sirajudeen, Thowfeek, and Peterson Surgery, through Rogers Park, participated in an improper and unlawful patient self-referral scheme wherein Sirajudeen, Thowfeek, and Peterson Surgery paid, or were paid by participating physicians and chiropractors, in cash or in kind, for patient referrals.

1081. Had the Defendants Sirajudeen, Thowfeek, and Peterson Surgery, refrained from participating in the improper referral scheme with participating physicians and others, then Defendants Sirajudeen, Thowfeek, and Peterson Surgery would not have been able to successfully submit false records and bills to Allstate.

1082. The mail fraud and/or wire fraud racketeering activity is related in that the predicate acts shared a common objective: defrauding Allstate and other insurance companies by submitting false medical documentation via the U.S. Mail and/or interstate wires to induce reliance on the Count VII Defendants' misrepresentations.

1083. The Count VII Defendants' repeated predicate acts occurred over a substantial period of time, spanning several years, and continued until their detection by Allstate.

1084. Allstate would not have allocated payments for Rogers Park's medical bills if it knew that the Count VII Defendant's medical documentation was fraudulent.

1085. The Count VII Defendants employed two (2) or more mailings and/or wires to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 24.

1086. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1087. The unlawful activities and other misconduct alleged had the direct effect of causing funds to be transferred from Allstate to Rogers Park for the benefit of the Count VII Defendants.

1088. The Count VII Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Rogers Park, which they knew would be billed by Rogers Park, and submitted to Allstate by Rogers Park, AMS, and/or by a personal injury attorney on behalf of a patient of Rogers Park, in order to collect payment from Allstate.

1089. Among other things, the Count VII Defendants sent notes, invoices, liens, referral forms, health insurance claim forms, and other documents, letters, and/or requests for payment that were routinely delivered to Allstate through the U.S. Mail and/or interstate wires.

1090. Policies of insurance were delivered to Allstate claimants through the U.S. Mail and/or interstate wires.

1091. Payments made by Allstate were delivered through the U.S. Mail and/or interstate wires.

1092. As documented above, the Count VII Defendants repeatedly and intentionally submitted, or caused to be submitted, claim-related documentation to Allstate allegedly provided by Rogers Park for collecting payment from Allstate under the medical expense and bodily injury benefits portion of the Allstate policies and applicable Illinois laws.

1093. Because of, and in reasonable reliance upon, the mailing and/or wiring and/or submission of those misleading documents and materially false representation, Allstate, by its agents and employees, issued drafts for the benefit of the Count VII Defendants that would not otherwise have been paid.

1094. The Count VII Defendants pattern of preparing and mailing and/or wiring, or causing and/or directing the preparation and mailing and/or wiring of these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count VII Defendants to continue perpetrating this scheme without being detected.

1095. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

1096. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Rogers Park for the benefit of the Count VII Defendants.

1097. Allstate is in the business of writing insurance and paying claims in the State of Illinois. Insurance fraud schemes practiced here and elsewhere have a harmful impact on Allstate's overall financial well-being and adversely affects insurance rates.

1098. The Count VII Defendants associated with the foregoing enterprise, and participated in the conduct of this enterprise through a pattern of racketeering activities.

1099. By means of the Count VII Defendants violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by the Count VII Defendants, and others acting in concert with the Count VII Defendants, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ROGERS PARK ONE DAY SURGERY CENTER, INC. ENTERPRISE
(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Narjisha Thowfeek, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, and AMS Medical Billing Consultants Inc.)

1100. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1101. Through their participation in the operation and management Rogers Park One Day Surgery Center, Inc. ("Rogers Park"), defendants Mohamed Sirajudeen a/k/a Mohamed Siraj ("Sirajudeen"), Narjisha Thowfeek ("Thowfeek"), Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center ("Peterson Surgery"), and AMS Medical Billing Consultants Inc. ("AMS") ("Count VIII Defendants") conspired with participating physicians to violate 18 U.S.C. § 1962(c).

1102. The Count VIII Defendants worked together with participating physicians and others to advance the alleged racketeering operation.

1103. Defendants, Sirajudeen, Thowfeek and Peterson Surgery, owned, operated and controlled Rogers Park. The Count VIII Defendants created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all.

1104. Defendants, Sirajudeen, Thowfeek, and Peterson Surgery, through Rogers Park, participated in an improper and unlawful patient referral scheme wherein they, Sirajudeen, Thowfeek, and Peterson Surgery paid, or were paid by participating physicians and others, in cash or kind, for patient referrals.

1105. AMS participated in the operation and control of Rogers Park by facilitating the false billing.

1106. The objective of the Rogers Park Enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Defendants ultimately received.

1107. The mail fraud and/or wire fraud racketeering activity are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting false medical documentation though the U.S. Mail and/or interstate wires to induce Allstate to rely on the Count VIII Defendants misrepresentations to make payments.

1108. The Count VIII Defendants repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

1109. Allstate would not have allocated payments for Rogers Park's medical bills if it knew that the Rogers Park's medical documentation was fraudulent.

1110. The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Rogers Park by means of a pattern of racketeering activity, including numerous acts of mail fraud and/or wire fraud as set forth in Exhibit 24, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

1111. The purpose of the conspiracy was to obtain payments from Allstate on behalf of Rogers Park, even though Rogers Park, because of the Count VIII Defendants' unlawful conduct, was not eligible to collect such payments.

1112. The Count VIII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

1113. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as result of the Count VIII Defendants' unlawful conduct described herein.

1114. By violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count VIII Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Count VIII Defendants, and others acting in concert with the Count VIII Defendants, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IX**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**PAULINA ANESTHESIA, INC. ENTERPRISE**
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Rogers Park One Day Surgery Center, Inc., and AMS Medical Billing Consultants Inc.)**

1115. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1116. Paulina Anesthesia, Inc. ("Paulina Anesthesia") constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1117. In connection with each of the claims identified in the within Complaint, Mohamed Sirajudeen a/k/a Mohamed Siraj ("Sirajudeen"), Rogers Park One Day Surgery Center, Inc. ("Rogers Park"), and AMS Medical Billing Consultants Inc. ("AMS") (collectively, the "Count IX Defendants") intentionally caused to be prepared and mailed False Medical Documentation by Paulina Anesthesia or knew that such False Medical Documentation would be mailed in the ordinary course of the business of Paulina Anesthesia, or should have reasonably foreseen the mailing and/or wiring of such false documentation by Paulina Anesthesia, AMS, and/or by a personal injury attorney on behalf of a patient of Paulina Anesthesia would occur, in furtherance of the Count IX Defendants' scheme to defraud.

1118. The Count IX Defendants worked together to advance the alleged racketeering operation.

1119. Defendant, Sirajudeen owned, operated, and controlled Paulina Anesthesia. He, with the assistance of AMS, created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all, to support the medical

treatment ordered by Rogers Park, to automatically include using Paulina Anesthesia as the anesthesia provider for injection procedures.

1120. Defendant, Sirajudeen, through Paulina Anesthesia, participated in an improper and unlawful patient referral scheme wherein participating providers and/or Rogers Park, referred patients to Paulina Anesthesia in exchange for payments, in cash or in kind.

1121. Had Defendants, Sirajudeen and Rogers Park chosen not to participate in the referral scheme with Paulina Anesthesia, then Paulina Anesthesia would not have been able to submit false records and invoices to the Allstate claimants.

1122. The objective of the Paulina Anesthesia enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Count IX Defendants ultimately received.

1123. The mail fraud and/or wire fraud racketeering activities are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting False Medical Documentation through the U.S. Mail and/or interstate wires to induce Allstate to rely on the Count IX Defendants' misrepresentations to make payments.

1124. The Count IX Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

1125. Allstate would not have allocated payments for the Count IX Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

1126. The Count IX Defendants knew that two (2) or more mailings and/or wires would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings and/or wires identified in the chart annexed hereto at Exhibit 25.

1127. The Count IX Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Paulina Anesthesia, which they knew would be billed by Paulina Anesthesia, and submitted to Allstate by Paulina Anesthesia, AMS, and/or by a personal injury attorney on behalf of a patient of Paulina Anesthesia, in order to collect payment from Allstate.

1128. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Paulina Anesthesia for the benefit of the Count IX Defendants that would not otherwise have been made.

1129. The Count IX Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX Defendants to continue this unlawful scheme without being detected.

1130. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1131. The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Paulina Anesthesia for the benefit of the Count IX Defendants.

1132. The Count IX Defendants participated in the conduct of the Paulina Anesthesia enterprise through a pattern of racketeering activities.

1133. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

-193-

1134. The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1135. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Illinois.

1136. By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from the Count IX Defendants three times the damages sustained by reason of the claims submitted by the Count IX Defendants, and others acting in concert with the Count IX Defendants, together with the costs of suit, including reasonable attorneys' fees.

**COUNT X**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**PAULINA ANESTHESIA, INC. ENTERPRISE**
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Rogers Park One Day Surgery Center, Inc., and AMS Medical Billing Consultants Inc.)**

1137. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1138. Mohamed Sirajudeen a/k/a Mohamed Siraj ("Sirajudeen"), Rogers Park One Day Surgery Center, Inc. ("Rogers Park"), and AMS Medical Billing Consultants Inc. ("AMS") (collectively, the "Count X Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Paulina Anesthesia, Inc. ("Paulina Anesthesia").

1139. The Count X Defendants worked together to advance the alleged racketeering operation.

1140. Defendant Sirajudeen owned, operated, and controlled Paulina Anesthesia. He, with the assistance of AMS, created false medical records and invoices to support medically

unnecessary services that were not rendered as represented, if at all, to support the medical treatment ordered by Rogers Park.

1141. Defendant, Sirajudeen, through Paulina Anesthesia, participated in an improper and unlawful patient referral scheme wherein Dr. Mohiuddin and/or Rogers Park referred patients to Paulina Anesthesia in exchange for payment, in cash or in kind.

1142. Had Defendant, Sirajudeen, through his ownership of Rogers Park, chosen not to participate in the referral scheme with Paulina Anesthesia, then Paulina Anesthesia would not have been able to submit false records and invoices to the Allstate claimants.

1143. The objective of the Paulina Anesthesia enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Count X Defendants ultimately received.

1144. The mail fraud and/or wire fraud racketeering activities are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting False Medical Documentation through the U.S. Mail and/or interstate wires to induce Allstate to rely on the Count X Defendants' misrepresentations to make payments.

1145. The Count X Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

1146. Allstate would not have allocated payments for the Count X Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

1147. The Count X Defendants agreed to further, facilitate, support, and operate the Paulina Anesthesia enterprise.

1148. As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

1149. The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through Paulina Anesthesia even though Paulina Anesthesia was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count X Defendants.

1150. The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful operation and control of Paulina Anesthesia, the provision of false, fraudulent, and unnecessary healthcare services to Paulina Anesthesia patients, and the creation and submission to Allstate of False Medical Documentation that materially misrepresented the reimbursement eligibility of Paulina Anesthesia.

1151. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) Paulina Anesthesia as a result of the Count X Defendants' unlawful conduct described herein.

1152. By virtue of the Count X Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Count X Defendants identified, three times the damages sustained by reason of the claims submitted by the Count X Defendants, and others acting in concert with the Count X Defendants, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### AMS MEDICAL BILLING CONSULTANTS INC. ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Rogers Park One Day Surgery Center, Inc., Narjisha Thowfeek, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, Manish D. Pandya, D.C., 87th Street Rehab Clinic PLLC, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, Deen Health System LLC, M & R Rudra Incorporated d/b/a New Life Medical Center, Paulina Anesthesia, Inc., and RPAV Management DME Inc.)**

1153.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1154.   AMS Medical Billing Consultants Inc. ("AMS") constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

1155.   In connection with each of the claims identified in the Complaint, Mohamed Sirajudeen a/k/a Mohamed Siraj ("Sirajudeen"), Rogers Park One Day Surgery Center, Inc. ("Rogers Park"), Narjisha Thowfeek ("Thowfeek"), Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center ("Peterson Surgery"), Manish D. Pandya, D.C. ("Pandya"), 87th Street Rehab Clinic PLLC ("87th St. Rehab"), ARMV Shiva Medical Corporation d/b/a Advanced Medical Center ("ARMV"), Deen Health System LLC ("Deen Health"), M & R Rudra Incorporated d/b/a New Life Medical Center ("New Life"), Paulina Anesthesia, Inc. ("Paulina Anesthesia"), and RPAV Management DME Inc. ("RPAV") (collectively, the "Count XI Defendants") acting through AMS, intentionally caused False Medical Documentation to be prepared and mailed or knew that such False Medical Documentation would be prepared and mailed in the ordinary course of the business of AMS, or should have reasonably foreseen that false documentation would be prepared and mailed by AMS, and/or by a personal injury attorney on behalf of a patients of the

-197-

Sirajudeen healthcare businesses or the Pandya healthcare businesses would occur, in furtherance of the Count XI Defendants' scheme to defraud.

1156. The Count XI Defendants worked together to advance the alleged racketeering operation.

1157. The Count XI Defendants controlled AMS. Together, they created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all, to support the medical treatment ordered by the Sirajudeen healthcare businesses and the Pandya healthcare businesses.

1158. The Count XI Defendants, acting through AMS, knowingly and with the intent to defraud, generated illicit profits by creating fabricated medical records and bills for medically unnecessary healthcare services, engaged in up-coding and unbundling by submitting claims through the U.S. Mail and/or interstate wires that utilized CPT codes intentionally selected to mischaracterize the intensity and nature of the services provided, such as the practice of mischaracterizing the intensity and nature of services provided.

1159. Had the Count XI Defendants chosen not to participate in the scheme to generate and submit False Medical Documentation, then AMS would not have been able to create false records and invoices with the intent that such false medical documentation would be submitted through the U.S. Mail and/or interstate wires on behalf of Allstate claimants.

1160. The objective of the Count XI Defendants was to utilize the AMS enterprise to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Count XI Defendants ultimately received.

1161. The mail fraud and/or wire fraud racketeering activities are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies) by submitting False Medical Documentation through the U.S. Mail and/or interstate wires to induce Allstate to rely on the Count XI Defendants' misrepresentations to make payments.

1162. The Count XI Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

1163. Allstate would not have allocated payments for the Count XI Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

1164. The Count XI Defendants knew that two (2) or more mailings and/or wires would be sent to demand and receive payment from Allstate, including, but not limited to, those mailings and/or wires identified in the chart annexed hereto at Exhibit 25.

1165. The Count XI Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services, acting through AMS, that were purportedly performed by the Sirajudeen healthcare businesses and the Pandya healthcare businesses, which they knew would be created by AMS, and submitted to Allstate by AMS, and/or by a personal injury attorney on behalf of a patients of the Sirajudeen healthcare businesses and the Pandya healthcare businesses, in order to collect payment from Allstate.

1166. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to the Sirajudeen healthcare businesses and the Pandya healthcare businesses for the benefit of the Count XI Defendants that would not otherwise have been made.

1167. The Count XI Defendants' pattern of fraudulent claims, each of which appeared legitimate on its face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI Defendants to continue this unlawful scheme without being detected.

1168. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count XI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1169. The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to the Sirajudeen healthcare businesses and the Pandya healthcare businesses for the benefit of the Count XI Defendants.

1170. The Count XI Defendants participated in the conduct of the AMS enterprise through a pattern of racketeering activities.

1171. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI Defendants' conduct.

1172. The Count XI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1173. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Illinois.

1174. By virtue of the Count XI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from the Count XI Defendants three times the damages sustained by reason of the claims submitted by the Count XI Defendants, and others acting in concert with the Count XI Defendants, together with the costs of suit, including reasonable attorneys' fees.

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
## AMS MEDICAL BILLING CONSULTANTS INC. ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Rogers Park One Day Surgery Center, Inc., Narjisha Thowfeek, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, Manish D. Pandya, D.C., 87th Street Rehab Clinic PLLC, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, Deen Health System LLC, M & R Rudra Incorporated d/b/a New Life Medical Center, Paulina Anesthesia, Inc., and RPAV Management DME Inc.)**

1175. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1176. Mohamed Sirajudeen a/k/a Mohamed Siraj ("Sirajudeen"), Rogers Park One Day Surgery Center, Inc. ("Rogers Park"), Narjisha Thowfeek ("Thowfeek"), Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center ("Peterson Surgery"), Manish D. Pandya, D.C. ("Pandya"), 87th Street Rehab Clinic PLLC ("87th St. Rehab"), ARMV Shiva Medical Corporation d/b/a Advanced Medical Center ("ARMV"), Deen Health System LLC ("Deen Health"), M & R Rudra Incorporated d/b/a New Life Medical Center ("New Life"), Paulina Anesthesia, Inc. ("Paulina Anesthesia"), and RPAV Management DME Inc. ("RPAV") (collectively, the "Count XII Defendants") conspired with others to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of AMS Medical Billing Consultants Inc. ("AMS").

1177. The Count XII Defendants worked together to advance the alleged racketeering operation.

1178. Defendants Sirajudeen, Rogers Park, Thowfeek, Peterson Surgery, Pandya, 87th St. Rehab, ARMV, Deen Health, New Life, Paulina Anesthesia, and RPAV controlled AMS. Acting through AMS, the Count XII Defendants caused False Medical Documentation to be prepared and mailed or knew that such False Medical Documentation would be prepared and mailed in the

ordinary course of the business of AMS, or should have reasonably foreseen that false documentation would be prepared and mailed by AMS, and/or by a personal injury attorney on behalf of a patients of the Sirajudeen healthcare businesses or the Pandya healthcare businesses.

1179. The Count XII Defendants controlled AMS. Together, they created false medical records and invoices to support medically unnecessary services that were not rendered as represented, if at all, to support the medical treatment ordered by the Sirajudeen healthcare businesses and the Pandya healthcare businesses.

1180. The Count XII Defendants, acting through AMS, knowingly and with the intent to defraud, generated illicit profits by creating fabricated medical records and bills for medically unnecessary healthcare services, engaged in up-coding and unbundling by submitting claims through the U.S. Mail and/or interstate wires that utilized CPT codes intentionally selected to mischaracterize the intensity and nature of the services provided., such as the practice of mischaracterizing the intensity and nature of services provided.

1181. Had the Count XII Defendants chosen not to participate in the scheme to generate and submit False Medical Documentation, then the Count XII Defendants could not have used AMS to submit false records and invoices to the Allstate claimants.

1182. The objective of the AMS enterprise was to extract money from Allstate by using false and fraudulent bills and records to induce Allstate to rely on these misrepresentations when making payments that the Count XII Defendants ultimately received.

1183. The mail fraud and/or wire fraud racketeering activities are related whereas the predicate acts all had the same objective of defrauding Allstate (and other insurance companies)

by submitting False Medical Documentation through the U.S. Mail and/or interstate wires to induce Allstate to rely on the Count XII Defendants' misrepresentations to make payments.

1184. The Count XII Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate.

1185. Allstate would not have allocated payments for the Count XII Defendants' medical bills if it knew that the Defendants' medical documentation was fraudulent.

1186. The Count XII Defendants agreed to further, facilitate, support, and operate the AMS enterprise.

1187. As such, the Count XII Defendants conspired to violate 18 U.S.C. § 1962(c).

1188. The purpose of the conspiracy was to obtain payments from Allstate for healthcare services provided to patients through the Sirajudeen healthcare businesses and the Pandya healthcare businesses even though the Sirajudeen healthcare businesses and the Pandya healthcare businesses, AMS were not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count XII Defendants.

1189. The Count XII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the unlawful control of AMS, the provision of false, fraudulent, and unnecessary healthcare services to Sirajudeen healthcare businesses and Pandya healthcare businesses' patients, and the creation and submission to Allstate of False Medical Documentation that materially misrepresented the reimbursement eligibility of Sirajudeen healthcare businesses and Pandya healthcare businesses.

1190. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make payments to (or for the benefit of) AMS as a result of the Count XII Defendants' unlawful conduct described herein.

1191. By virtue of the Count XII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Count XII Defendants identified, three times the damages sustained by reason of the claims submitted by the Count XII Defendants, and others acting in concert with the Count XII Defendants, together with the costs of the suit, including reasonable attorney's fees.

## COUNT XIII
## COMMON LAW FRAUD
### (Against all Defendants)

1192. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1193. Mohamed Sirajudeen a/k/a Mohamed Siraj, Narjisha Thowfeek, Manish D. Pandya D.C., Rogers Park One Day Surgery Center, Inc., Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, M & R Rudra Incorporated d/b/a New Life Medical Center, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, 87th Street Rehab Clinic PLLC, RPAV Management DME Inc., AMS Medical Billing Consultants Inc., Paulina Anesthesia. Inc., and Deen Health System LLC (collectively, the "Count XIII Defendants") committed fraud by, among other things, misrepresenting and billing for (1) healthcare services provided pursuant to illegal ownership of the Sirajudeen healthcare businesses; (2) unlawful referrals by all Defendants; (3) fraudulent ambulatory surgery center fees; (4) fraudulent anesthesia fees; (5) billing for medically unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; (6) the

fraudulent practice of unbundling medical services to inflate reimbursement; and (7) billing for services that were not performed as represented.

1194. The Count XIII Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to Rogers Park One Day Surgery Center, Inc, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, M & R Rudra Incorporated d/b/a New Life Medical Center, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, 87th Street Rehab Clinic PLLC, Deen Health System LLC, Paulina Anesthesia. Inc., and RPAV Management DME Inc.'s eligibility for and entitlement to reimbursement under Illinois law.

1195. The Count XIII Defendants' misrepresentations and omissions of material fact were conveyed through statements made in medical records and bills submitted on behalf of Rogers Park One Day Surgery Center, Inc, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, M & R Rudra Incorporated d/b/a New Life Medical Center, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, 87th Street Rehab Clinic PLLC, Deen Health System LLC, Paulina Anesthesia. Inc., AMS Medical Billing Consultants Inc., and RPAV Management DME Inc.'s records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

1196. The Count XIII Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

1197. The Count XIII Defendants knew that Allstate would rely on Rogers Park One Day Surgery Center, Inc, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, M & R

Rudra Incorporated d/b/a New Life Medical Center, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, 87th Street Rehab Clinic PLLC, Deen Health System LLC, Paulina Anesthesia. Inc., AMS Medical Billing Consultants Inc., and RPAV Management DME Inc.'s documents when deciding to pay claims, so they purposely and intentionally misrepresented or omitted material facts, as set out in the allegations and incorporated exhibits throughout this complaint, to induce Allstate into making payment on the claims.

1198.  Allstate's damages include, but are not necessarily limited to, the total amount actually paid by Allstate in connection with the Count XIII Defendants' false claims ($1,687,372.71).

**COUNT XIV**
**ILLINOIS UNJUST ENRICHMENT**
**(Against all Defendants)**

1199.  Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1200.  Mohamed Sirajudeen a/k/a Mohamed Siraj, Narjisha Thowfeek, Manish D. Pandya D.C., Rogers Park One Day Surgery Center, Inc., Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, M & R Rudra Incorporated d/b/a New Life Medical Center, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, 87th Street Rehab Clinic PLLC, RPAV Management DME Inc., AMS Medical Billing Consultants Inc., Paulina Anesthesia. Inc., and Deen Health System LLC (collectively, the "Count XIV Defendants") were unjustly enriched by misrepresenting and billing for (1) illegal ownership of the Sirajudeen healthcare businesses; (2) unlawful referrals by all Defendants; (3) fraudulent ambulatory surgery center fees; (4) fraudulent anesthesia fees; (5) billing for medically unnecessary healthcare services provided pursuant to a

pre-determined treatment protocol; (6) the fraudulent practice of unbundling medical services to inflate reimbursement; and (7) billing for services that were not performed as represented.

1201. The Count XIV Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact, as set out in the complaint and incorporated exhibits, related to the Count XIV Defendants' eligibility for and entitlement to reimbursement under Illinois law.

1202. The Count XIV Defendants' misrepresentations and omissions of material fact were conveyed through statements made in Count XIV Defendants' records, documents, notes, reports, invoices, liens, prescription forms, delivery receipts, health insurance claim forms, and other documents, letters, and/or requests for payment.

1203. The Count XIV Defendants' statements and representations were false, or they at least required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

1204. The Count XIV Defendants knew that Allstate would rely on the Count XIV Defendants' documents when deciding to pay claims, so they, in turn, purposely and intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

1205. When Allstate paid the Count XIV Defendants directly, or when Allstate paid a third-party bodily injury claim that was supported by billing submitted by the Count XIV Defendants, Allstate reasonably believed that it was legally obligated to make payments on these claims based on the representations made in the records and bills created and submitted by (or on behalf of) the Count XIV Defendants.

1206. Each and every payment that Allstate was caused to make to (or for the benefit of) the Count XIV Defendants during the course of the scheme constitutes a benefit that the Count XIV Defendants aggressively sought and voluntarily accepted.

1207. The Count XIV Defendants caused the Count XIV Defendants to wrongfully obtain a multitude of payments from Allstate as a direct and proximate result of the unlawful conduct detailed throughout this Complaint. Allstate's injury is the direct and proximate result of the Count XIV Defendants' unlawful conduct.

1208. The Count XIV Defendants obtained substantial monetary benefits as the result of their unlawful conduct during the course of this scheme—benefits that were derived, in part, directly from the monies that Allstate was wrongfully induced to pay on the insurance claims at issue in this Complaint.

1209. Retention of those benefits by any of the Count XIV Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Rogers Park One Day Surgery Center, Inc., Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, M & R Rudra Incorporated d/b/a New Life Medical Center, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, 87th Street Rehab Clinic PLLC, Deen Health System LLC, Paulina Anesthesia, Inc., and RPAV Management DME Inc.)**

1210. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in paragraphs 1-941 as if set forth fully herein.

1211. In view of its billing for (1) healthcare services provided pursuant to illegal ownership of the Sirajudeen healthcare businesses; (2) unlawful referrals by all Defendants; (3) fraudulent ambulatory surgery center fees; (4) fraudulent anesthesia fees; (5) billing for medically

unnecessary healthcare services provided pursuant to a pre-determined treatment protocol; (6) the fraudulent practice of unbundling medical services to inflate reimbursement; and (7) billing for services that were not performed as represented, Rogers Park One Day Surgery Center, Inc., Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, M & R Rudra Incorporated d/b/a New Life Medical Center, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, 87th Street Rehab Clinic PLLC, Deen Health System LLC, Paulina Anesthesia, Inc., and RPAV Management DME Inc. (collectively, the "Count XV Defendants") were, at all times relevant, completely ineligible for reimbursement under Illinois law, and thus have no standing to submit or receive insurance benefits from Allstate, and thus have no standing to submit or receive insurance benefits from Allstate.

1212. The Count XV Defendants continue to submit, or continue to cause to submit, claims to Allstate demanding payment, and other claims remain pending with Allstate.

1213. The Count XV Defendants continue demanding payment for claims that remain pending with Allstate.

1214. The Count XV Defendants continue to challenge Allstate's prior claim denials and seek payment in connection with first party and third-party bodily injury claims.

1215. A justifiable controversy exists between Allstate and the Count XV Defendants because they reject Allstate's ability to deny such claims.

1216. Allstate has no adequate remedy at law.

1217. The Count XV Defendants will continue to bill Allstate for absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future claims submitted by the Count XV Defendants.

1218. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring (a) that the Count XV Defendants have no standing to seek, collect, or retain any payments made by Allstate, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, the Count XV Defendants.

## X. DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate North American Insurance Company, respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**M & R RUDRA INCORPORATED D/B/A NEW LIFE MEDICAL CENTER ENTERPRISE**
**(Against Manish D. Pandya, D.C. and AMS Medical Billing Consultants Inc.)**

(a) AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c) GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### M & R RUDRA INCORPORATED D/B/A NEW LIFE MEDICAL CENTER ENTERPRISE
### (Against Manish D. Pandya, D.C., and AMS Medical Billing Consultants Inc.)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### 87TH STREET REHAB CLINIC PLLC ENTERPRISE
### (Against Manish D. Pandya, D.C. and AMS Medical Billing Consultants Inc.)

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**87TH STREET REHAB CLINIC PLLC ENTERPRISE**
**(Against Manish D. Pandya, D.C. and AMS Medical Billing Consultants Inc.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DEEN HEALTH SYSTEM LLC ENTERPRISE**
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj and AMS Medical Billing Consultants Inc.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### DEEN HEALTH SYSTEM LLC ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj and AMS Medical Billing Consultants Inc.)**

(a)  AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)  GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ROGERS PARK ONE DAY SURGERY CENTER, INC. ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Narjisha Thowfeek, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, and AMS Medical Billing Consultants Inc.)**

(a)  AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)  GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ROGERS PARK ONE DAY SURGERY CENTER, INC. ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Narjisha Thowfeek, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, and AMS Medical Billing Consultants Inc.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### PAULINA ANESTHESIA, INC. ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Rogers Park One Day Surgery Center, Inc., and AMS Medical Billing Consultants Inc.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### PAULINA ANESTHESIA, INC. ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Rogers Park One Day Surgery Center, Inc., and AMS Medical Billing Consultants Inc.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### AMS MEDICAL BILLING CONSULTANTS INC. ENTERPRISE
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Rogers Park One Day Surgery Center, Inc., Narjisha Thowfeek, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, Manish D. Pandya, D.C., 87th Street Rehab Clinic PLLC, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, Deen Health System LLC, M & R Rudra Incorporated d/b/a New Life Medical Center, Paulina Anesthesia, Inc., and RPAV Management DME Inc.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT XII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**AMS MEDICAL BILLING CONSULTANTS INC. ENTERPRISE**
**(Against Mohamed Sirajudeen a/k/a Mohamed Siraj, Rogers Park One Day Surgery Center, Inc., Narjisha Thowfeek, Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, Manish D. Pandya, D.C., 87th Street Rehab Clinic PLLC, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, Deen Health System LLC, M & R Rudra Incorporated d/b/a New Life Medical Center, Paulina Anesthesia, Inc., and RPAV Management DME Inc.)**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT XIII**
**COMMON LAW FRAUD**
**(Against all Defendants)**

(a)     AWARD Allstate's actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs, incurred in the detection of the Defendants' illegal conduct; and

(c)     GRANT any other relief this Court deems just and proper.

**COUNT XIV**
**ILLINOIS UNJUST ENRICHMENT**
**(Against all Defendants)**

(a)     AWARD Allstate's actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT any other relief this Court deems just and proper.

**COUNT XV**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Rogers Park One Day Surgery Center, Inc., Peterson Surgery Center LLC d/b/a Rogers Park Surgery Center, M & R Rudra Incorporated d/b/a New Life Medical Center, ARMV Shiva Medical Corporation d/b/a Advanced Medical Center, 87th Street Rehab Clinic PLLC, Deen Health System LLC, Paulina Anesthesia, Inc., and RPAV Management DME Inc.)**

(i)    DECLARE that the Count XV Defendants billed for medication, DME, services and procedures that were provided in violation of Illinois law;

(ii)   DECLARE that the Count XV Defendants charge for medication, DME, services and procedures that are unlawful;

(iii)  DECLARE that Allstate has no obligation to pay any pending, previously denied, and/or future claims submitted by the Count XV Defendants for such medication, DME, services, and procedures; and

(iv)   GRANT all other relief this Court deems just and proper.

**JURY TRIAL DEMAND**

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate North American Insurance Company, demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

-217-

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Nathan A. Tilden*

_____

Nathan A. Tilden
ntilden@ktmpc.com
Douglas D. McInnis
dmcinnis@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Fire & Casualty Insurance Company, and*
*Allstate North American Insurance Company*

Dated: May 5, 2026